UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| ALVIN GREENBERG, MICHAEL STEINBERG, and JULIE HANSON, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>            Defendant. | Case No. 2:21-cv-898<br><br>CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................4

III.    PARTIES .............................................................................................................5

        A.      Plaintiffs ..................................................................................................5

        B.      Defendant ...............................................................................................13

IV.     FACTUAL ALLEGATIONS .............................................................................13

V.      CHOICE OF LAW ALLEGATIONS .................................................................47

VI.     CLASS ACTON ALLEGATIONS .....................................................................47

VII.    CLAIMS FOR RELIEF ......................................................................................50

FIRST CAUSE OF ACTION  VIOLATION OF WASHINGTON CONSUMER
        PROTECTION ACT ("WCPA") (WASH. REV. CODE § 19.86) ......................50

SECOND CAUSE OF ACTION  NEGLIGENCE ........................................................53

THIRD CAUSE OF ACTION  UNJUST ENRICHMENT ...........................................54

PRAYER FOR RELIEF ................................................................................................55

JURY TRIAL DEMANDED .........................................................................................55

1      For their Class Action Complaint against Defendant Amazon.com, Inc. ("Amazon"),

2  Plaintiffs, on their own behalf and on behalf of all others similarly situated, allege as follows:

3                                    **I.     INTRODUCTION**

4      1.      With this action, Plaintiffs seek to hold Amazon accountable for its unlawful price

5  gouging during the COVID-19 pandemic.

6      2.      Throughout the pandemic, consumers have turned increasingly to online retailers, and

7  Amazon in particular, to fulfill their essential needs.  With medical experts warning about the ease of

8  infection in public settings, and "stay home" orders prevailing in most parts of the country,

9  consumers recognized during the pandemic that retail excursions can have perilous consequences for

10  themselves or loved ones, no matter what precautions are taken.  In this moment, Amazon's services

11  have never been more appealing.  Without venturing into public and risking exposure, and with just a

12  few clicks, Americans can purchase a wide range of consumer goods from Amazon that will be

13  delivered directly to their homes.

14      3.      Amazon's sales have never been higher, and since the COVID-19 pandemic began, its

15  sales in some categories (*e.g.*, home items) have increased ***more than 1,000 percent***.[1]

16  Correspondingly, Amazon's profits have skyrocketed.  Jeff Bezos's personal wealth increased by

17  $75 billion (or approximately $205 million per day) in 2020.[2]

18      4.      While Amazon has provided needed services during the pandemic, this does not place

19  it above the law.  Like every seller, Amazon has a legal obligation under Washington (and other)

20  laws to ensure that its pricing does not exploit consumers facing emergency conditions.  That is,

21  price gouging is not just immoral, it is a manifest violation of the Washington Consumer Protection

22  Act ("WCPA") and other state laws.

23

24

---

25      [1] *See* Dana Mattioli & Sebastien Herrera, *Amazon Struggles to Find Its Coronavirus Footing.*
26  *'It's a Time of Great Stress.'*, WALL STREET J. (Mar. 31, 2020), https://www.wsj.com/articles/
     amazon-struggles-to-find-its-coronavirus-footing-its-a-time-of-great-stress-11585664987.

27      [2] *See* Kate Taylor, *A chart shows how Jeff Bezos's net worth exploded by $75 billion in 2020,*
     *reaching $188 billion before he stepped down as Amazon's CEO*, BUS. INSIDER (Feb. 2, 2021),
28  https://www.businessinsider.com/amazon-ceo-jeff-bezos-net-worth-explodes-in-2020-chart-2020-12.

5.      To be sure, there is some price fluctuation in any dynamic market.  This, however, is not a case about ordinary price fluctuation.  It is about Amazon leveraging a pandemic to profit unfairly off consumers in real need.  Moreover, available data show that Amazon's price increases have been anything but normal.  Just by way of example, after COVID-19 was declared a nationwide public health emergency by the U.S. Department of Health & Human Services,[3] certain Amazon prices increased as follows:

- **Face Masks**: Increases up to *1,800 percent*, from $4.21 to $79.99;
- **Cold Remedies:** Increases up to *1,523 percent*, from $4.65 to $79.00;
- **Toilet Paper:** Increases up to *1,044 percent*, from $17.48 to $200;
- **Pain Reliever**: Increases up to *233 percent*, from $18.75 to $62.40;
- **Black Beans:** Increases up to *521 percent*, from $3.54 to $21.99;
- **Baking Soda**: Increases of more than *1,500 percent*, from $3.08 to $50.00;
- **Flour:** Increases up to *400 percent*, from $22.00 to $110.00;
- **Yeast:** Increases up to *625 percent*, from $7.02 to $50.95; and
- **Disinfectant Wipes:** Increases of more than *745 percent*, from $20.71 to $174.96.

6.      All of these (and many more) Amazon price increases are flagrantly unlawful under Washington law.  While the WCPA does not codify a specific threshold for price gouging, many states with comparable consumer-protection regimes set the bar at 10%.  *See, e.g.*, Cal. Penal Code § 396(b), Ark. Code § 4-88-303(a), W. Va. Code §46A-6J-3.  Others set it at 15%.  *See, e.g.*, Or. Admin R. 401.965(3). Others bar *any* price increase during a declared emergency.  *See* Haw. Rev. Stat. Ann § 127A-30(a)(1).  A bill being considered by Washington's legislature would render unlawful prices increases of 15% or more during a declared emergency.[4]

7.      While further Washington legislation may be informative, it is not required to hold Amazon accountable now.  As the Washington Attorney General has already recognized, charging

---

[3] *See* U.S. Dep't of Health & Human Servs., *Determination that a Public Health Emergency Exists* (dated Jan. 31, 2020, eff. Jan 27, 2020), available at: https://www.phe.gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx.

[4] *See* SB 5191, 67th Leg., Reg. Sess. (Wash. 2021), text and status available at https://app.leg.wa.gov/billsummary?BillNumber=5191&Year=2021 (last visited June 29, 2021).

excessive prices during the COVID-19 pandemic "is a violation of the Consumer Protection Act, RCW 19.86.020" as it currently exists.[5]  Invoking the WCPA, the Washington Attorney General has issued numerous cease-and-desist letters barring "price gouging during this emergency."[6]  Whether or not further price gouging legislation is enacted, courts likewise have an obligation to enforce the plain terms of the WCPA, including its freestanding prohibition on "unfair" acts or practices.  And price gouging to profit off a pandemic is about as "unfair" as a business practice can get.

8.      Prior to this action, Amazon has acknowledged price gouging on its platform during the pandemic, but it has deflected responsibility by blaming third-party suppliers who use Amazon to market their goods.  This public relations campaign has obscured two important facts.  *First*, when a third party markets a product on Amazon, Amazon controls virtually every aspect of the sale, including the price ceiling.  Thus, when Amazon sells products supplied by third parties at excessive prices, Amazon is responsible.  *Second*, and most brazenly, Amazon has inflated prices on its own inventory of products throughout the pandemic.  These are products Amazon supplies and sells directly to consumers.  For example, a study by the Public Interest Research Group ("PIRG") shows that, in February 2020, Amazon had increased prices on its own inventory by more than 50 percent on one-sixth of public health products used to combat COVID-19.[7] Later in September 2020, Public Citizen tracked Amazon pricing on 10 essential products that Amazon markets directly (e.g. masks, toilet paper, disinfectant, etc.) and identified markups from 48% to 1,010%.[8]  In short, while claiming to combat third-party price gouging, Amazon has jacked prices on its own inventory of products to profiteer off consumers in desperate need.

---

[5] *See* Bob Ferguson, Wash. Att'y Gen., Notices to Cease and Desist (Mar. 26, 2020), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_Releases/DemandLetters032620.pdf.

[6] *See id.*

[7] *See* U.S. Pub. Interest Research Grp. Ed. Fund, *Analysis: Coronavirus spike most surgical mask, sanitizer prices at least 50% on Amazon* (last updated July 28, 2020), https://uspirgedfund.org/resources/usf/analysis-coronavirus-spike-most-surgical-mask-sanitizer-prices-least-50-amazon.

[8] Public Citizen, *Prime Gouging : How Amazon Raised Prices to Profit from the Pandemic* at 12 (Sept. 2020), available at https://mkus3lurbh3lbztg254fzode-wpengine.netdna-ssl.com/wp-content/uploads/Prime-Gouging-report.pdf.

CLASS ACTION COMPLAINT - 3

9.      To safely obtain essential goods during the COVID-19 crisis, Plaintiffs Alvin Greenberg, Michael Steinberg, and Julie Hanson purchased items from Amazon at excessive and unfair prices that vastly exceeded the prices prevailing before the pandemic—increases ranging from 58% to 469%. Amazon profited unlawfully from these sales, and Plaintiffs were harmed commensurately. On behalf of themselves, and a proposed Class of consumers similarly situated, Plaintiffs seek damages, restitution, injunctive relief, and all other available remedies.

## II.      JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction because this is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which confers original jurisdiction on the federal courts for any class action in which any member of the Class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate $5,000,000, exclusive of interest and costs. Plaintiffs allege that the total claims of individual Class members in this action are in excess of $5,000,000, as required by 28 U.S.C. § 1332(d)(2) & (6). Plaintiffs are citizens of California, whereas Defendant is a citizen of Washington, satisfying 28 U.S.C. § 1332(d)(2)(A). Furthermore, the total number of Class members is greater than 100, as required by 28 U.S.C. § § 1332(d)(5)(B). Federal subject matter jurisdiction thus exists.

11.     Amazon has minimum contacts with the United States, this judicial district, and Washington. Amazon maintains its headquarters in Washington and has intentionally availed itself of the laws of Washington by conducting a substantial amount of business in the state. This Court accordingly has personal jurisdiction over Amazon.

12.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) because Amazon is headquartered and resides in this District. Venue is further appropriate in this district pursuant to the forum selection clause in Amazon's online "conditions of use," which are available when a consumer signs up for an Amazon account and makes purchases. The conditions provide that "[a]ny dispute or claim relating in any way to your use of any Amazon Service will be adjudicated in the state or Federal courts in King County, Washington, and you consent to exclusive jurisdiction and venue in these courts."

### III.   PARTIES

**A.   Plaintiffs**

13.    Plaintiff Alvin Greenberg, Ph.D., is 74 years old and resides in San Rafael, California. San Rafael is in Marin County.

14.    Dr. Greenberg is a practicing toxicologist. He served previously as Chair of the Bay Area Air Quality Management District Hearing Board, a Member of the California Occupational Health and Safety Standards Board (appointed by the governor), and Assistant Deputy Chief for Health, Cal-OSHA.

15.    Following U.S. Department of Health and Human Services' January 31, 2020 declaration of a national COVID-19 emergency, Marin County issued a Shelter-in-Place Order on March 16, 2020.[9] Consistent with prevailing guidance from health experts, the order instructed residents such as Dr. Greenberg to "self-isolate in their place of residence to the maximum extent feasible."[10] Marin County officials implored residents to leave their homes "as infrequently as possible and only for approved activities."[11] While discouraging avoidable excursions, Marin County officials reminded residents that they could still "go online, purchase items, and have them delivered to [their] home."[12] This guidance was reiterated by the California Department of Health, which on March 16, 2020, advised individuals over the age of 65, such as Dr. Greenberg, to "[r]emain at home until further guidance is issued" and to "[c]onsider on-line ordering for food and other supplies."[13]

---

[9] *See* Matt Willis, MD, MPH, Health Officer of the Cty. Of Marin, *Order of the Cty. Health Officer of the Cty. Of Marin to Shelter in Place* (Mar. 16, 2020), available at https://coronavirus.marinhhs.org/sites/default/files/Files/Shelter%20in%20Place/Shelter%20in%20Place%20Order%2016%20March%202020.pdf.

[10] *Id.*

[11] Marin Health & Human Servs., *Frequently Asked Questions*, https://coronavirus.marinhhs.org/faqs/en  (last visited June 29, 2021) (FAQ: "What can I do to slow the spread of COVID-19").

[12] *See id.* (FAQ: "Can I still order the things I need online from businesses and have them delivered to my home?").

[13] *See* Cal. Dep't of Pub. Health, *COVID-19 Public Health Guidance: Self-Isolation for Older Adults and Those Who Have Elevated Risk* (Mar. 16, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf.

CLASS ACTION COMPLAINT - 5

16.     Marin County renewed its Shelter-in-Place Order on March 31, 2020, expanding it to make social distancing mandatory.[14]  The Shelter-in-Place Order was further renewed by subsequent pronouncements, and California's statewide shelter-in-place order remained in effect until June 15, 2021.[15]

17.     On or around April 21, 2020, Dr. Greenberg spoke with his girlfriend, Julie Hoemke, who resides in San Jacinto, California. Ms. Hoemke lives with three of her children and a granddaughter who, at that time, was six months old. Consistent with guidance from public health officials, Ms. Hoemke had been regularly disinfecting the surfaces of her home to protect herself and family from COVID-19. She had been using bleach for this purpose but had run out of her supply. Ms. Hoemke visited and called multiple retailers in her vicinity—including grocery stores, Home Depot, Lowes, and Walmart—in hopes of securing a replacement supply of bleach. The retailers, however, were all sold out of bleach and other disinfectants.

18.     Hearing this, Dr. Greenberg endeavored to locate bleach that could be shipped to Ms. Hoemke. Dr. Greenberg did not, however, feel safe visiting retail outlets in and around his San Rafael home. COVID-19 was spreading at this time and at 74 years of age, and with asthma, Dr. Greenberg recognized that he was at heightened risk of experiencing complications should he come into contact with the virus. Heeding public health guidance, Dr. Greenberg instead looked online for a supplier of bleach. The only online retailer he could locate with any bleach in stock was Amazon, which on April 21, 2020, was selling three-bottle containers of Clorox Concentrated Germicidal Bleach for $58.19. From his professional training, Dr. Greenberg was generally aware that bleach is effective in combatting viruses. Dr. Greenberg had also reviewed the CDC's and EPA's websites to confirm as much. The particular Clorox product Dr. Greenberg located on Amazon features a higher concentrate of sodium hypochlorite, the active ingredient that kills viruses.

---

[14] *See* Lisa Santora, MD, MPH, Deputy Health Officer of the Cty. Of Marin, *Order of the Cty. Health Officer of the Cty. Of Marin to Shelter in Place* (Mar. 31, 2020), available at https://coronavirus.marinhhs.org/sites/default/files/2020-03/marin_final-superseding-shelter-in-place-order.pdf.

[15] *See Safely reopening California*, https://covid19.ca.gov/safely-reopening/ (last updated June 22, 2021).

1    19.    Dr. Greenberg recognized immediately that $58.19 was an exorbitant price for three

2  bottles of Clorox Concentrated Germicidal Bleach. But under the circumstances, he saw no

3  meaningful choice but to purchase it from Amazon. Even if this product could be obtained from

4  stores in his area, and there was no assurance of that given retail scarcity of COVID-combatting

5  products, as indicated by Ms. Hoemke's inability to find bleach at local retailers, Dr. Greenberg did

6  not feel safe venturing into retail outlets, nor would this have been consistent with public health

7  guidance. The only alternative was to wait in hopes that other online retailers would restock the

8  product, but it was unclear when (if ever) this would occur. At the time, Amazon itself purported to

9  only have six boxes of Clorox Concentrated Germicidal Bleach remaining. With COVID-19

10  spreading rapidly, and the safety of his girlfriend and family imperiled, Dr. Greenberg did not

11  believe that waiting was an option. Dr. Greenberg accordingly purchased the product at the listed

12  price of $58.19. Dr. Greenberg paid for the bleach out of pocket and has not been reimbursed.

13    20.    The price Dr. Greenberg paid for Clorox Germicidal Bleach vastly exceeded the price

14  that prevailed on Amazon prior to the pandemic. On January 31, 2020, when Health and Human

15  Services Secretary Alex M. Azar II declared a nationwide COVID-19 health emergency (effective

16  January 27, 2020), the specific product Dr. Greenberg purchased sold on Amazon for **$21.74**.[16] By

17  April 21, 2020, when Dr. Greenberg made his purchase, the price had jumped to **$58.19**, which

18  represents a ***168%*** increase above the January 31, 2020 price.[17]

26  _____

27    [16] *See* https://keepa.com/#!product/1-B06XZJH8XJ (last visited June 30, 2021).  For brevity,
links to specific product price-tracking websites are abbreviated to their URLs.

28    [17] *Id.*



21.     Plaintiff Michael Steinberg lives in Oakland, California, which is in Alameda County. Following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency, Alameda County declared a State of Emergency on March 1, 2020.

22.     To prevent a larger outbreak of COVID-19, on March 16, 2020, Alameda County issued a Shelter-in-Place Order, which instructed its citizens to "self-isolate in their places of residence to the maximize extent feasible."[18] On that same day, similar orders were issued by five surrounding Bay Area counties, as well as the City of Berkeley, with a total population exceeding six million people covered by the orders.  A California statewide shelter-in-place order remained in effect through June 15, 2021.

23.     While discouraging avoidable excursions, like in Marin County, Alameda County officials informed residents that they could still "go online, purchase items, and have them delivered to [their] home."[19] The Alameda County Interim Health Officer has explained that sheltering in place is necessary because of, among other things, "evidence of continued significant community

---

[18] Dr. Erica Pan, Interim Health Officer of the Cty. of Alameda, *Order of the County Health Officer to Shelter in Place* (Mar. 16, 2020), http://www.acgov.org/documents/Final-Order-to-Shelter-In-Place.pdf.

[19] *See* Alameda Cty. Health Care Servs. Agency, *Alameda County FAQs for Shelter in lace Order* at 21 (updated Apr. 29, 2020, eff. May 4, 2020), available at https://www.albanyca.org/home/showpublisheddocument/44444/637239184942130000 (FAQ: "Can I still order the things I need online from businesses and have them delivered to my residence?").

transmission of COVID-19 within the County and throughout the Bay Area," that "the virus can survive for hours to days on surfaces and be indirectly transmitted between individuals," "[b]ecause even people without symptoms can transmit the infection, and because evidence shows the infection is easily spread, gatherings and other direct or indirect interpersonal interactions can result in preventable transmission of the virus."[20]

24.    Consistent with these orders and prevailing guidance from medical experts, Mr. Steinberg limited trips outside the home during the COVID-19 pandemic. He also sought to prepare more meals at home to minimize contact with outside food vendors, which includes making his own bread.

25.    Although fearful when leaving his home, Mr. Steinberg during the pandemic has attempted to purchase yeast, a necessary ingredient for bread, at local grocery stores.  But at points during the pandemic, yeast has been unavailable or exceedingly difficult to procure.  John Heilman, vice president of yeast manufacturing for AB Mauri, makers of Fleischmann's Yeast, told USA Today that the two to three weeks of dry yeast buffer inventory Fleischmann's had on hand "was gone almost instantly" after the beginning of the COVID-19 pandemic, and estimated on April 23, 2020, that it would take approximately one to two months to get store shelves stocked again.[21]

26.    In April 2020, Mr. Steinberg was unable to locate yeast at local grocery stores and looked for supply on the internet. On April 3, 2020, Mr. Steinberg saw a sales listing for a two-pound pouch of Red Star Active Dry Yeast on Amazon for **$39.97**. He looked online at the website of another large retailer but could not find any yeast for sale.

27.    Mr. Steinberg was unable to find yeast elsewhere, he understood the government directives to shelter in place, and he recognized the importance of making food at home in the midst of the pandemic. Thus, he felt that he had no meaningful choice but to purchase yeast on Amazon and accept the terms Amazon was offering, and he did so.

---

[20] *See id.* at 3, ¶ 9.

[21] Jessica Guynn & Kelly Tyko, *Dry yeast flew off shelves during coronavirus pantry stocking. Here's when you can buy it again*, USA TODAY (updated Apr. 30, 2020), https://www.usatoday.com/story/money/food/2020/04/23/coronavirus-pantry-baking-yeast-shortage/3004274001/.

28.     Nonetheless, Mr. Steinberg was still very upset about the price of yeast on Amazon, a basic household staple, and believed that he was being exploited because there was nowhere else to buy it. So, in the week following his April 3, 2020 purchase, he complained to Amazon about the price and the apparent price gouging. He made multiple phone calls, but the calls got him nowhere. It seemed that each Amazon agent he spoke with had no idea what was going on, apart from noting his prior call and concern. They read from what seemed to be a script, which was nonresponsive to anything he was trying to communicate. When Mr. Steinberg complained about the price jump and pointed out that he believed the Amazon website tracks prices, a person he thinks was a supervisor said that he had no access to that information, and that it is up to another department to figure out whether a price is appropriate. Feeling frustrated but out of options, Mr. Steinberg kept the yeast and received no discount or rebate.

29.     The price Mr. Steinberg paid for Red Star Active Dry Yeast vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when Health and Human Services Secretary Alex M. Azar II declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mr. Steinberg purchased sold on Amazon for **$7.02**.[22]  By April 3, 2020, when Mr. Steinberg made his purchase, the price had jumped to **$39.97**, which represents a ***469%*** increase over the January 31, 2020 price.[23]

---

[22] *See* https://keepa.com/#!product/1-B005KR0MZG (last visited June 30, 2021).  The price for this product reached as high as $50.95 during the pandemic.

[23] *Id.*



30.     Plaintiff Julie Hanson lives in Diamond Springs, California, which is in El Dorado County.

31.     Following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national COVID-19 emergency, El Dorado County issued a Shelter-in-Place directive on March 19, 2020.[24] California's Governor Newsom issued a statewide Shelter-in-Place Order the same day.[25] As with the statewide directive, El Dorado County's Order was designed to ensure "that the maximum numbers of people self-isolate in their place of residence to the greatest extent feasible."[26] Action was needed, El Dorado County concluded, because of "evidence of increasing occurrence of COVID-19 in the surrounding counties and the State of California."[27] Officials warned in particular that individuals with underlying health conditions faced enhanced "risk for serious health complications, including death, from COVID-19."[28] El Dorado County's Shelter-

---

[24] *See* Nancy J. Williams, Public Health Officer, El Dorado Cty. Health & Human Servs. Agency, *Directive of the El Dorado County Public Health Officer Restricting Activities in Response to COVID-19 Outbreak* (Mar. 19, 2020). available at https://www.edcgov.us/Government/hhsa/ Documents/El%20Dorado%20-%20shelter-in-place%20directive%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.pdf, last visited July 1, 2020.

[25] *See* Cal. Exec. Order N-33-20 (Mar. 19, 2020), https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf, last visited July 1, 2020.

[26] *See* El Dorado Cty., *supra* note 24.

[27] *See id*.

[28] *See id*.

in-Place Order came on the heels of statewide guidance from the California Department of Health, which highlighted the "elevated risk" for health-compromised individuals and advised them to "[c]onsider on-line ordering for food and other supplies" to keep themselves and loved ones healthy.[29]

32.     Ms. Hanson is 57 years old and suffers from underlying health conditions, some of which heighten the risk she will experience adverse, and potentially fatal, consequences should she come in contact with the novel coronavirus. Ms. Hanson has Parkinson's disease and bronchiectasis, a lung condition that causes coughing due to scarred tissue in the bronchi, or the passages that let air into the lungs. Severe bronchiectasis can lead to respiratory and heart failure. Ms. Hanson was also in a head-on vehicle collision in 2018, which has impaired her mobility.

33.     Prior to the outbreak of COVID-19, Ms. Hanson was just beginning to regain mobility sufficient to shop outside her home. But as COVID-19 spread through California in February 2020, Ms. Hanson decided, particularly in light of her health conditions, that it was not safe for her to make retail excursions. This decision comported with public health guidance, including subsequent directives issued by El Dorado County and California health officials, regarding the need to self-isolate, particularly for persons with underlying health conditions. To meet her daily needs, and to provide for her family, Ms. Hanson turned to Amazon and the home delivery it offers. Since the outbreak of COVID-19, Ms. Hanson has purchased certain items from Amazon for herself, and others for daughters who live in their own residences and receive support from Ms. Hanson.

34.     On or around April 14, 2020, Ms. Hanson became aware that one of her daughters, Sabrina Gates, had acquired a kitten and was experiencing an outbreak of fleas in her own household. Ms. Gates lives with three young children, one of whom has Type 1 diabetes, a condition that increases the likelihood that COVID-19 will lead to serious health complications. Like her mother, Ms. Gates has generally stayed inside her home throughout the COVID-19 pandemic to protect herself and particularly her diabetic son.

---

[29] *See* Cal. Dep't of Pub. Health, *supra* note 13.

35.     Ms. Hanson undertook to locate products that might alleviate her daughter's flea infestation. Ms. Hanson found one such product—Zodiac Flea & Tick Spray—on Chewy.com, an online pet-supply retailer, but the product was not available for shipment. Ms. Hanson subsequently found the same product on Amazon and, on April 30, 2020, purchased it for the price of $14.19. Ms. Hanson paid out of pocket and has not been reimbursed.

36.     The price Ms. Hanson paid for Zodiac Flea & Tick Spray vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the U.S. Department of Health and Human Services declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Ms. Hanson purchased sold on Amazon for **$8.99.**[30]  By April 30, 2020, when Ms. Hanson made her purchase, the price had increased to **$14.19**, representing a *58%* increase over the January 31, 2020 price.[31]



**B.     Defendant**

37.     Defendant Amazon is a corporation organized and existing under the laws of Delaware, with its principal place of business in Seattle, Washington.  Amazon is the world's largest online retailer.

### IV.     FACTUAL ALLEGATIONS

### *Outbreak of COVID-19*

---

[30] *See* https://keepa.com/#!product/1-Bpara 001OVGJUO (last visited June 30, 2021)

[31] *See id.*

CLASS ACTION COMPLAINT - 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

38.     In late 2019, an outbreak of respiratory illness resulting from a novel coronavirus was first identified in Wuhan City, Hubei Province, China. That illness, now known as COVID-19, has spread across the world. COVID-19 has been designated a pandemic by the World Health Organization, the first pandemic resulting from a coronavirus. As of the date of this Complaint, more than 181 million confirmed cases of COVID-19 have been reported across the globe, and almost 4 million persons have died from their illness.[32]

39.     The first diagnosed case of COVID-19 in the United States was a Washington state resident who had traveled to Wuhan.[33]   That diagnosis occurred on January 21, 2020.  Within days there was a second diagnosis in Chicago and another in Orange County.[34]  Alarm spread rapidly within the public health community and population at large.  On January 23, the World Health Organization (WHO) confirmed that the coronavirus was being transmitted human-to-human, and recommended that "all countries should be prepared for containment, including active surveillance, early detection, isolation and case management, contract tracing and prevention."[35]   The following week, several cases of human-to-human transmission were confirmed in the United States.

40.     On January 31, the U.S. Department of Health and Human Services declared a public health emergency (effective January 27, 2020).[36]  At the same time, the U.S. imposed entry restrictions on foreign nationals and quarantined U.S. citizens who had been evacuated from Hubei

---

[32] *See* World Health Organization, *Coronavirus (COVID-19) Dashboard,* available at: https://covid19.who.int/ (last visited July 1, 2021).

[33] *See* Alan J. Stein, *First confirmed case of COVID-19 in the United States is diagnosed in Snohomish County on January 20, 2020,* HISTORYLINK.ORG (Apr. 20, 2020), https://historylink.org/File/21018.

[34] *See* Stacey Baca et al., *Coronavirus diagnosed in Chicago woman; 2nd case in US*, ABC 7 CHICAGO (Jan. 24, 2020), https://abc7chicago.com/coronavirus-chicago-in-ohare/5875738/.

[35] *See* Kyle Hicks, *3rd US case of new coronavirus confirmed in Orange County, California, officials say*, ABC 7 DENVER (updated Jan. 26, 2020), https://www.thedenverchannel.com/news/national/3rd-us-case-of-new-coronavirus-confirmed-in-orange-county-california-officials-say.

[36] *See* Dep't Health & Human Servs., Press Release, *Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus* (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html.

province.[37]  The virus, however, continued to spread rapidly, with new cases being reported across the country (and world).  Washington state was an early epicenter, with an outbreak occurring at a long-term care center in Kirkland, Washington.[38]

41.     Things took a particularly dire turn on February 26, when health officials confirmed that a California patient had tested positive for COVID-19 despite having no known exposure to the virus through travel or contact with an affected individual. This was the first confirmation that COVID-19 was being transmitted in the United States through "community spread," suggesting that untold numbers of citizens were also affected but asymptomatic or otherwise not being tested for COVID-19.

42.     On February 29, a Washington man was the first reported COVID-19 death.[39]  The virus continued to spread exponentially.  The CDC has reported that during a three-week stretch between late February and early March, COVID-19 cases in the U.S. "increased more than 1,000-fold."[40]  By March 17, COVID-19 had been detected in all 50 states,[41] and 91 people had died from COVID-19 in the U.S.[42]  Today, more than 600,000 people in the U.S. have died from COVID-19, and no aspect of American life has gone unchanged.[43]

### Emergency Declarations and Lockdowns

[37] *See* Alex Leary & Brianna Abbott, *U.S. Imposes Entry Restrictions Over Coronavirus*, WALL STREET J. (updated Jan. 31, 2020), https://www.wsj.com/articles/u-k-reports-first-coronavirus-cases-as-china-allies-limit-ties-11580467046.

[38] *See* Nicole Acevedo & Minyvonne Burke, *Washington state man becomes first U.S. death from coronavirus*, NBC NEWS (updated Feb. 29, 2020), https://www.nbcnews.com/news/us-news/1st-coronavirus-death-u-s-officials-say-n1145931.

[39] *Id.*

[40] *See* Anne Schuchat, MD, CDC COVID-19 Response Team, *Public Health Response to the Initiation and Spread of Pandemic COVID-19 in the United States*, February 24–April 21, 2020, 69 MORBIDITY & MORTALITY WEEKLY REP. (May 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e2.htm.

[41] *See* Associated Press, *West Virginia, the last US state without coronavirus, confirms 1st case*, FOX 8 NEWS (updated Mar. 17, 2020), https://myfox8.com/news/coronavirus/west-virginia-the-last-us-state-without-coronavirus-confirms-1st-case/.

[42] *See* Will Feuer, *US coronavirus cases surpass 5,000, up fivefold from a week ago*, CNBC (updated Mar. 17, 2020), https://www.cnbc.com/2020/03/17/us-coronavirus-cases-surpass-5000-up-fivefold-from-a-week-ago.html.

[43] *See* CDC, *Covid Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited July 1, 2021).

CLASS ACTION COMPLAINT - 15

43.     Following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national public health emergency related to COVID-19, state governments issued their own declarations of emergency.  The first statewide proclamation was issued by California Governor Gavin Newsom on March 19, 2020.[44]  Declarations in other states followed in rapid succession.

44.     Consistent with guidance from public health officials,[45] state governments typically coupled (or followed) their declarations of emergency with "stay home," "shelter-in-place," or other types of lockdown orders requiring residents to remain in their homes to the extent feasible.  By April 20, 2020, 45 states had some form of "stay home" order in place, covering approximately 95% of the U.S. population.[46] As the New York Times put it, "In a desperate race to stunt the spread of the coronavirus, millions of Americans have been asked to do what would have been unthinkable only a few months ago:  Don't go to work, don't go to school, don't leave the house at all, unless you have to."[47]

45.     Although the wording differed, state governments across political stripes echoed this resounding theme:

-     Gov. Eric J. Holcomb (Indiana): "Hoosiers, hunker down."[48]

---

[44] *See* Cal. Exec. Order N-33-20, *supra* note 25.

[45] *See, e.g.*, Ros Krasny et al., *Fauci says it's time to 'hunker down'*, ARKANSAS DEMOCRAT GAZETTE (updated Mar. 16, 2020), https://www.arkansasonline.com/news/2020/mar/16/fauci-says-it-s-time-to-hunker-down-202/ (National Institute of Allergy and Infectious Diseases (NIAID) director Dr. Fauci instructing Americans to "stay home" during March interviews with major news outlets); Dean Cole & Alison Main, *Top infectious disease expert4 doesn't rule out supporting temporary national lockdown to combat coronavirus*, CNN (updated Mar. 15, 2020), https://www.cnn.com/ 2020/03/15/politics/anthony-fauci-national-lockdown-bars-restaurants-cnntv/index.html (Dr. Fauci informing the public in March 2020 that he would "like to see a dramatic diminution of the personal interaction that we see").

[46] *See* Sara Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. TIMES (updated Apr. 20, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[47] *Id.*

[48] *See* IndyStar, *Indiana coronavirus updates: Governor orders Hoosiers to stay at home starting Wednesday* (updated Mar. 24, 2020), https://www.indystar.com/story/news/health/2020/03/23/ indiana-coronavirus-updates-indianapolis-covid-19-latest-news/2896967001/.

- Gov. Ned Lamont (Connecticut): "At this critical time it is essential that everyone just stay home."[49]

- Gov. Brad Little (Idaho): "Our health care and public safety workers are putting themselves in harm's way to respond to the coronavirus emergency, and we owe it to them to do our part by following this statewide stay-home order."[50]

- Gov. Larry Hogan (Maryland): "This is a deadly public health crisis—we are no longer asking or suggesting that Marylanders stay home, we are directing them to do so."

- Gov. Tim Walz (Minnesota): "We are asking you—because it is going to take cooperation and collaboration—stay home."[51]

- Gov. Bill Lee (Tennessee): "[B]ecause with personal liberty comes great personal responsibility, all Tennesseans must do their part by staying at home whenever possible."[52]

- Gov. Phil Scott (Vermont): "Vermonters are directed to stay at home or in their place of residence, leaving only for essential reasons."[53]

- Gov. Jay Inslee (Washington): "The more of us who stay home, the fewer of us who will be infected by COVID-19 and the more lives that will be saved."[54]

- Gov. Chris Sununu (New Hampshire): "We can't stress this enough – you should stay at your house unless absolutely necessary."[55]

- Gov. Michelle Lujan Grisham (New Mexico): "This is quite frankly an instruction to stay home."[56]

---

[49] *See* Gov. Ned Lamont, Press Release, *Governor Lamont Signs Executive Order Asking Connecticut Businesses and Residents: 'Stay Safe, Stay Home'* (Mar. 20, 2020), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/03-2020/Governor-Lamont-Signs-Executive-Order-Asking-Connecticut-Businesses-and-Residents-Stay-Safe.

[50] *See* State of Idaho, *Statewide Stay-Home Order* (updated Mar. 27, 2020), https://coronavirus.idaho.gov/statewide-stay-home-order/.

[51] *Stay at home: These states have issued orders for residents not to go out amid COVID-19 pandemic*, Fox 10 Phoenix (updated Apr. 9, 2020), https://www.fox10phoenix.com/news/stay-at-home-these-states-have-issued-orders-for-residents-not-to-go-out-amid-covid-19-pandemic

[52] *See* Tenn. Exec. Order No. 22 (Mar. 30,2020), https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee22.pdf.

[53] *See* VTDigger, *'Stay home,' Scott orders; relief measures pass,* Vt. Cmty. Newspaper Grp. (updated Apr. 2, 2020), https://www.vtcng.com/state_and_world/state_news/stay-home-scott-orders-relief-measures-pass/article_4a53daee-6f74-11ea-9b66-ef84b25aca39.html.

[54] *See* Austin Jenkins & Tom Banse, *Washington Gov. Inslee Announces Statewide Stay-At-Home Order*, OPB (Mar. 23, 2020), https://www.opb.org/news/article/washington-governor-inslee-coronavirus-stay-at-home-order/.

[55] *See See* Gov. Chris Sununu (@GovChrisSununu), Twitter (Mar. 26, 2020, 12:04 PM), https://twitter.com/govchrissununu/status/1243252555599265792.

[56] *See* Dan McKay (@mckaydan), Twitter (Mar. 23, 2020, 2:30 PM), https://twitter.com/mckaydan/status/1242201996028870656 .

CLASS ACTION COMPLAINT - 17

- Gov. Kate Brown (Oregon): "Stay Home, Save Lives."[57]

- Gov. Ralph Northam (Virginia): "Our message to Virginians is clear:  stay home."[58]

46.  Although statewide "stay home" orders generally authorized residents to shop outside the home for essential items if necessary, prominent health officials have encouraged consumers to shop online to protect themselves and arrest the spread of COVID-19.  In this regard, during the pandemic the CDC advised all Americans to "[o]rder food and other items online for home delivery or curbside pickup (if possible)," and to "[o]nly visit the grocery store, or other stores selling household essentials, in person when you absolutely need to," as "[t]his will limit your potential exposure to others and the virus that causes COVID-19."[59]  As for individuals sick with COVID-19, or potentially exposed, the CDC has instructed as follows:  "Do not leave your home, except to get medical care. Do not visit public areas."[60]

### *Hoarding and Retail Scarcity*

47.  The ability to shop outside the home was further curtailed, particularly in the early stages of the pandemic (but also in subsequent waves), by hoarding and retail scarcity.  As COVID-19 spread through the United States, and government efforts to combat the virus intensified, consumers began to stockpile essential items. By late January 2020, there were already reports that consumers were buying out retail stock of surgical masks and N95 respirators.[61] The research firm

---

[57] *See* Or. Exec. Order No. 20-12 (Mar. 23, 2020), https://govsite-assets.s3.amazonaws.com/ jkAULYKcSh6DoDF8wBM0_EO%2020-12.pdf.

[58] *See* Gov. Ralph S. Northam, Press Release, *Governor Northam Issues Statewide Stay at Home Order* (Mar. 30, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/ headline-855702-en.html.

[59] *See* Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Running Essential Errands* (updated July 30, 2020), https://stacks.cdc.gov/view/cdc/91347/ cdc_91347_DS1.pdf(last visited June 19, 2021).

[60] *See* Centers for Disease Control & Prevention, *What to Do If You Are Sick* (updated Mar. 17, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html..

[61] *See* Scottie Andrew, *There's been a run of surgical masks in the US because of the coronavirus scare. You don't need them, physicians say*, CNN (updated Jan. 28, 2020), https://www.cnn.com/2020/01/28/health/coronavirus-us-masks-prevention-trnd/index.html.

CLASS ACTION COMPLAINT - 18

Nielsen found that the sale of medical supplies and rubbing alcohol surged nearly twenty percent after the first reported case of COVID-19 in the United States on January 30.[62]

48.     In February and March, the reports of stockpiling, scarcity, and hoarding escalated. Nielsen found that sales of medical supplies and rubbing alcohol jumped 65 to 85 percent after there was a report of person-to-person transmission of COVID-19 on February 29. The firm also found that powdered milk sales jumped 85 percent, and rice and bean sales increased 25 to 37 percent.[63] For the week ending on March 7, 2020, compared to the same week a year earlier, sales of hand sanitizer, aerosol disinfectants, and multipurpose cleaners were 470, 385.3, and 148.2 percent higher, respectively.[64] In keeping, on March 18, a news station in the San Francisco Bay Area posted an article online, "Coronavirus impact: Why shoppers are hoarding toilet paper, supplies and groceries."[65] The article discussed "one of the most visible reaction[s] to the coronavirus – empty shelves at the grocery stores," and interviewed a local shopper who had gone to a large grocery store hoping to buy paper towels and toiletries, but came away with nothing.[66] The article's authors interviewed a marketing professor, Michal Strahilevitz, to explain the hoarding and scarcity: "when something becomes scarce, everybody wants more of it because they're afraid next time . . . [t]here won't be any toilet paper at all."[67]

49.     On March 13, 2020, the New York Times reported that shoppers were "flood[ing] stores across the nation and emptied shelves, looking to stockpile groceries and household items to

---

[62] *See* Michael Finney & Randall Yip, *Coronavirus impact: Why shoppers are hoarding toilet paper, supplies and groceries*, ABC 7 NEWS (Mar. 18, 2020), https://abc7news.com/hoarding-buying-frenzy-empty-grocery-shelves-toilet-paper-shortage/6025373/..

[63] *Id.*

[64] *See* Camila Domonoske & Avie Schneider, *Here's What's Been Flying Off Store Shelves*, NPR (Mar. 16, 2020), https://www.npr.org/2020/03/16/816404689/spiking-demand-for-sanitizer-canned-goods-leaves-stores-struggling-to-keep-up.

[65] *See* Finney & Yip, *supra* note 62.

[66] *Id.*

[67] *Id.*

CLASS ACTION COMPLAINT - 19

prepare for uncharted territory."[68] "They grabbed milk and aspirin, paper towels and spaghetti. Cans of soup and bottles of laundry detergent. Olive oil and sanitizing wipes. With futures suddenly thrust into the unknown, they did what felt reassuring: panic shop."[69]

50.     A second wave of COVID-19 cases in November 2020 brought a second wave of hoarding and retail scarcity.  On November 17, the New York Post reported that, "[w]ith COVID-19 cases surging across the US, panic buying is back in vogue — as evidenced by a sea of empty shelves in supermarkets across the nation in scenes reminiscent of earlier this year, according to reports."[70]

### ***Consumers Turn Increasingly to Online Purchasing, And Amazon in Particular***

51.     In response to retail shortages and to limit exposure to the coronavirus, more consumers have been doing their shopping online, increasing consumer demand and reliance on online retailers. According to a Nielsen survey, in mid-March 2020, when the concerns over COVID-19 transmission rapidly escalated, approximately "one-quarter of shoppers said they expected to shop online more frequently—or for the first time—to avoid germs in public places."[71] The data confirm that this has occurred. The following graph shows a large increase in March sales of consumer packaged goods ("CPG"), in store and online as compared to the same month a year prior, with an astonishing 91 percent increase for online sales. In the two weeks ending on March 21, upwards of 35 percent more people had shopped online for CPG items as compared with a typical week.[72]

---

[68] *See* Corina Knoll, *Panicked Shoppers Empty Shelves as Coronavirus Anxiety Rises*, N.Y. TIMES (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/nyregion/coronavirus-panic-buying.html.

[69] *Id.*

[70] *See* Yaron Steinbuch, *COVID-19 panic buying: Toilet paper, essentials fly off shelves again*, N.Y. POST (updated Nov. 17, 2020), https://nypost.com/2020/11/17/covid-19-panic-buying-toilet-paper-essentials-fly-off-shelves/.

[71] *See* NielsenIQ, *Tracking the unprecedented impact of COVID-19 on U.S. CPG shopping behavior* (Mar. 30, 2020), https://www.nielsen.com/us/en/insights/article/2020/tracking-the-unprecedented-impact-of-covid-19-on-u-s-cpg-shopping-behavior/.

[72] *See id.*

CLASS ACTION COMPLAINT - 20

U.S. CPG SALES HIGHLIGHT AN
UNPRECEDENTED CHANGE IN SHOPPER BEHAVIOR

Dollar percentage change vs. year-ago period

+ 91%

+ 45%

+ 29%

+ 9%

Week Ending 2/22    Week Ending 2/29    Week Ending 3/7    Week Ending 3/14

—— In Store    —— Online

Source: Nielsen Total US xAOC; Nielsen Ecommerce measurement powered by Rakuten

Copyright © 2020 The Nielsen Company

52.    Data released by the Commerce Department shows that, overall, U.S. online "sales hit $791.70 billion in 2020, up 32.4% from $598.02 billion in the prior year."[73]  As observers have noted, "[e]commerce thrived in 2020 because of store closures and shoppers' fear of contracting the coronavirus in public. And figures from Q1 2021 show that the coronavirus is still making an impact on retail spending. Online sales increased 39% year over year in Q1 2021, nearly triple the 14% increase in Q1 2020, and faster than Q3 2020 and Q4 2020."[74]

53.    An unprecedented demand on internet retailers has also led to product scarcity online, with some retailers out of stock and experiencing shipping problems, including large delays.[75] Consumers thus have become only more reliant on Amazon—the world's largest online retailer—for

---

[73] *See* Digital Commerce 360, *Coronavirus adds $105 billion to US ecommerce in 2020* (June 16, 2021), https://www.digitalcommerce360.com/article/coronavirus-impact-online-retail/.

[74] *See id.*

[75] *See* Katie Evans, *A viral surge: How the coronavirus is impacting shipping and delivery of online orders*, Digital Commerce 360 (Mar. 20, 2020), https://www.digitalcommerce360.com/ 2020/03/20/a-viral-surge-how-the-coronavirus-is-impacting-shipping-and-delivery-of-online-orders/.

essential consumer goods. Indeed, by July 2020, Amazon's sales accounted for **almost half of all U.S. retail e-commerce**.[76] By comparison, Amazon's nine largest competitors had only a 1.1 to 6.6 percent share.[77]

54.    Industry observers have universally recognized that Amazon saw "unprecedented demand amid widespread coronavirus-related shutdowns."[78] As one observer put it, with "millions of Americans ordered to remain home, Amazon is now, more than ever, a lifeline for essentials for millions of people rather than just a convenient option for online shopping."[79]  By April 2020, consumer spending on Amazon had increased nearly 100 percent over 2019.[80] Fueled by the pandemic, Amazon's sales increased $318.41 over 2020 as a whole, a 44.1% increase that eclipsed already bullish forecasts for Amazon's growth.[81]

55.    One reason Amazon has seen its sales increase is that it can supply essential goods that are not always available on retail shelves in the COVID-19 era.  And in terms of product diversity, Amazon sells twelve million products on the Amazon.com platform, with a particularly

---

[76] *See* eMarketer, *Amazon Now Has Nearly 50% of US Ecommerce Market* (July 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.

[77] *Id.*

[78] *See* Sergei Klebnikov, *Jeff Bezos Gets $6.4 Billion Richer As Amazon Stock Hits A New Record High*, Forbes (updated Apr. 14, 2020), https://www.forbes.com/sites/sergeiklebnikov/2020/04/14/jeff-bezos-gets-63-billion-richer-as-amazon-stock-hits-a-new-record-high/.

[79] *See* Jason Del Rey, *Amazon was already powerful. The coronavirus pandemic cleared the way to dominance.*, Vox (Apr. 10, 2020), https://www.vox.com/recode/2020/4/10/21215953/amazon-fresh-walmart-grocery-delivery-coronavirus-retail-store-closures.

[80] *See* Facteus, *Facteus Insight Report on Consumer Spending and Transactions (FIRST)* (June 3, 2020), https://first.facteus.com/reports/first-report-6-3-2020.

[81] *See* Blake Droesch, *Amazon dominates US ecommerce, though its market share varies by category*, Emarketer (Apr. 27, 2021), https://www.emarketer.com/content/amazon-dominates-us-ecommerce-though-its-market-share-varies-by-category.

large range of consumer goods.[82] In 2018, it was estimated that Amazon had 1.5 billion items listed for sale and over 200 million users.[83]

55.    On March 4, 2020, Senator Edward J. Markey (D-Massachusetts) wrote a letter to Amazon CEO Jeff Bezos about reports of price gouging on Amazon.[84] He stated that "[i]nternet-based retailers such as Amazon.com have a particular responsibility to guard against price gouging in current circumstances as consumers—who are finding the shelves of local brick-and-mortar stores bare, and who may wish to avoid venturing into crowded stores and shopping malls—turn to the internet."[85] Consistent with Senator Markey's observation, and heeding the official guidance described above, consumers have turned to Amazon—the world's dominant online retailer—to obtain the goods they require to survive and endure in these unprecedented times.

56.    Amazon's own policies further push online consumers to shop on its e-commerce platform, Amazon.com. For example, under its "fair pricing" provisions, Amazon penalizes third-party suppliers who allow their products to be sold for lower prices outside Amazon.com.[86] Amazon's "fair pricing" policy states "Amazon regularly monitors the prices of items on our marketplaces," and that if it sees "pricing practices" on the Amazon.com platform "that harm[] customer trust, Amazon can remove the Buy Box [*i.e.*, the coveted one-click-to-buy button[87]], remove the offer, suspend the ship option, or, in serious or repeated cases, suspend[] or terminat[e]

---

[82] *See* 60pi, *How Many Products Does Amazon® Carry?* (May 2016), https://0ca36445185fb449d582-f6ffa6baf5dd4144ff990b4132ba0c4d.ssl.cf1.rackcdn.com/ IG_360piAmazon_9.13.16.pdf,; Amazon store directory, https://www.amazon.com/gp/site-directory?ref_=nav_em_T1_0_2_2_36__fullstore, last visited July 2, 2020.

[83] *See* Neel Mehta et al., *Amazon changes prices on its products about every 10 minutes – here's how and why they do it*, BUSINESS INSIDER (Aug. 10, 2018), https://www.businessinsider.com/ amazon-price-changes-2018-8.

[84] *See* Sen. Edward J. Markey, Letter to Jeffrey P. Bezos, Amazon.com, Inc. (Mar. 4, 2020), https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf, last visited July 2, 2020.

[85] *Id.*

[86] *See, e.g.*, Guadalupe Gonzalez, *You're No Longer Required to Sell Products for Less on Amazon. The Problem? If You Don't, You've Got Another Penalty Coming*, INC. (Mar. 13, 2019), https://www.inc.com/guadalupe-gonzalez/amazon-removes-price-parity-not-fair-price-rule-third-party-sellers-antitrust-violations.html.

[87] *See infra*, ¶¶ 64, 66.

selling privileges."[88] One of the pricing practices Amazon identifies as "harmful" to customer trust is "[s]etting a price on a product or service that is significantly higher than recent prices offered *on or off* Amazon."[89]

57.     Under the "fair pricing" provision, "[a]ny single product or multiple products packages must have a price that is equal to or lower than the price of the same item being sold by the seller on other sites or virtual marketplaces."[90] The "fair pricing" provision "applies to both the individual product price as well as the collective price that the item or items are being sold for."[91] Amazon's "fair pricing" policy is in effect no different than its former explicit "price parity" (*i.e.*, platform most favored nation or "PMFN") provision, and ensures that Amazon's prices are equal to or better than prices on competing e-commerce sites. With this policy in place, prices on Amazon are generally favorable to online alternatives, further driving customers to Amazon during the COVID-19 pandemic.

### *Amazon Raised Prices Excessively During the COVID-19 Pandemic*

58.     As the world's largest online retailer, Amazon maintains its own inventory of products, which it sells directly to consumers across the country. These Amazon-supplied products account for approximately 32 percent of the revenue from of all products sold on Amazon.[92] In addition, Amazon sells products provided by third-party suppliers. These third-party product sales account for approximately 68 percent of the sales revenue on the Amazon.com platform.[93]

59.     As the COVID-19 pandemic spread, Amazon's prices for many essential goods spiked dramatically. In his March 4, 2020 letter to Amazon CEO Jeff Bezos, Senator Markey described "disturbing news reports of coronavirus-inspired price gouging on Amazon.com,"

---

[88] *See* Amazon, *Amazon Marketplace Fair Pricing Policy*, https://sellercentral.amazon.com/gp/ help/external/G5TUVJKZHUVMN77V (last visited July 1, 2021).

[89] *Id.* (emphasis added).

[90] *See* Feedvisor, *Amazon Pricing Policy*, https://feedvisor.com/university/amazon-pricing-policy/ (last visited July 1, 2021).

[91] *Id.*

[92] *See* eMarketer, *supra* note 76.

[93] *Id.*

CLASS ACTION COMPLAINT - 24

including that bottles of Purell hand sanitizer, "typically sold for less than $10 per box," were "listed at $400," and similarly inflated prices existed for face masks.[94] Senator Markey explained that, as "first steps," Amazon had announced the prior week that it had removed listings for price gouging and reiterated that third-party suppliers must comply with Amazon's "fair pricing policies," but that there had been "continued reports of price gouging and a lack of transparency," which left consumers exposed to unfair trade practices.[95] He referenced a third-party Amazon supplier whose goods were sold on Amazon and described Amazon's enforcement policy as "haphazard."[96]

60. On March 11, 2020, the United States Public Interest Research Group Education Fund ("PIRG") published a study showing that prices for half of certain public-health products sold on Amazon—particularly, products in high demand during the COVID-19 crisis—had increased by more than 50 percent in February above their 90-day average.[97] These price increases were not limited to products supplied by third parties. Of the essential products PIRG evaluated, nearly one in six supplied by Amazon itself increased in price by more than 50 percent above the 90-day average.

61. Referencing the PIRG study, attorneys general from 33 states sent Amazon a letter on March 25, 2020, calling on Amazon to eliminate price gouging on its platform. The attorneys general, including Washington's, noted that "[a]s COVID-19 spreads throughout the country, it is especially important unscrupulous sellers do not take advantage of Americans by selling products at unconscionable prices."[98] The letter implored Amazon to take action to abide by and enforce "the nation's consumer protection laws."[99]

62. Other industry observers have analyzed Amazon's pricing data and concluded that Amazon "doubled its own prices on essential goods as the COVID-19 pandemic grew between early

---

[94] *See* Markey, *supra* note 84.

[95] *Id.*

[96] *Id.*

[97] *See* U.S. Pub. Interest Research Grp. Ed. Fund, *supra* note 7.

[98] *See* Letter from 33 state attorneys general to Jeff Bezos (Mar. 25, 2020), https://www.attorneygeneral.gov/wp-content/uploads/2020/03/03_25_2020_Multistate-letter.pdf.

[99] *Id.*

CLASS ACTION COMPLAINT - 25

January and mid-March."[100] At one point in March, observers noted, Amazon "listed a four-pack of

its own brand of toilet paper for $72."[101] Consumers confirmed these unconscionable prices,

reposting the listings online hoping to warn others that Amazon itself was "participating in price

gouging":[102]



63.     A September 2020 study by Public Citizen confirmed that, "[w]hile the initial media

and law enforcement focus of price gouging was on third-party sellers, . . . Amazon is directly selling

items at significantly above the regular market price despite publicly stating that the company is

---

[100] *See* Adam Walser, *Data shows Amazon raised prices during pandemic alongside sellers accused of price gouging*, ABC 10 NEWS (updated Mar. 28, 2020), https://www.10news.com/news/coronavirus/data-shows-amazon-raised-prices-during-pandemic-alongside-sellers-accused-of-price-gouging.

[101] *Id.*

[102] *See* u/cpotter, *Amazon themselves participating in price gouging. $72 for toilet paper.*, REDDIT (Mar. 14, 2020), https://www.reddit.com/r/mildlyinfuriating/comments/fiuwuo/amazon_themselves_participating_in_price_gouging/.

fighting price gouging."[103]  Public Citizen identified pandemic price increases by Amazon on its own inventory that ranged from 48% to 1,010%.[104]  The study concluded that "Amazon has misled the public, law enforcement, and policymakers about price increases during the pandemic."[105]

64.     Although certain offending listings have been removed, Plaintiffs' independent investigation has confirmed that Amazon has sold products at unlawfully inflated amounts during the COVID-19 crisis, including before and after Amazon claimed to have cracked down on price gouging, and Amazon continues to do so. Moreover, these price increases occurred both on products supplied by third parties and on products supplied by Amazon. Unconscionable examples abound, starting with price increases Amazon imposed on its own inventory of products:

- **Aleve Back & Muscle Pain Tablet, Pain Reliever**: Increased *233 percent*, from $18.75 to $62.40, immediately after the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[106]



---

[103] Public Citizen, *supra* note 8, at 12.

[104] *Id.*

[105] *Id.* at 4.

[106] *See* https://camelcamelcamel.com/product/B07WDK2Z85 (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B07WDK2Z85 (last visited June 30, 2021).

- **Curad Alcohol Prep Pads:** Increases of more than **_157 percent_**, from less than $7 to $17.99, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[107]



- **North 760008A Silicone Full Facepiece Respirators – Face Piece Only:** Increases of **_61 percent_**, from $169.02 to $271.79, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[108]



[107] *See* https://camelcamelcamel.com/product/B00KOSP454 (last visited June 30, 2021).

[108] *See* https://camelcamelcamel.com/product/B00142BRF0 (last visited June 30, 2021); https://keepa.com/#!product/1-B00142BRF0 (last visited June 30, 2021).

- **Faraon Black Beans, 4 lb:** Increases up to ***166 percent***, from $4.98 to $13.26, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[109]



- **Cold-EEZE Cold Remedy Lozenges Honey Lemon:** Increases of ***111 percent***, from $4.68 to $9.86 following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[110]



---

[109] *See* https://camelcamelcamel.com/product/B07BBW3N81 (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B07BBW3N81 (last visited June 30, 2021).

[110] *See* https://camelcamelcamel.com/product/B000KOPX4O (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B000KOPX4O (last visited June 30, 2021).

- **Lysol Disinfecting Wipes:** Increases exceeding *86 percent*, from less than $12 to $22.36, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[111]



- **Germ Guardian Plugable Air Purifier & Sanitizer:** Increases of *91 percent*, from $34.99 to $66.99, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[112]



---

[111] *See* https://camelcamelcamel.com/product/B00Q70RCW6 (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B00Q70RCW6 (last visited June 30, 2021).

[112] *See* https://camelcamelcamel.com/product/B000G2BESO (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B000G2BESO (last visited June 30, 2021).

65.     Additional excessive price increases on Amazon's own inventory of products following the U.S. Department of Health and Human Services' declaration of a national emergency include, but are not limited to, the following:

| OTHER PRICE INCREASES ON AMAZON INVENTORY DURING THE COVID-19 PANDEMIC | |
|---|---|
| **PRODUCT** | **PRICE INCREASE** |
| Clorox Hydrogen Peroxide Disinfecting Wipes | *217%*[113] |
| Cottonnell Flushable Wet Wipes | *156%*[114] |
| Dynarex Alcohol Prep Pad | *122%*[115] |
| GoYoga Yoga Mat | *~99%*[116] |
| Hibiclens Antibacterial / Antiseptic Skin Cleanser | *97%*[117] |
| Aleve Arthritis Cap Pain Relief | *~80%*[118] |
| Spectrum Essential Organic Ground Flaxseed | *66%*[119] |
| StarKist Chunk Light Tuna in Water | *59%*[120] |
| Meyenberg Whole Powdered Goat Milk | *57%*[121] |
| Ice Mountain 199% Natural Spring Water | *54%*[122] |
| Medline Iodine Pads | *~52%*[123] |

---

[113] *See* https://camelcamelcamel.com/product/B00K3U1B64 (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B00K3U1B64 (last visited June 30, 2021).

[114] *See* https://camelcamelcamel.com/product/B07B46WWN2 (last visited July 4, 2020).  Price increase estimated based on data available July 4, 2020.  Pricing history for this product is no longer available on camelcamelcamel.com.

[115] *See* https://keepa.com/#!product/1-B005BFL0RQ (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B005BFL0RQ (last visited June 30, 2021).

[116] *See* https://camelcamelcamel.com/product/B01IZDFWY2 (last visited June 30, 2021).

[117] *See* https://keepa.com/#!product/1-B00EV1D79A (last visited June 30, 2021); https://camelcamelcamel.com/product/B00EV1D79A (last visited June 30, 2020).

[118] *See* https://camelcamelcamel.com/Aleve-Arthritis-Naproxen-Reliever-Headache/product/B07ZV5V19T (last visited June 30, 2021).

[119] *See* https://keepa.com/#!product/1-B00DOKFLYI (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B00DOKFLYI (last visited June 30, 2021).

[120] *See* https://keepa.com/#!product/1-B00FWUO2IE (last visited June 30, 2021).

[121] *See* https://keepa.com/#!product/1-B004K69OMU (last visited June 30, 2021); https://camelcamelcamel.com/product/B004K69OMU (last visited June 30, 2021).

[122] *See* https://keepa.com/#!product/1-B01KCNJHYO (last visited June 30, 2021); *see also* https://camelcamelcamel.com/Ice-Mountain-Natural-8-ounce-plastic/product/B01KCNJHYO (last visited June 30, 2021).

[123] *See* https://camelcamelcamel.com/product/B075KKP2BR (last visited June 30, 2021).

| | |
|---|---|
| KIND Bars, Dark Chocolate Nuts & Sea Salt | *36%*[124] |
| Tide PODS Free and Gentle Laundry Detergent | *30%*[125] |
| 3M Full Facepiece Reusable Respirator 6700 | *22%*[126] |

66.     In addition to increasing prices on its own inventory during the COVID-19 pandemic, Amazon sold third-party-supplied products at vastly inflated prices and, by taking a share of the transaction proceeds, profited from the excess. Just by way of example:

- **Disposable 3-Layer Masks:** Increase of ***1,800 percent***, from $4.21 to $79.99, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[127]



[124] *See* https://keepa.com/#!product/1-B07PMTGM3C (last visited June 30, 2021); https://camelcamelcamel.com/product/B07PMTGM3C (last visited June 30, 2021).

[125] *See* https://keepa.com/#!product/1-B07JMK7STT (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B07JMK7STT (last visited June 30, 2021).

[126] *See* https://keepa.com/#!product/1-B007JZ1K1C (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B007JZ1K1C (last visited June 30, 2020).

[127] *See* https://camelcamelcamel.com/product/B07W13JQW9 (last visited June 30, 2021).

- **Arm & Hammer Pure Baking Soda, 5 lb.**: Increase of ***1,523 percent***, from $3.08 to $50.00 following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[128]



- **Dynarex Corporation Surgical Procedure Masks**: Increase of ***376 percent***, from $11.71 to $55.78, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[129]



---

[128] *See* https://keepa.com/#!product/1-B00HNSJSX2 (last visited June 30, 2021).

[129] *See* https://camelcamelcamel.com/Dynarex-Corporation-2201-50-Surgical-Procedure/product/B00QO4MKN6 (last visited June 30, 2021).  Base price of $11.71 identified on camelcamelcamel.com as of July 4, 2020.

- **Disposable Earloop Face Masks**: Increases exceeding ***500 percent***, from less than $20 to $120, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[130]



- **Cold-EEZE Cold Remedy Lozenges Honey Lemon:**  Increases of ***1,599 percent***, from less than $4.65 to $79.00, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[131]



---

[130] *See* https://camelcamelcamel.com/product/B078718WVB (last visited June 30, 2021).  Base price of less than $20 identified on camelcamelcamel.com as of July 4, 2020.

[131] *See* https://keepa.com/#!product/1-B000KOPX4O (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B000KOPX4O (June 30, 2021).

- **Goya Black Beans Dry 14 oz.:** Increases up to **521 percent**, from $3.54 to $21.99, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[132]



- **King Arthur Flour:** Increases up to **400 percent**, from $22.00 to $110.00, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[133]



---

[132] *See* https://keepa.com/#!product/1-B00IMLRH9G (last visited June 30, 2021). Amazon also sold its own inventory of this product in 2020 at prices up to $14.47, roughly four times the price prevailing prior to the pandemic. *See id.*

[133] *See* https://camelcamelcamel.com/product/B078P9TBNW (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B078P9TBNW (last visited June 30, 2021).  Amazon sold its own inventory of this product during 2020 at prices exceeding $70, roughly three times the pre-pandemic price.  *See* https://camelcamelcamel.com/product/B078P9TBNW (last visited June 30, 2021).

- **Logitech HD Pro Webcam C920:** Increase of at least *423 percent*, from less than $65.99 to $345, following the U.S. Department of Health and Human Services' January 31, 2020 declaration of a national emergency.[134]



67.    Additional excessive price increases on third-party supplied Amazon sales include, but are not limited to, the following:

| OTHER PRICE INCREASES ON THIRD-PARTY SUPPLIED PRODUCTS DURING THE COVID-19 PANDEMIC | |
|---|---|
| **PRODUCT** | **PRICE INCREASE** |
| Quilted Northern Ultra Plush Toilet Paper 18 Rolls | *1,044%*[135] |
| Nishiki Medium Grain Rice | *880%*[136] |
| Lysol Disinfecting Wipes | *~745%*[137] |

---

[134] *See* https://camelcamelcamel.com/product/B006JH8T3S (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B006JH8T3S (last visited June 30, 2021).

[135] *See* https://keepa.com/#!product/1-B07F1KLYVH (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B07F1KLYVH (last visited June 30, 2021).

[136] *See* https://keepa.com/#!product/1-B00852ZN2U (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B00852ZN2U (last visited June 30, 2021).

[137] See https://keepa.com/#!product/1-B00Q70RCW6 (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B00Q70RCW6 (last visited June 30, 2021).

| | |
|---|---|
| Advil Coated Tablets Pain Reliever and Fever Reducer | *656%*[138] |
| Curad Alcohol Prep Pads | *542%*[139] |
| StarKist Chunk Light Tuna in Water | *517%*[140] |
| Kraft Easy Mac Microwavable Macaroni and Cheese | *485%*[141] |
| Barilla Pasta, Spaghetti | *381%*[142] |
| Planters Salted Peanuts (48 Pack) | *368%*[143] |
| Almond Milk | *330%*[144] |
| Kraft Macaroni & Cheese | *315%*[145] |
| Bounty Select-A-Size Paper Towels | *313%*[146] |
| Chef Boyardee, Spaghetti & Meatballs | *295%*[147] |
| Asian Best Jasmine Rice | *255%*[148] |
| Raven Powder-Free Disposable Black Nitrile 6 Mi. Gloves | *214%*[149] |
| Better Than Bouillon Organic Chicken Base | *119%*[150] |

---

[138] *See* https://keepa.com/#!product/1-B0000VLK4O (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B0000VLK4O (last visited June 30, 2021).

[139] *See* https://keepa.com/#!product/1-B00KOSP454 (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B00KOSP454 (last visited June 30, 2021).

[140] *See* https://keepa.com/#!product/1-B00FWUO2IE (last visited June 30, 2021). https://camelcamelcamel.com/product/B00FWUO2IE (last visited June 30, 2021).

[141] *See* https://keepa.com/#!product/1-B005ECO3H0 (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B005ECO3H0 (last visited June 30, 2021).

[142] *See* https://keepa.com/#!product/1-B00WBGKJPW (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B00WBGKJPW (last visited June 30, 2021).

[143] *See* https://keepa.com/#!product/1-B004TPU7LO (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B004TPU7LO (last visited June 30, 2021).

[144] *See* https://keepa.com/#!product/1-B07HL1NRGQ (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B07HL1NRGQ (last visited June 30, 2021).

[145] *See* https://keepa.com/#!product/1-B011W21U0I (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B011W21U0I (last visited June 30, 2021).

[146] *See* https://keepa.com/#!product/1-B010OW4KMW (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B010OW4KMW (June 30, 2021).

[147] *See* https://keepa.com/#!product/1-B004XVZG1U (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B004XVZG1U (last visited June 30, 2021).

[148] *See* https://keepa.com/#!product/1-B019VPL9OK (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B019VPL9OK (last visited June 30, 2021).

[149] *See* https://keepa.com/#!product/1-B002XXO5US (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B002XXO5US (last visited June 30, 2021).

[150] *See* https://keepa.com/#!product/1-B00415IRQO (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B00415IRQO (last visited June 30, 2021).

| Kirkland Signature Dried Cherries, 20 Ounce | *109%*[151] |
|---|---|
| Elder Berry Whole, dried 1lb | *67%*[152] |
| Kirkland Signature Ibuprofen Liquid Softgels | *66%*[153] |

### *Amazon is Responsible for Unlawful Price Increases on All Products Sold on its Platform*

68.    Amazon is accountable for unlawfully increasing the prices on its own inventory of products sold or offered to consumers during the COVID-19 crisis. Amazon is also legally responsible for price gouging on the third-party products it markets to consumers. Far from serving as a passive intermediary, Amazon controls the sale and marketing of all third-party products on its platform and receives a portion of the transaction proceeds, typically around 15 percent of the sales price (in addition to assessing recurring fees on third-party suppliers).[154]

69.    Amazon's control over third-party products extends to pricing. For certain third-party products, Amazon retains complete control of the prices at which they are offered. In particular, third-party suppliers who enroll in Amazon's "Sold by Amazon" ("SBA") program are guaranteed a "hands off the wheel selling experience," through which Amazon retains absolute discretion to price and reprice third-party inventory however Amazon sees fit. In the SBA program, the third-party supplier is guaranteed revenue from the sale of its product on Amazon.com based on the Minimum Gross Proceeds ("MGP") price, which Amazon sets unilaterally. Moreover, whatever the MGP price may be, *the price listed for and sold to the Amazon consumer* is set solely by Amazon, and may be more or less than the MGP price—it is controlled by Amazon.[155]

---

[151] *See* https://keepa.com/#!product/1-B004CSGRS0 (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B004CSGRS0 (last visited June 30, 2021).

[152] *See* https://keepa.com/#!product/1-B076JMVSW5 (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B076JMVSW5 (last visited June 30, 2021).

[153] *See* https://keepa.com/#!product/1-B000VK2QPQ (last visited June 30, 2021); *see also* https://camelcamelcamel.com/product/B000VK2QPQ (last visited June 30, 2021).

[154] *See* Dave Hamrick, *Amazon FBA Fees: How They Work and How to Profit as a Seller*, JUNGLESCOUT (Mar. 24, 2021), https://www.junglescout.com/blog/amazon-fba-fees/.

[155] *See* John Robb, *The Amazon SBA Program (aka Sold by Amazon.com)*, ECOMCREW (Jan. 2020), https://www.ecomcrew.com/the-amazon-sba-program-aka-sold-by-amazon/.

CLASS ACTION COMPLAINT - 38

70.     In other cases involving "large or strategic" third-party suppliers, Amazon also negotiates all pricing terms,[156] or negotiates most-favored-nation protections assuring that third-party suppliers do not undercut Amazon's prices when offering their products through other retail outlets.[157]

71.     Amazon also offers third-party suppliers "Automated Pricing" services, whereby Amazon will automatically adjust the prices for third-party supplied products based on preset "rules" Amazon makes available to the suppliers.[158] With Automated Pricing, Amazon generally adjusts the pricing of third-party products to match or stay in some relationship to competitor prices.[159] This service coordinates pricing across Amazon's platform. If competitive benchmarks increase for any reason—including price gouging—Amazon adjusts all automatically priced products accordingly across its ecosystem. If Amazon were concerned that certain products supplied by third parties were being inflated compared to pre-emergency prices, it could have turned off its automatic repricing software that set prices for specific products and sales beyond lawful limits.

72.     Even in instances where third-party suppliers retain some authority to set prices, Amazon establishes the price ceiling and retains the ultimate right to reject a price. As discussed previously, Amazon has a "fair pricing policy" pursuant to which it "regularly monitors the prices" set by third-party suppliers.[160] If Amazon identifies a price it considers too high relative to other prices (on or off Amazon's platform), Amazon may, among other things, remove the offer or suspend the seller.[161] Amazon may also remove the product from the "Buy Box" (discussed *infra*),

---

[156] *See Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing of the H. Subcomm. on Antitrust, Commercial, & Admin. Law, Comm. on the Judiciary,* 116th Cong. 23 (July 16, 2019) (responses of Amazon to Questions for the Record), https://docs.house.gov/meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf.

[157] *See id.* at 1.

[158] *See* Amazon, *Create a Pricing Rule,* https://sellercentral.amazon.com/gp/help/external/help-page.html?itemID=201995750 (last visited July 1, 2021).

[159] *See id.*

[160] *See* Amazon Marketplace Fair Pricing Policy, *supra* note 88.

[161] *See id.*

CLASS ACTION COMPLAINT - 39

the vehicle through which nearly all Amazon products are sold.[162] Amazon also polices the price ceiling by suggesting that third-party sellers lower their prices.[163] In other instances, Amazon will unilaterally reduce the price of third-party supplied products by providing the consumer with a "discount, which appears as a credit" in the consumer's account.[164] These "discounts" are provided exclusively by Amazon, not the third-party supplier.

73.    Beyond pricing, Amazon controls all other aspects of transactions involving third-party supplied products.  Consumers who purchase third-party products generally have no direct interaction with the third-party suppliers. Amazon promotes the products on its website, the contents of which Amazon controls entirely. Pursuant to the Amazon Services Business Solutions Agreement, which third-party suppliers are required to sign to have their products sold on Amazon.com, "Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including [a third-party supplier's] use of the same. Amazon may assign any of these rights or delegate any of its responsibilities."[165] The Agreement also grants Amazon a royalty-free, non-exclusive, worldwide right and license to commercially or non-commercially exploit in any manner the information provided by third-party suppliers.[166]

74.    When a consumer purchases a third-party supplied product, Amazon collects the order, shipping, and payment information from the customer, and it processes all payments. Amazon maintains the right to use mechanisms to rate, or allow shoppers to rate, these products and suppliers and to make the ratings publicly available, which it frequently does at the time the consumer is considering purchase.[167]

---

[162] *See id.*; *see also* H. Subcomm. on Antitrust, Comercial, & Admin. Law, *supra* note 156, at 23.

[163] *See* H. Subcomm. on Antitrust, Comercial, & Admin. Law, *supra* note 156, at 1–2.

[164] *See id.* at 25.

[165] *See* Amazon, *Amazon Services Business Solutions Agreement* at S-6, https://sellercentral.amazon.com/gp/help/external/G1791 (last visited July 1, 2021).

[166] *See id*. at 4.

[167] *See id.* at S.1.2.

CLASS ACTION COMPLAINT - 40

75.     Most third-party supplied products sold by Amazon are "Fulfilled by Amazon" or "FBA." This means Amazon warehouses the products at its own storage facilities. Amazon maintains electronic records tracking this inventory, which it can commingle with its own.[168] When a customer orders an FBA product, Amazon packages and ships the product directly, while handling customer service aspects of the transaction.[169] Amazon handles returns and reserves the right to fulfill customer returns with *any* "returned Amazon Fulfillment Units."[170] Amazon unilaterally determines which products may participate in the FBA program.[171]

76.     Amazon also reserves "sole discretion" to "cancel[]" listings of third-party suppliers' products or "remov[e]" suppliers' listing privileges for violation of Amazon policies,[172] to permanently "withhold any payments" to suppliers for engaging in, *inter alia*, "illegal activity" or repeated violations of Amazon's "Program policies,"[173] and to "accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of customers."[174] Amazon prohibits third-party suppliers from sending unsolicited communications to customers, mandates that all communications must be sent through a service provided on the Amazon platform, and Amazon keeps a record of all correspondence using this service.[175]

---

[168] *See id.* at F-4.

[169] *See* JungleScout, *The State of the Amazon Seller 2021* at 14, available for download at: https://www.junglescout.com/amazon-seller-report/ (last visited July 1, 2021); *see also generally* Amazon Services Business Solutions Agreement, Fulfillment By Amazon Service Terms, *supra* note 165.

[170] *See* Amazon Servs. Bus. Sols. Agmt., *supra* note 165, at F-6.2.

[171] *See id*. at F-1.

[172] *See* Amazon, *Listing Restrictions*, https://sellercentral.amazon.com/gp/help/external/ 200832300 (last visited July 1, 2021).

[173] *See* Amazon Servs. Bus. Sols. Agmt., *supra* note 165, at 2.

[174] *See* id. at S-2.2.

[175] *See* Amazon, *Selling Policies and Seller Code of Conduct*, https://sellercentral.amazon.com/ gp/help/external/help.html?itemID=G1801 (last visited July 1, 2021); Amazon, *Buyer-Seller Messaging Service Overview*, https://sellercentral.amazon.com/gp/help/external/ help.html?itemID=202125900 (last visited July 1, 2021). Amazon also requires that its third-party suppliers release it and agree to indemnify, defend, and hold it harmless against any claim, loss, damage, settlement, cost, expense, or other liability arising from, *inter alia*, sales of the suppliers' products. *See* Amazon Servs. Bus. Sols. Agmt., *supra* note 165, at 6.1.

CLASS ACTION COMPLAINT - 41

77.    Amazon also controls the entire "shopping experience" on its platform, using proprietary ranking mechanisms to direct consumers to third-party products of Amazon's choosing. When a consumer searches for a generic product on Amazon—for example, "bleach"—the search results are curated and ranked by Amazon.[176]  As any seller might, Amazon gives particular products prominence or "shelf space." Amazon does this not only by ranking search results, but also by assigning products certain designations, such as "Sponsored," or "Amazon's Choice," or "Best Seller," or "Amazon Prime."[177] The criteria for these designations is established by Amazon and, through them, Amazon places the weight of its brand behind particular third-party supplied products.

78.    Amazon also determines which supplier will "win" particular transactions, effectively allocating sales between itself and different third-party suppliers without any meaningful involvement (or even knowledge) of the consumer. Specifically, from Amazon's general search results page, consumers can click on a particular product of interest and then are directed to a separate page for that product. Many suppliers—including both Amazon and third-party suppliers—provide the same products on Amazon and all of these suppliers share the same individual product page. Amazon pushes consumers to particular suppliers through a "Buy Box" at the top right corner of the product page. The Buy Box includes "Add to Cart" and "Buy Now" buttons for the supplier Amazon has chosen.[178] Only one supplier controls the Buy Box at any given point in time, and when users click the "Add to Cart" or "Buy Now" button, they are buying from that Amazon-selected supplier.[179] Over 90 percent of sales on Amazon occur using the Buy Box.[180]

79.    Amazon allocates shares of the Buy Box such that the chosen supplier can change throughout the day. Thus, a consumer who clicks "Add to Cart" for a particular product at 6:00 a.m.

---

[176] Janger & Twerski, *The Heavy Hand of Amazon: A Seller Not a Neutral Platform*, 14 BROOKLYN J. CORP., FIN & COMM. LAW 259 (Oct. 2019), https://brooklynworks.brooklaw.edu/bjcfcl/vol14/iss2/3/.

[177] *Id.* at 264–65.

[178] *Id.* at 268.

[179] *See* Leanna Zeibak, *How to Win the Amazon Buy Box in 2021*, TINUITI (Mar. 25, 2020), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

[180] *Id.*

may be purchasing a product supplied by Supplier X, while a consumer who clicks the same button for the same product at 6:30 a.m. may be purchasing a product from Supplier Y, or a product supplied by Amazon itself.[181] Thus, not only does Amazon control which supplied products will win transactions, and how many transactions Amazon itself will supply, Amazon allocates these shares down to the minute.

80.     Text at the bottom of the "Buy Box" gives consumers some information as to who the supplier may be. The text generally states either "(1) sold by [name of third party] and shipped by [name of third party]; (2) sold by [name of third party] and fulfilled by Amazon; or (3) sold and shipped by Amazon." But the reality is that Amazon substitutes freely between suppliers after the sale.[182] As noted above, most third-party-supplied products are "Fulfilled by Amazon" or "FBA." By default, Amazon warehouses FBA products by product type, not by supplier. Unless a supplier opts out of this program, and Amazon makes it disadvantageous to do so, all products of the same type are "commingled."[183] Accordingly, when a consumer purchases, for example, Clorox Disinfecting Wipes from Amazon, Amazon will generally fulfill this order from its commingled stock of Clorox Disinfecting Wipes regardless of what "supplier" was identified at the time of sale. The actual product the consumer receives could thus be one supplied by *any* third-party supplier, *or* by Amazon itself. And again, Amazon choses whose product the consumer will receive without any input from the consumer or third-party suppliers involved.

81.     For all of the foregoing reasons, Amazon functions as the "seller" of all third-party supplied products on its platform. At an absolute minimum, Amazon facilitates these sales. Not only does Amazon control pricing—either by fixing the price point or price ceiling—Amazon interacts directly with customers to execute transactions, promotes particular third-party-supplied products, and often fulfills orders from a commingled stock. Amazon controls the entire shopping experience on its platform, regardless of who supplies the products sold. Amazon is responsible when it sells

---

[181] Janger & Twerski, *supra* note 176, at 270.

[182] *Id.* at 269.

[183] *Id.*

third-party-supplied products at prices that exceed legal prohibitions on price gouging. Nothing is sold on Amazon, at any price, without Amazon's active participation and facilitation.

82.     Amazon cannot deflect blame on third parties for a separate but related reason—Amazon knew third-party suppliers would increase prices by unconscionable amounts during the pandemic, and knowingly allowed it to happen.

83.     As Amazon is aware, third-party suppliers have previously inflated prices to unlawfully capitalize on emergencies, most prominently during Hurricane Irma in 2017.[184] Moreover, wherever COVID-19 has spread, it has led to scarcity of essential consumer items and substantial price inflation. Amazon was on notice that the same dynamic would play out in the United States once the virus reached its shores, or even sooner.

84.     Price inflation on third-party supplied products was not only foreseeable; Amazon *knew* that it was occurring in real time and has claimed to have longstanding rules and systems to prevent and stop price gouging as a violation of its "fair pricing" policies (those claims, as shown in this Complaint, have been proven false). Amazon assiduously tracks pricing on its platform to best position itself in the marketplace. Amazon thus knew that prices on third-party-priced products were exceeding legal thresholds, often by unconscionable amounts. Amazon had an obligation to prevent this from occurring, and to stop it once it occurred, which Amazon could readily do by excising offending third-party suppliers and taking down excessively priced listings. Amazon retains contractual authority to take these very steps.[185]

85.     Amazon did not act, however, until late February 2020, when it first began to suspend and take down some (but not close to all) products priced excessively by third parties.[186] Moreover, while Amazon's actions made for good publicity, they did not effectively address—much less

---

[184] *See* Jennifer Calfas, *Amazon Is Removing $100 Packs of Water After Being Accused of Hurricane Irma Price Gouging*, MONEY (Sept. 7, 2017), https://money.com/amazon-bottled-water-price-gouging-hurricane-irma-florida/.

[185] *See* Amazon Marketplace Fair Pricing Policy, *supra* note 88.

[186] *See* Annie Palmer, *Amazon cracks down on coronavirus price gouging and products making false claims*, CNBC (Feb. 27, 2020), https://www.cnbc.com/2020/02/27/amazon-cracks-down-on-coronavirus-price-gouging-false-claims.html.

eliminate—the problem. Amazon continued to sell third-party priced products at unconscionably inflated prices, as the examples cited in this Complaint demonstrate. Notably in this regard, after Amazon took its limited initial steps to address price gouging by third-party-suppliers, Senator Markey commented on Amazon's claim that it was addressing price gouging, writing on March 4, 2020 that despite Amazon's purported efforts, there had been "continued reports of price gouging" on the platform.[187]

86.     As public outcry swelled, Amazon was compelled on March 23, 2020, to suspend 3,900 United States accounts associated with products Amazon offered at excessive prices.[188] On that same date, Amazon issued a blog post stating that it has "zero tolerance for price gouging" and claimed to have had "longstanding policies and systems to prevent this harmful practice."[189] But those assertions already had been proven false with the gouging ramping up and ongoing for months. And Amazon's actions, even at that point, were again inadequate. Just two days later, 33 attorneys general, including Washington Attorney General Bob Ferguson, advised Amazon the "new protections" implemented by Amazon had "failed to remove unconscionably priced critical supplies during the COVID-19 pandemic."[190] To this day, third parties are pricing critical goods on the Amazon platform at unconscionable levels, and Amazon is selling those goods across the country.

87.     Amazon should have had adequate systems in place long before COVID-19 reached the U.S. to monitor and eliminate price gouging on its platform. As 33 attorneys general have advised, Amazon should not simply react to third-party price inflation—it should have policies to

---

[187] *See* Markey, *supra* note 84.

[188] *See* Josh Rivera, *Amazon removes more than 3,900 seller accounts from US store due to 'coronavirus-based price gouging'*, USA TODAY (updated Mar. 24, 2020), https://www.usatoday.com/story/money/2020/03/23/coronavirus-amazon-price-gouging-removed-accounts/2904729001/. In a letter to shareholders published on April 16, 2020, Amazon CEO Jeff Bezos indicated that Amazon had suspended "more than 6,000 selling accounts globally." Amazon Annual Report, Ex. 99.1 (2020), available at https://www.sec.gov/Archives/edgar/data/1018724/000119312520108427/d902615dex991.htm. The letter did not specify how many of these accounts were operating in the United States, or whether that number is any greater than the 3,900 United States accounts suspended previously.

[189] *See* Amazon, *Price gouging has no place in our stores* (Mar. 23, 2020), https://blog.aboutamazon.com/company-news/price-gouging-has-no-place-in-our-stores.

[190] *See* Letter from 33 attorneys general, *supra* note 98.

"prevent unconscionable price increases from occurring in the first place."[191] Amazon has the technology and sophistication to do this. In a May 13, 2020 blog post, Amazon acknowledged that it maintains "dynamic automated technology to proactively seek out and pull down unreasonably priced offers."[192] Amazon did not, however, deploy this system proactively to prevent unlawful price increases.

88.     Ultimately, the most troubling aspect of Amazon's "efforts" to address third-party price gouging is not that they came late, or were ineffectual, or that Amazon profited on these sales, all of which is true; **it is that while Amazon actively publicized these efforts, Amazon itself continued to inflate prices on its own inventory of products in amounts that satisfy any definition of "price gouging."**

### *Amazon Price-Gouged Its Way to Unprecedented Revenues During the COVID-19 Crisis*

89.     With rampant price gouging, Amazon has exploited unprecedented consumer demand during the COVID-19 pandemic to reap extraordinary profits. Amazon's 2020 first-quarter net sales reached $75.5 billion, up 26 percent from the first quarter of 2019.[193] This means that through the first quarter Amazon had generated $10,000 every second of every day in 2020.  Amazon continued to profit throughout the pandemic.  Its 2020 revenues were up 38%, an increase of more than $100 billion, and its net profits spiked a remarkable 84%.[194]

90.     Despite the stock market's collapse in 2020, there has never been a better time to be an Amazon shareholder. As one leading analyst stated in April 2020:

> [Amazon] has achieved a feat that many investors on Wall Street would
> regard as impossible in a stock market that's fallen sharply off its highs
> this year. Amazon's shares have soared more than 40% in the past

---

[191] *See id.*

[192] *See* Brian Huseman, Amazon Vice President of Public Policy, *It's time for Congress to establish a federal price gouging law* (May 13, 2020), https://blog.aboutamazon.com/policy/its-time-for-congress-to-establish-a-federal-price-gouging-law.

[193] *See* Amazon, Press Release, *Amazon.com Announces First Quarter Results* (Apr. 30, 2020), https://s2.q4cdn.com/299287126/files/doc_financials/2020/Q1/Amazon-Q1-2020-Earnings-Release.pdf.

[194] *See* Shelley E. Kohan, *Amazon's Net Profit Soars 84% With Sales Hitting $386 Billion*, FORBES (Feb. 2, 2021), https://www.forbes.com/sites/shelleykohan/2021/02/02/amazons-net-profit-soars-84-with-sales-hitting-386-billion/?sh=51d2e1b71334.

CLASS ACTION COMPLAINT - 46

month alone to a new record high as of early afternoon trading on Thursday, giving the company a market value of more than $1.2 trillion.[195]

91.     Jeff Bezos, Amazon's president and CEO, has seen his personal fortune swell during the COVID-19 pandemic. Among other assets, Mr. Bezos owns an 11.2 percent stake in Amazon. On April 14 alone, when Amazon stock surged more than 5 percent, Mr. Bezos's fortune grew by some $6.3 billion. Overall, Jeff Bezos's personal wealth increased by $75 billion (or approximately $205 million per day) as the pandemic raged throughout 2020.[196]

## V.     CHOICE OF LAW ALLEGATIONS

92.     Washington law applies to Plaintiffs' claims by virtue of a Washington choice-of-law provision that is set forth in "conditions of use" that appear on Amazon's website.  These conditions of use are available to consumers when they sign up for an Amazon account and make subsequent purchases.  In pertinent part, the choice-of-law clause contained in the conditions of use provides:

> By using any Amazon Service, you agree that applicable federal law, and the laws of the state of Washington, without regard to principles of conflict of laws, will govern these Conditions of Use and any dispute of any sort that might arise between you and Amazon.

## VI.     CLASS ACTON ALLEGATIONS

93.     Plaintiffs bring this proposed action on behalf of themselves and, pursuant to Rules 23(a), 23(b)(2) & 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class (collectively, the "Class"):

> All persons who purchased any consumer good or food item on Amazon.com after January 31, 2020 at a price at least 15 percent greater than the price charged on Amazon.com for the same consumer good or food item before January 31, 2020.

94.     As discussed above, January 31, 2020, is the date on which the U.S. Department of Health and Human Services declared a national emergency related to COVID-19.  This is a conservative class cut-off date given that alarm related to COVID-19 predated the emergency

---

[195] *See* Nathan Reiff, *Amazon Earnings: What Happened*, INVESTOPEDIA (updated July 30, 2020), https://www.investopedia.com/amazon-earnings-4692665.

[196] *See* Taylor, *supra* note 2.

declaration, and Amazon was aware long before January 31, 2020, that consumers were turning to online retail to safely obtain the consumer goods they required.  As addressed below,  the class definition's 15% threshold for unlawful price increases is also conservative given that a lesser increase could readily be deemed unfair under the WCPA, particularly because many states with analogous consumer-protection laws prohibit increases of 10% or any amount during declared emergencies.

95. Plaintiffs reserve the right to revisit the Class definition based upon information learned through discovery.

96. Excluded from this proposed Class are Defendant; Defendant's affiliates and subsidiaries; Defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

97. This action may appropriately proceed as a class action because Plaintiffs seek injunctive relief that will apply to the Class as a whole and, further, because Plaintiffs will prove the elements of their damages claims with predominantly common evidence.

98. **Numerosity:** The proposed Class includes thousands (and potentially millions) of consumers who paid unlawfully inflated prices for products on Amazon.com. The members of this Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members is not available to Plaintiffs at this time, but the number and identity of individual Class members can be ascertained from Amazon's books and records.

99. **Commonality and Predominance:** Numerous questions of law and fact are common to the claims of the Plaintiffs and members of the proposed Class, and these common questions predominate over any questions affecting only individual Class members. These include, but are not limited to:

(a) Whether Amazon inflated prices during the COVID-19 pandemic;

(b) Whether those price increases were "unfair" under the WCPA;

(d) Whether Amazon unlawfully increased prices on its own inventory of products;

CLASS ACTION COMPLAINT - 48

1     (e)    Whether Amazon is liable for price increases on products supplied by third-

2 parties;

3     (f)    Whether Amazon exercised reasonable care to monitor and prevent price

4 inflation by third-party Amazon suppliers;

5     (g)    Whether and the extent to which consumers were harmed by unlawful price

6 increases on Amazon, and the extent of their damages;

7     (h)    The extent to which Amazon was enriched unjustly;

8     (i)    Whether Amazon should be subjected to punitive damages, and the

9 appropriate amount; and

10     (j)    Whether Plaintiffs are entitled to injunctive relief and the appropriate scope of

11 any equitable decree.

12     100.    **Typicality:** Plaintiffs' claims are typical of the claims of all Class members because,

13 among other things, all Class members were comparably and similarly injured by Amazon's

14 wrongful conduct alleged herein. Plaintiffs, like all Class members, purchased products from

15 Amazon at prices that were unlawfully inflated during the COVID-19 pandemic.

16     101.    **Adequacy**: Plaintiffs will represent and protect the interests of the proposed Class

17 adequately and fairly. Plaintiffs have retained counsel competent and experienced in complex

18 class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class,

19 and their interests do not conflict with the interests of the proposed Class members they seek to

20 represent.

21     102.    **Injunctive and declaratory relief:** By way of the conduct described in this Class

22 Action Complaint, Defendant has acted on grounds that apply generally to the proposed Class.

23 Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the

24 Class as a whole.

25     103.    **Superiority:** A class action is superior to all other available methods for the fair and

26 efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in

27 its management. Even if members of the proposed Class could sustain individual litigation, that

28 course would not be preferable to a class action because individual litigation would increase the

CLASS ACTION COMPLAINT - 49

delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class-action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## VII.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT ("WCPA")
(WASH. REV. CODE § 19.86)**

104.   Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

105.   The WCPA renders unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

106.    Although the WCPA does not define what constitutes an "unfair" act or practice, the prohibition must "be liberally construed" to ensure "that its beneficial purposes may be served." *Id.*

107.   Interpretation of the WCPA is informed "by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters." *Id.* Section 5(a) of the Federal Trade Commission Act (FTC Act) (15 U.S.C. § 45) likewise prohibits "[u]nfair or deceptive acts or practices in or affecting commerce." An act or practice may be deemed unfair under the FTC Act if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n).  An act also may be deemed unfair if it is unethical, oppressive, or unscrupulous.

108.   As set forth herein, Amazon violated the WCPA by charging consumers grossly inflated and thus "unfair" prices during the COVID-19 pandemic.

109.   For purposes of this Complaint, Plaintiffs allege that a price increase of 15% on any consumer good or food item during a declared emergency is "unfair" for purposes of the WCPA. This is a conservative threshold.  Numerous states with analogous consumer-protection laws prohibit price increases of 10% or more, and at least one prohibits any price increase once an emergency has

been declared. *See, e.g.*, Cal. Penal Code § 396(b), Ark. Code § 4-88-303(a), W. Va. Code § 46A-6J-3; Haw. Rev. Stat. Ann § 127A-30(a)(1).

110.   A nationwide emergency related to COVID-19 was first declared by the U.S. Department of Health and Human Services on January 31, 2020, and a national emergency has existed by executive decree ever since.[197]   This Complaint's January 31, 2020, cut-off date for price-gouging is conservative because public alarm and retail hoarding were occurring prior to the January 31, 2020 emergency declaration.   Amazon knew no later than January 31, 2020 (and likely far earlier) that there was increased demand for online retail, and its services in particular.   Amazon had a responsibility not to gouge consumers who turned to online retail increasingly as a means of obtaining essential goods safely during an escalating and alarming public health crisis.

111.   Under the FTC Act framework, which informs the WCPA, a price increase of 15% during a declared emergency is unfair because it causes substantial consumer injury, particularly where, as here, the increases were widespread, affecting potentially millions of consumers across the country and greatly affecting the public interest.   Consumers lacked reasonable means to avoid their injuries, as the exorbitant prices they paid attest.   Nor are there any countervailing consumer or competition benefits to price gouging.   The only party that benefitted here was Amazon, which has reaped blockbuster profits by charging excessive prices throughout the pandemic. Amazon's acts in taking advantage of desperate consumers during the pandemic to charge exorbitant prices was also unethical, oppressive, and unscrupulous.

112.   Increasing prices excessively during a pandemic is also unethical, oppressive, and unscrupulous, and thus "unfair" for purposes of the WCPA.

---

[197] *See* U.S. Dep't of Health & Human Servs., *supra* note 3. On March 13, 2020, President Trump followed the Health and Human Services Division by declaring a national emergency (effective March 1, 2020) pursuant to the National Emergencies' Act.  *See* 85 Fed. Reg. 15,337 (2020), https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak.   On February 24, 2021, President Biden extended the national emergency declaration for another year.  *See* Pres. Joseph R. Biden, Jr., Letter to U.S. Congress (Feb. 24, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/24/a-letter-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/.

113.   On information and belief, Amazon's price increases were not directly attributable to additional costs imposed on Amazon by suppliers, and Amazon increased prices on many products in excessive and unfair amounts even when accounting for any additional costs and the markup Amazon customarily applies to such products.

114.   Amazon sells, and facilitates the sale of, all products available on Amazon.com. Thus, Amazon is liable under the WCPA for all unlawful prices on its platform. This includes sales involving Amazon's own inventory of products. It also includes sales involving products supplied by third parties. Consumers purchasing third-party-supplied products interact almost exclusively with Amazon, which, functioning as the seller, controls virtually all aspects of the transaction, including by establishing a price ceiling, in many cases setting the specific selling price below that ceiling, and maintaining final authority to remove any product listing. Amazon promotes third-party supplied products on its platform, including by offering them for sale through its "Buy Box," and otherwise choosing to rank, curate, and give prominence to the sale of specific products. Amazon asserts effective control over which supplied products will win transactions and how many products Amazon itself will supply, and allocates these shares down to the minute. Amazon accepts payment when third-party-supplied products are purchased and handles all material aspects of the transaction. As with any seller, Amazon profits when it sells third-party-supplied products, collecting per-transaction and other fees. And because Amazon's fees are tied to the purchase price, Amazon profits directly when third-party products are sold at higher prices.

115.   For all of these reasons, and as elaborated further herein, Amazon causes and is responsible for all price-gouging on its platform, including sales (or sales offers) involving third-party supplied products.

116.   As a direct and proximate result of Amazon's unfair business acts and practices, Plaintiffs are entitled to injunctive relief and actual damages, trebled to the extent permitted under Wash. Rev. Code § 19.86.090.  Plaintiffs are also entitled to the cost of suit, including reasonable attorney's fees.

## SECOND CAUSE OF ACTION

### NEGLIGENCE

117.   Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

118.   Amazon has a non-delegable duty to apply a level of reasonable care commensurate with the foreseeable harms arising from its control, maintenance, and management of the largest online retail platform in the world. This encompasses a duty to ensure that, during a declared public emergency, consumer goods or food items are not sold on the platform at excessive prices.

119.   As the COVID-19 crisis emerged in January 2020, and even prior, it was foreseeable that third-party suppliers on Amazon would attempt to inflate prices excessively for many goods essential to enduring and combatting the public health crisis. Such price inflation has occurred on Amazon's platform in prior emergencies, and was occurring wherever COVID-19 spread. Amazon knew it would occur in response to COVID-19.

120.   Amazon has the ability, technological capacity, and contractual right to prevent price gouging during a declared emergency. Amazon maintains complete control over its platform. It has oversight on the prices of all products sold on the platform and, by contract with its third-party suppliers, may unilaterally remove or suspend any listing priced excessively.

121.   Amazon, its agents, servants, and/or employees, failed to exercise ordinary care and failed to comply with existing standards of care in the following acts and/or omissions:

- Failing to maintain and/or implement systems to detect price increases by third-party suppliers;

- Listing products with excessive price increases during the COVID-19 pandemic;

- Failing to remove (or timely remove) product listings with excessive price increases during the COVID-19 pandemic;

- Failing to remove from the Amazon platform (or timely remove) third-party suppliers engaged in price gouging;

- Failing to adequately investigate reports of excessive price inflation on third-party supplied products; and

1      • Facilitating the listing, sale, and delivery of products priced at excessive levels on its

2          platform.

3      122.    Given the foreseeability of price gouging during the COVID-19 pandemic, a

4  reasonable online retailer in Amazon's position would have had systems in place to prevent price

5  gouging from ever occurring, and would have taken prompt, aggressive steps to stamp it out entirely.

6  Amazon did not do so. Despite Amazon's vast resources and sophistication, it lacked or failed to

7  implement systems to prevent unlawful price increases on third-party supplied products, and the acts

8  Amazon ultimately did take to address price gouging came far too late, and were ineffectual.

9      123.    Amazon knew that, because of its failure to exercise reasonable care, consumers such

10  as Plaintiffs would be overcharged.

11     124.    Amazon's negligence was the proximate cause and substantial factor in causing

12  Plaintiffs' economic loss. Had Amazon exercised reasonable care, Plaintiffs would not have paid

13  excessive amounts for products they purchased from Amazon. Plaintiffs are entitled to compensatory

14  and equitable damages and declaratory relief in an amount to be proven at trial.

15                          **THIRD CAUSE OF ACTION**

16                              **UNJUST ENRICHMENT**

17     125.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

18     126.    Amazon has exploited vulnerable consumers by selling, and offering for sale,

19  products at excessive prices during COVID-19 pandemic. Facing retail scarcity and official warnings

20  as to the risks of public interaction, consumers have turned to Amazon as a lifeline to obtain goods

21  vital to their safety, health, and well-being. Basic principles of equity, justice, and fair dealing,

22  prohibit sellers from capitalizing on such exigencies to charge consumers excessive prices.

23     127.    By selling consumer goods, emergency supplies, medical equipment, and other

24  essential products at excessive and inflated prices during the COVID-19 pandemic, Amazon was

25  unjustly enriched. Amazon profited on both the sale of its own inventory as well as products supplied

26  by third parties, for which Amazon retains a portion of the transaction proceeds. All of these inflated

27  profits were conferred by Plaintiffs and the class they seek to represent, and retained unjustly by

28  Amazon.

CLASS ACTION COMPLAINT - 54

128.    In selling goods at excessive prices during a public health crisis, Amazon knew that it was overcharging consumers, that consumers would be harmed, and that by retaining the sale proceeds Amazon would be unjustly enriched.

129.    In the event Plaintiffs lack an adequate remedy at law, Amazon is required to make restitution in equity pursuant to the common law of unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief on their own behalf and on behalf of all those similarly situated:

A.    That the Court certify the proposed Class and appoint Plaintiffs as Class representatives and their counsel as Class counsel;

B.    That the Court award them and the proposed Class all appropriate relief, to include, but not be limited to, treble damages, restitution, and injunctive relief prohibiting Amazon from forever engaging in the wrongful conduct alleged herein, which has harmed Plaintiffs, the Class, and the public at large;

C.    That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein;

D.    That the Court award them and the proposed Class reasonable attorneys' fees, costs, and pre- and post-judgment interest;

E.    That the Court impose punitive damages; and

F.    That the Court award them and the proposed Class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

CLASS ACTION COMPLAINT - 55

Dated:  July 2, 2021

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*

Steve W. Berman (WSBA #12536)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, Washington  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Ben Harrington (*pro hac forthcoming*)
Benjamin J. Siegel (*pro hac forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, California  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
Email: benh@hbsslaw.com
Email: bens@hbsslaw.com

*Attorneys for Plaintiffs and the Proposed Class*