1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

8

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

9

| | |
|---|---|
| ALVIN GREENBERG, MICHAEL STEINBERG, JULIE HANSON, CHRISTINA KING, and RONNELL ROBERTSON, on behalf of themselves and all others similarly situated,<br><br>                              Plaintiffs,<br><br>        v.<br><br>AMAZON.COM, INC., a Delaware corporation,<br><br>                              Defendant. | Case No. 2:21-cv-00898-RSL<br><br>SECOND AMENDED CLASS ACTION COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**TABLE OF CONTENTS**

<u>Page</u>

I.     INTRODUCTION ...................................................................................................1

II.    JURISDICTION AND VENUE ............................................................................4

III.   PARTIES ...............................................................................................................5

     A.     Plaintiffs .....................................................................................................5

         1.     Alvin Greenberg, Ph.D. ................................................................5

         2.     Michael Steinberg ..........................................................................8

         3.     Julie Hanson ..................................................................................11

         4.     Christina King ...............................................................................14

         5.     Ronnell Robertson .........................................................................21

     B.     Defendant ................................................................................................23

     C.     History of Fair Pricing ............................................................................23

IV.   FACTUAL ALLEGATIONS ...............................................................................26

     A.     Outbreak of COVID-19 ..........................................................................26

     B.     Emergency Declarations and Lockdowns ..............................................28

     C.     Hoarding and Retail Scarcity ..................................................................31

     D.     Consumers Turn Increasingly to Online Purchasing, and Amazon in Particular .................................................................................................33

     E.     Amazon Raised Prices Excessively During the COVID-19 Pandemic ....................36

     F.     Amazon is Responsible for Unlawful Price Increases on All Products Sold on Its Platform ...............................................................................56

     G.     End of Emergency Lockdowns ...............................................................65

     H.     Amazon Price-Gouged Its Way to Unprecedented Revenues During the COVID-19 Crisis ....................................................................................65

V.     CHOICE OF LAW ALLEGATIONS ..................................................................66

VI.   CLASS ACTON ALLEGATIONS ......................................................................66

VII.   CLAIMS FOR RELIEF .......................................................................................69

FIRST CAUSE OF ACTION   VIOLATION OF WASHINGTON CONSUMER
     PROTECTION ACT ("WCPA") (WASH. REV. CODE § 19.86) .......................69

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

SECOND CAUSE OF ACTION  NEGLIGENCE ........................................................... 72

2

THIRD CAUSE OF ACTION  UNJUST ENRICHMENT .............................................. 73

3

PRAYER FOR RELIEF ........................................................................................... 74

4

JURY TRIAL DEMANDED .................................................................................... 74

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    For their Second Amended Class Action Complaint against Defendant Amazon.com, Inc.

2   ("Amazon"), Plaintiffs Alvin Greenberg, Michael Steinberg, Julie Hanson, Christina King, and

3   Ronnell Robertson, on their own behalf and on behalf of all others similarly situated, allege as follows:

4                              **I.    INTRODUCTION**

5    1.    With this action, Plaintiffs seek to hold Amazon accountable for its unlawful price

6   gouging during the COVID-19 pandemic. As Amazon announced on its website on March 23, 2020,

7   "Price gouging has no place in our stores."[1] And as the Washington Supreme Court held on August 8,

8   2024, price gouging is not allowed under Washington's Consumer Protection Laws.[2] This lawsuit

9   seeks to hold Amazon accountable for price gouging.

10    2.    Throughout the pandemic, consumers turned increasingly to online retailers, and

11   Amazon in particular, to fulfill their essential needs. With medical experts warning about the ease of

12   infection in public settings, and "stay home" orders prevailing in most parts of the country, consumers

13   recognized during the pandemic that retail excursions can have perilous consequences for themselves

14   or loved ones, no matter what precautions are taken. In that moment, Amazon's services were essential.

15   Without venturing into public and risking exposure, and under emergency stay-at-home orders, and

16   with just a few clicks, Americans could purchase a wide range of consumer goods from Amazon that

17   would be delivered directly to their homes.

18    3.    Amazon's sales have never been higher, and since the COVID-19 pandemic began, its

19   sales in some categories (*e.g.*, home items) increased ***more than 1,000 percent***.[3] Correspondingly,

20   Amazon's profits have skyrocketed. Jeff Bezos's personal wealth increased by $75 billion (or

21   approximately $205 million per day) in 2020.[4]

22

---

23   [1]    Amazon, "Price gouging has no place in our stores," ABOUTAMAZON.COM (Mar. 23, 2020),
24   https://www.aboutamazon.com/news/company-news/price-gouging-has-no-place-in-our-stores.

[2]    *Greenburg v. Amazon.com Inc.*, No. 101858-4 (Wash. Sup. Ct. Aug. 8, 2024).
25
[3]    *See* Dana Mattioli & Sebastien Herrera, *Amazon Struggles to Find Its Coronavirus Footing. 'It's*
26   *a Time of Great Stress.'*, WALL STREET J. (Mar. 31, 2020), https://www.wsj.com/articles/amazon-
   struggles-to-find-its-coronavirus-footing-its-a-time-of-great-stress-11585664987.
27
[4]    *See* Kate Taylor, *A chart shows how Jeff Bezos's net worth exploded by $75 billion in 2020,*
28   *reaching $188 billion before he stepped down as Amazon's CEO*, BUS. INSIDER (Feb. 2, 2021),

SECOND AMENDED CLASS ACTION COMPLAINT – 1
010923-11/2753066 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

4.      While Amazon provided needed services during the pandemic, this does not place it above the law. Like every seller, Amazon has a legal obligation under Washington (and other) laws to ensure that its pricing does not exploit consumers facing emergency conditions. That is, price gouging is not just immoral, it is a manifest violation of the Washington Consumer Protection Act ("WCPA").

5.      To be sure, there is some price fluctuation in any dynamic market. This, however, is not a case about ordinary price fluctuation. It is about Amazon leveraging a pandemic to profit unfairly off consumers in real need. Available data show that Amazon's price increases have been anything but normal. Just by way of example, after COVID-19 was declared a nationwide public health emergency by the United States Department of Health and Human Services ("HHS"),[5] certain Amazon prices increased as follows:

- **Face Masks:** Increases up to ***1,800 percent***, from $4.21 to $79.99;

- **Cold Remedies:** Increases up to ***1,523 percent***, from $4.65 to $79.00;

- **Toilet Paper:** Increases up to ***1,044 percent***, from $17.48 to $200;

- **Pain Reliever:** Increases up to ***233 percent***, from $18.75 to $62.40;

- **Black Beans:** Increases up to ***521 percent***, from $3.54 to $21.99;

- **Baking Soda:** Increases of more than ***1,500 percent***, from $3.08 to $50.00;

- **Flour:** Increases up to ***400 percent***, from $22.00 to $110.00;

- **Yeast:** Increases up to ***625 percent***, from $7.02 to $50.95; and

- **Disinfectant Wipes:** Increases of more than ***745 percent***, from $20.71 to $174.96.

6.      All of these (and many more) Amazon price increases are flagrantly unlawful under Washington law. While the WCPA does not codify a specific threshold for price gouging, many states with comparable consumer-protection regimes set the bar at 10%. *See, e.g.*, Cal. Penal Code § 396(b), Ark. Code § 4-88-303(a), W. Va. Code §46A-6J-3. Others set it at 15%. *See, e.g.*, Or. Admin R. 401.965(3). Others bar *any* price increase during a declared emergency. *See* Haw. Rev. Stat. Ann

---

https://www.businessinsider.com/amazon-ceo-jeff-bezos-net-worth-explodes-in-2020-chart-2020-12.

[5] *See* HHS, *Determination that a Public Health Emergency Exists* (dated Jan. 31, 2020, eff. Jan 27, 2020), available at https://aspr.hhs.gov/legal/PHE/Pages/2019-nCoV.aspx.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    § 127A-30(a)(1). A bill being once considered by Washington's legislature would render unlawful

2    prices increases of 15% or more during a declared emergency.[6]

3           7.     The Washington Attorney General has recognized that charging excessive prices during

4    the COVID-19 pandemic "is a violation of the Consumer Protection Act, RCW 19.86.020" as it

5    currently exists.[7] Invoking the WCPA, the Washington Attorney General has issued numerous cease-

6    and-desist letters barring "price gouging during this emergency."[8] Whether or not further price gouging

7    legislation is enacted, courts likewise have an obligation to enforce the plain terms of the WCPA,

8    including its freestanding prohibition on "unfair" acts or practices. And price gouging to profit off a

9    pandemic is about as "unfair" as a business practice can get.

10           8.     Prior to this action, Amazon has acknowledged price gouging on its platform during

11    the pandemic, but it has deflected responsibility by blaming third-party suppliers who use Amazon to

12    market their goods. Indeed, Amazon knew how to identify price gouging and represented to its

13    customers that "we have dynamic, automated systems in place that locate and remove unfairly priced

14    items" and that Amazon had removed "well over half a million of offers from our stores due to

15    coronavirus-based price gouging." This public relations campaign surfaced two important facts. *First*,

16    when a third party markets a product on Amazon, Amazon controls virtually every aspect of the sale,

17    ***including the price ceiling***, and can identify price gouging and stop it. Further, when Amazon sells

18    products supplied by third parties at excessive prices, Amazon is responsible. *Second*, and most

19    brazenly, Amazon inflated prices on its own inventory of products throughout the pandemic. These

20    are products Amazon supplies and sells directly to consumers. For example, a study by the Public

21    Interest Research Group ("PIRG") shows that, in February 2020, Amazon had increased prices on its

22    own inventory by more than 50 percent on one-sixth of public health products used to combat COVID-

23

24    6   *See* SB 5191, 67th Leg., Reg. Sess. (Wash. 2021), text and status available at
25        https://app.leg.wa.gov/billsummary?BillNumber=5191&Year=2021 (last visited Sept. 19, 2024).

26    7   *See* Bob Ferguson, Wash. Att'y Gen., Notices to Cease and Desist (Mar. 26, 2020), https://agportal-
    s3bucket.s3.amazonaws.com/uploadedfiles/Another/News/Press_
27        Releases/DemandLetters032620.pdf; *see also Greenberg v. Amazon*, Case No. 101858-4 (Wa.
    Sup. Ct.), Brief of Amicus Curiae Attorney General of the State of Washington (Dec. 4, 2023).

28    8   *See id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    19.[9] Later in September 2020, Public Citizen tracked Amazon pricing on 10 essential products that

2    Amazon markets directly (e.g. masks, toilet paper, disinfectant, etc.) and identified markups from 48%

3    to 1,010%.[10] In short, while claiming to combat third-party price gouging, Amazon has jacked prices

4    on its own inventory of products to profiteer off consumers in desperate need.

5        9.    To safely obtain essential goods during the COVID-19 crisis, Plaintiffs Alvin

6    Greenberg, Michael Steinberg, Julie Hanson, Christina King, and Ronnell Robertson purchased items

7    from Amazon at excessive and unfair prices that vastly exceeded the prices prevailing before the

8    pandemic—increases ranging from 53% to 826%. Amazon profited unlawfully from these sales and

9    Plaintiffs were harmed commensurately. On behalf of themselves, and a proposed Class of consumers

10   similarly situated, Plaintiffs seek damages, restitution, injunctive relief, and all other available

11   remedies.

12                                II.    JURISDICTION AND VENUE

13       10.    This Court has subject matter jurisdiction because this is a class action arising under

14   the Class Action Fairness Act of 2005 ("CAFA"), which confers original jurisdiction on the federal

15   courts for any class action in which any member of the Class is a citizen of a state different from any

16   defendant, and in which the matter in controversy exceeds in the aggregate $5,000,000, exclusive of

17   interest and costs. Plaintiffs allege that the total claims of individual class members in this action are in

18   excess of $5,000,000, as required by 28 U.S.C. § 1332(d)(2) & (6). Plaintiffs are citizens of California,

19   whereas Defendant is a citizen of Washington, satisfying 28 U.S.C. § 1332(d)(2)(A). Furthermore, the

20   total number of class members is greater than 100, as required by 28 U.S.C. § 1332(d)(5)(B). Federal

21   subject matter jurisdiction thus exists.

22       11.    Amazon has minimum contacts with the United States, this judicial district, and

23   Washington. Amazon maintains its headquarters in Washington and has intentionally availed itself of

---

[9]   *See* U.S. Pub. Interest Research Grp. Ed. Fund, *Analysis: Coronavirus spike most surgical mask, sanitizer prices at least 50% on Amazon* (last updated July 28, 2020), https://uspirgedfund.org/resources/usf/analysis-coronavirus-spike-most-surgical-mask-sanitizer-prices-least-50-amazon.

[10]  Public Citizen, *Prime Gouging: How Amazon Raised Prices to Profit from the Pandemic* at 12 (Sept. 2020), available at https://www.citizen.org/wp-content/uploads/Prime-Gouging-report.pdf.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    the laws of Washington by conducting a substantial amount of business in the state. This Court

2    accordingly has personal jurisdiction over Amazon.

3        12.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(1) because

4    Amazon is headquartered and resides in this District. Venue is further appropriate in this district

5    pursuant to the forum selection clause in Amazon's online "conditions of use," which are available

6    when a consumer signs up for an Amazon account and makes purchases. The conditions provide that

7    "[a]ny dispute or claim relating in any way to your use of any Amazon Service will be adjudicated in

8    the state or Federal courts in King County, Washington, and you consent to exclusive jurisdiction and

9    venue in these courts."

10                       **III.**      **PARTIES**

11    **A.**     **Plaintiffs**

12        **1.**      **Alvin Greenberg, Ph.D.**

13        13.      Plaintiff Alvin Greenberg, Ph.D., is 74 years old and resides in San Rafael, California.

14    San Rafael is in Marin County.

15        14.      Dr. Greenberg is a toxicologist. He served previously as Chair of the Bay Area Air

16    Quality Management District Hearing Board, a Member of the California Occupational Health and

17    Safety Standards Board (appointed by the governor), and Assistant Deputy Chief for Health, Cal-

18    OSHA.

19        15.      Following the January 31, 2020 declaration of a national COVID-19 emergency by the

20    HHS, Marin County issued a Shelter-in-Place Order on March 16, 2020.[11] Consistent with prevailing

21    guidance from health experts, the order instructed residents such as Dr. Greenberg to "self-isolate in

22    their place of residence to the maximum extent feasible."[12] Marin County officials implored residents

23

24

25

26

27

28

---

[11]   *See* Matt Willis, MD, MPH, Health Officer of the Cty. of Marin, *Order of the Cty. Health Officer of the Cty. of Marin to Shelter in Place* (Mar. 16, 2020), available at https://coronavirus.marinhhs.org/sites/default/files/Files/Shelter%20in%20Place/Shelter%20in%20Place%20Order%2016%20March%202020.pdf.

[12]   *Id.*


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    to leave their homes "as infrequently as possible and only for approved activities."[13] While

2    discouraging avoidable excursions, Marin County officials reminded residents that they could still "go

3    online, purchase items, and have them delivered to [their] home."[14] This guidance was reiterated by

4    the California Department of Health, which on March 16, 2020, advised individuals over the age of

5    65, such as Dr. Greenberg, to "[r]emain at home until further guidance is issued" and to "[c]onsider

6    on-line ordering for food and other supplies."[15]

7           16.    Marin County renewed its Shelter-in-Place Order on March 31, 2020, expanding it to

8    make social distancing mandatory.[16] The Shelter-in-Place Order was further renewed by subsequent

9    pronouncements, and California's statewide shelter-in-place order remained in effect until June 15,

10    2021.[17]

11           17.    On or around April 21, 2020, Dr. Greenberg spoke with his girlfriend, Julie Hoemke,

12    who resides in San Jacinto, California. Ms. Hoemke lives with three of her children and a

13    granddaughter who, at that time, was six months old. Consistent with guidance from public health

14    officials, Ms. Hoemke had been regularly disinfecting the surfaces of her home to protect herself and

15    family from COVID-19. She had been using bleach for this purpose but had run out of her supply. Ms.

16    Hoemke visited and called multiple retailers in her vicinity—including grocery stores, Home Depot,

17    Lowes, and Walmart—in hopes of securing a replacement supply of bleach. The retailers, however,

18    were all sold out of bleach and other disinfectants.

19

20    

21    [13]    Marin Health & Human Servs., *Frequently Asked Questions*, https://coronavirus.marinhhs.org/
       faqs/en (last visited June 29, 2021) (FAQ: "What can I do to slow the spread of COVID-19").

22    [14]    *See id*. (FAQ: "Can I still order the things I need online from businesses and have them delivered
23         to my home?").

24    [15]    *See* Cal. Dep't of Pub. Health, *COVID-19 Public Health Guidance: Self-Isolation for Older Adults
       and Those Who Have Elevated Risk* (Mar. 16, 2020), https://www.cdph.ca.gov/Programs/CID/
       DCDC/CDPH%20Document%20Library/Self_Isolation_Guidance_03.16.20.pdf.

25    [16]    *See* Lisa Santora, MD, MPH, Deputy Health Officer of the Cty. Of Marin, *Order of the Cty. Health
26         Officer of the Cty. Of Marin to Shelter in Place* (Mar. 31, 2020), available at
27         https://coronavirus.marinhhs.org/sites/default/files/2020-03/marin_final-superseding-shelter-in-
       place-order.pdf.

28    [17]    *See Safely reopening California*, https://covid19.ca.gov/safely-reopening/ (June 22, 2021 update).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

18.    Hearing this, Dr. Greenberg endeavored to locate bleach that could be shipped to Ms. Hoemke. Dr. Greenberg did not, however, feel safe visiting retail outlets in and around his San Rafael home. COVID-19 was spreading at this time and at 74 years of age, and with asthma, Dr. Greenberg recognized that he was at heightened risk of experiencing complications should he come into contact with the virus. Heeding public health guidance, Dr. Greenberg instead looked online for a supplier of bleach. The only online retailer he could locate with any bleach in stock was Amazon, which on April 21, 2020, was selling three-bottle containers of Clorox Concentrated Germicidal Bleach for $58.19. From his professional training, Dr. Greenberg was generally aware that bleach is effective in combatting viruses. Dr. Greenberg had also reviewed the CDC's and EPA's websites to confirm as much. The particular Clorox product Dr. Greenberg located on Amazon features a higher concentrate of sodium hypochlorite, the active ingredient that kills viruses.

19.    Dr. Greenberg recognized immediately that $58.19 was an exorbitant price for three bottles of Clorox Concentrated Germicidal Bleach. But under the circumstances, he saw no meaningful choice but to purchase it from Amazon. Even if this product could be obtained from stores in his area, and there was no assurance of that given retail scarcity of COVID-combatting products, as indicated by Ms. Hoemke's inability to find bleach at local retailers, Dr. Greenberg did not feel safe venturing into retail outlets, nor would this have been consistent with public health guidance. The only alternative was to wait in hopes that other online retailers would restock the product, but it was unclear when (if ever) this would occur. At the time, Amazon itself purported to only have six boxes of Clorox Concentrated Germicidal Bleach remaining. With COVID-19 spreading rapidly, and the safety of his girlfriend and family imperiled, Dr. Greenberg did not believe that waiting was an option. Dr. Greenberg accordingly purchased the product at the listed price of $58.19. Dr. Greenberg paid for the bleach out of pocket and has not been reimbursed.

20.    The price Dr. Greenberg paid for Clorox Germicidal Bleach vastly exceeded the price that prevailed on Amazon prior to the pandemic. On January 31, 2020, when Health and Human Services Secretary Alex M. Azar II declared a nationwide COVID-19 health emergency (effective

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    January 27, 2020), the specific product Dr. Greenberg purchased sold on Amazon for **$21.74**.[18] By

2    April 21, 2020, when Dr. Greenberg made his purchase, the price had jumped to **$58.19**, which

3    represents a ***168%*** increase above the January 31, 2020 price.[19]



16    **2.    Michael Steinberg**

17    21.    Plaintiff Michael Steinberg lives in Oakland, California, which is in Alameda County.

18    Following the January 31, 2020 declaration of a national emergency by the HHS, Alameda County

19    declared a State of Emergency on March 1, 2020.

20    22.    To prevent a larger outbreak of COVID-19, on March 16, 2020, Alameda County issued

21    a Shelter-in-Place Order, which instructed its citizens to "self-isolate in their places of residence to the

22    maximize extent feasible."[20] On that same day, similar orders were issued by five surrounding Bay

23    Area counties, as well as the City of Berkeley, with a total population exceeding six million people

---

18    *See* https://keepa.com/#!product/1-B06XZJH8XJ (last visited Oct. 22, 2021). For brevity, links to
      specific product price-tracking websites are abbreviated to their URLs.

19    *Id.*

20    Dr. Erica Pan, Interim Health Officer of the Cty. of Alameda, *Order of the County Health Officer
      to Shelter in Place* (Mar. 16, 2020), http://www.acgov.org/documents/Final-Order-to-Shelter-In-
      Place.pdf.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

covered by the orders. A California statewide shelter-in-place order remained in effect through June 15, 2021.

23.    While discouraging avoidable excursions, like in Marin County, Alameda County officials informed residents that they could still "go online, purchase items, and have them delivered to [their] home."[21] The Alameda County Interim Health Officer has explained that sheltering in place is necessary because of, among other things, "evidence of continued significant community transmission of COVID-19 within the County and throughout the Bay Area," that "the virus can survive for hours to days on surfaces and be indirectly transmitted between individuals," "[b]ecause even people without symptoms can transmit the infection, and because evidence shows the infection is easily spread, gatherings and other direct or indirect interpersonal interactions can result in preventable transmission of the virus."[22]

24.    Consistent with these orders and prevailing guidance from medical experts, Mr. Steinberg limited trips outside the home during the COVID-19 pandemic. He also sought to prepare more meals at home to minimize contact with outside food vendors, which includes making his own bread.

25.    Although fearful when leaving his home, Mr. Steinberg during the pandemic attempted to purchase yeast, a necessary ingredient for bread, at local grocery stores. But at points during the pandemic, yeast was unavailable or exceedingly difficult to procure. John Heilman, vice president of yeast manufacturing for AB Mauri, makers of Fleischmann's Yeast, told USA Today that the two to three weeks of dry yeast buffer inventory Fleischmann's had on hand "was gone almost instantly" after

---

[21]    *See* Alameda Cty. Health Care Servs. Agency, *Alameda County FAQs for Shelter in lace Order* at 21 (updated Apr. 29, 2020, eff. May 4, 2020), available at https://www.albanyca.org/home/showpublisheddocument/44444/637239184942130000 (FAQ: "Can I still order the things I need online and have them delivered to my residence?").

[22]    *See id.* at 3, ¶ 9.

SECOND AMENDED CLASS ACTION COMPLAINT – 9
010923-11/2753066 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

the beginning of the COVID-19 pandemic, and estimated on April 23, 2020, that it would take approximately one to two months to get store shelves stocked again.[23]

26.    In April 2020, Mr. Steinberg was unable to locate yeast at local grocery stores and looked for supply on the internet. On April 3, 2020, Mr. Steinberg saw a sales listing for a two-pound pouch of Red Star Active Dry Yeast on Amazon for **$39.97**. He looked online at the website of another large retailer but could not find any yeast for sale.

27.    Mr. Steinberg was unable to find yeast elsewhere, he understood the government directives to shelter in place, and he recognized the importance of making food at home in the midst of the pandemic. Thus, he felt that he had no meaningful choice but to purchase yeast on Amazon and accept the terms Amazon was offering, and he did so.

28.    Nonetheless, Mr. Steinberg was still very upset about the price of yeast on Amazon, a basic household staple, and believed that he was being exploited because there was nowhere else to buy it. So, in the week following his April 3, 2020 purchase, he complained to Amazon about the price and the apparent price gouging. He made multiple phone calls, but the calls got him nowhere. It seemed that each Amazon agent he spoke with had no idea what was going on, apart from noting his prior call and concern. They read from what seemed to be a script, which was nonresponsive to anything he was trying to communicate. At some point he was told that the yeast he purchased was not returnable because it is a food product. When Mr. Steinberg complained about the price jump and pointed out that he believed the Amazon website tracks prices, a person he thinks was a supervisor said that he had no access to that information, and that it is up to another department to figure out whether a price is appropriate. Feeling frustrated but out of options, Mr. Steinberg kept the yeast and received no discount or rebate.

29.    The price Mr. Steinberg paid for Red Star Active Dry Yeast vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when Health and Human Services Secretary Alex M. Azar II declared a nationwide COVID-19 health emergency (effective January 27, 2020), the

---

[23]    Jessica Guynn & Kelly Tyko, *Dry yeast flew off shelves during coronavirus pantry stocking. Here's when you can buy it again*, USA TODAY (updated Apr. 30, 2020), https://www.usatoday.com/story/money/food/2020/04/23/coronavirus-pantry-baking-yeast-shortage/3004274001/.



specific product Mr. Steinberg purchased sold on Amazon for **$7.02**.[24] By April 3, 2020, when Mr.

Steinberg made his purchase, the price had jumped to **$39.97**, which represents a ***469%*** increase over

the January 31, 2020 price.[25]



### 3.    Julie Hanson

30.    Plaintiff Julie Hanson lives in Diamond Springs, California, which is in El Dorado

County.

31.    Following the HHS' January 31, 2020 declaration of a national COVID-19

emergency, El Dorado County issued a Shelter-in-Place directive on March 19, 2020.[26] California's

---

[24] *See* https://keepa.com/#!product/1-B005KR0MZG (last visited Oct. 22, 2021). The price for this product reached as high as $99.95 during the pandemic.

[25] *Id.*

[26] *See* Nancy J. Williams, Public Health Officer, El Dorado Cty. Health & Human Servs. Agency, *Directive of the El Dorado County Public Health Officer Restricting Activities in Response to COVID-19 Outbreak* (Mar. 19, 2020). available at https://www.edcgov.us/Government/hhsa/ Documents/El%20Dorado%20-%20shelter-in-place%20directive%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.pdf (last visited July 1, 2020).



Governor Newsom issued a statewide Shelter-in-Place Order the same day.[27] As with the statewide directive, El Dorado County's Order was designed to ensure "that the maximum numbers of people self-isolate in their place of residence to the greatest extent feasible."[28] Action was needed, El Dorado County concluded, because of "evidence of increasing occurrence of COVID-19 in the surrounding counties and the State of California."[29] Officials warned in particular that individuals with underlying health conditions faced enhanced "risk for serious health complications, including death, from COVID-19."[30] El Dorado County's Shelter-in-Place Order came on the heels of statewide guidance from the California Department of Health, which highlighted the "elevated risk" for health-compromised individuals and advised them to "[c]onsider on-line ordering for food and other supplies" to keep themselves and loved ones healthy.[31]

32.    Ms. Hanson is 57 years old and suffers from underlying health conditions, some of which heighten the risk she will experience adverse, and potentially fatal, consequences should she come in contact with the novel coronavirus. Ms. Hanson has Parkinson's disease and bronchiectasis, a lung condition that causes coughing due to scarred tissue in the bronchi, or the passages that let air into the lungs. Severe bronchiectasis can lead to respiratory and heart failure. Ms. Hanson was also in a head-on vehicle collision in 2018, which has impaired her mobility.

33.    Prior to the outbreak of COVID-19, Ms. Hanson was just beginning to regain mobility sufficient to shop outside her home. But as COVID-19 spread through California in February 2020, Ms. Hanson decided, particularly in light of her health conditions, that it was not safe for her to make retail excursions. This decision comported with public health guidance, including subsequent directives issued by El Dorado County and California health officials, regarding the need to self-

---

[27]  *See* Cal. Exec. Order N-33-20 (Mar. 19, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf (last visited July 1, 2020).

[28]  *See* El Dorado Cty., *supra* note 26.

[29]  *See id.*

[30]  *See id.*

[31]  *See* Cal. Dep't of Pub. Health, *supra* note 15.

SECOND AMENDED CLASS ACTION COMPLAINT – 12
010923-11/2753066 V1

isolate, particularly for persons with underlying health conditions. To meet her daily needs, and to provide for her family, Ms. Hanson turned to Amazon and the home delivery it offers. Since the outbreak of COVID-19, Ms. Hanson has purchased certain items from Amazon for herself, and others for daughters who live in their own residences and receive support from Ms. Hanson.

34.     On or around April 14, 2020, Ms. Hanson became aware that one of her daughters, Sabrina Gates, had acquired a kitten and was experiencing an outbreak of fleas in her own household. Like her mother, Ms. Gates generally stayed inside her home throughout the COVID-19 pandemic to protect herself and particularly her diabetic son.

35.     Ms. Hanson undertook to locate products that might alleviate her daughter's flea infestation. Ms. Hanson has had many pets in her lifetime and has found flea sprays manufactured by Zodiac to be particularly safe and effective at treating houses for fleas. She was able to find Zodiac Flea & Tick Spray listed on Chewy.com, an online pet-supply retailer, but the product was not available for shipment. Ms. Hanson subsequently found the same product on Amazon and, on April 30, 2020, purchased it for the price of $14.19. Ms. Hanson paid out of pocket and has not been reimbursed. This product was supplied by Amazon itself (not a third-party retailer).

36.     The price Ms. Hanson paid for Zodiac Flea & Tick Spray vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Ms. Hanson purchased sold on Amazon for **$8.99**.[32] By April 30, 2020, when Ms. Hanson made her purchase, the price had increased to **$14.19**, representing a ***58%*** increase over the January 31, 2020 price.[33]

---

[32]   *See* https://keepa.com/#!product/1-Bpara B001OVGJUO (last visited Oct. 22, 2021).

[33]   *See id*.

SECOND AMENDED CLASS ACTION COMPLAINT – 13
010923-11/2753066 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX



4.      **Christina King**

37.      Plaintiff Christina King lives in Mesa, Arizona. Mesa is in Maricopa County.

38.      As COVID-19 spread through Arizona in early 2020, Maricopa County was at the epicenter of the evolving crisis. The first known case of COVID-19 in Arizona was a student at Arizona State University in Maricopa County who had travelled to Wuhan China and was diagnosed upon his return.[34] The virus spread rapidly, and with great alarm, through the community in the weeks that followed.

39.      On March 11, 2020, Arizona Governor Doug Ducey announced a state of emergency due to the continuing outbreak of COVID-19.[35] Less than a week later, on March 17, 2020, Mesa Mayor John Giles declared a state of emergency in Mesa.[36] Just two days later, with COVID-19

---

[34]  *See* Arizona Department of Health Services, News Release (Jan. 26, 2020) available at https://www.azdhs.gov/director/public-information-office/index.php#news-release-012620     (last visited Oct. 22, 2021).

[35]  *See Declaration of Emergency* (March 11, 2020) available at https://azgovernor.gov/sites/default/files/declaraton_0.pdf (last visited Oct. 22, 2021).

[36]  *See Proclamation and Declaration of Emergency* (March 17, 2020), available at https://www.mesaaz.gov/home/showpublisheddocument/37274/637200547492300000,

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

spreading exponentially, Mayor Giles closed all recreational, entertainment, sports, and fitness venues, while also shutting down restaurants and bars to onsite consumption.[37] Mayor Giles urged residents to avoid social gatherings of ten or more people and "to practice social distancing in their daily lives."[38] Similar guidance was issued in neighboring Maricopa communities, including Phoenix.

40.     As with the rest of the country, Maricopa County has experienced a shortage of essential products during the pandemic, with disruptions in the supply chain and hording emptying retail shelves. The situation became so dire that, on March 19, 2020, Governor Ducey called in the National Guard to help retail stores restock their shelves, to the extent possible.[39] Shortly thereafter, Governor Ducey closed Arizona schools and, on March 30, 2020, he issued a statewide "stay home" order in hopes of quelling the transmission of COVID-19.[40]

41.     The outbreak of COVID-19 posed acute risks to Mrs. King, who has a compromised immune system due to chemotherapy treatment she completed in January 2020. Mrs. King also interacts regularly with elderly parents and in-laws who live nearby. From the outset of the pandemic, Mrs. King has been particularly concerned about contracting and transmitting COVID-19 to these family members, who, given their advanced age, are at heighted risk of experiencing severe and potentially fatal health effects. Mrs. King's mother is also immunocompromised as a result of having lupus.

---

last visited Oct. 22, 2021.

[37] *See City of Mesa, Arizona Second Proclamation of the Mayor Under the Declaration of Emergency* (March 19, 2020) available at http://www.leagueaz.org/e/covid_19/links/mesa_proclamation_soe_2.pdf (last visited Oct. 22, 2021).

[38] *Id.*

[39] *See* State of Arizona, Department of Emergency and Military Affairs, *Frequently Asked Questions for AZ National Guard COVID-19 Response Task Force Logistics* (March 23, 2020) available at https://azgovernor.gov/sites/default/files/azngtaskforcelogisticsfaqs_2020-03-23_0.pdf (last visited Oct. 22, 2021).

[40] *See* Office of the Governor Doug Ducey*, Executive Order: 2020-18* (March 30, 2020) available at https://azgovernor.gov/sites/default/files/eo_2020-18_stay_home_stay_healthy_stay_connected_1.0.pdf (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

42.     Mrs. King has turned increasingly to online retail during the pandemic. She did this to protect herself and family from COVID-19, including the elderly parents and in-laws she needed to help in obtaining essential items. In addition, Mrs. King has been unable to find many of the products she and her family require at brick-and-mortar retail outlets in her vicinity, making online retailers the primary option. Mrs. King's elderly parents and in-laws do not frequently shop online due to concerns about identity theft, and thus Mrs. King purchases and distributes items to them when she can.

43.     When Mrs. King shops online she typically compares prices across multiple platforms, including Vitacost, Target, Sprouts, Costco, Amazon, and others. But throughout the pandemic, Mrs. King observed that essential goods were often unavailable on many of these platforms, or were available only for short periods of time before supplies were exhausted. In many instances, Mrs. King found that the products she seeks (including essential items to combat COVID-19) were available only on Amazon.

44.     Amazon repeatedly price gouged Mrs. King during the pandemic, including on at least the five purchases detailed below.

45.     Around March 20, 2020, Mrs. King's mother expressed her dismay about the number of products that were out of stock at local stores, including beef ramen noodles. Recognizing that her mother was growing increasingly nervous about product shortages, Mrs. King looked online for an available supply of beef ramen noodles that could be delivered safely to her home. Amazon is not Mrs. King's preferred retailer for food items, but she had difficulty finding this product on other online stores. Eventually, Mrs. King found a 12-pack of Marachan beef ramen noodles on Amazon for $38.89. Mrs. King believed $38.89 was an inflated price, and this was not the exact product Mrs. King's mother preferred. But having been unable to find ramen noodles anywhere else, Mrs. King had no alternative to Amazon and made the purchase. Mrs. King paid out-of-pocket for this item and was not reimbursed.

46.     The price Mrs. King paid Amazon for a 12-pack of Marachan instant noodles vastly exceeded Amazon's price prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs.



King purchased sold on Amazon for **$4.20.** The **$38.89** price Mrs. King paid on March 20, 2020 represents an **826%** increase over the January 31, 2020 price.[41]



47.    Also in March 2020, Mrs. King was looking to purchase a supply of rice, a staple for her own family. Like many staples, rice was in short supply at this time. Mrs. King could not locate any rice at her local grocery outlets, so again she checked online. Mrs. King searched several online stores, but they were all sold out of rice. Ultimately, Mrs. King found a four-pack of 32-ounce containers of RiceSelect Jasmati rice on Amazon. This was substantially more rice than Mrs. King wanted to purchase. And Mrs. King believed the price Amazon was charging—$44.95—was inflated. But given her inability to find rice at grocery outlets or online stores, and given the importance of safely obtaining food staples for her family, Mrs. King did not believe she had a meaningful choice. She purchased the rice on March 20, 2020.

48.    The price Mrs. King paid vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs. King purchased sold on Amazon for **$20.82.** The **$44.95** price Mrs. King paid on March 20, 2020, represents an **116%** increase over the January 31, 2020 price.[42]

---

[41]    *See* https://keepa.com/#!product/1-B003OB69PC (last visited Oct. 22, 2021).

[42]    *See* https://keepa.com/#!product/1-B000EH4XYS (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9



10    49.    Mrs. King also experienced great difficulty obtaining hand sanitizer during the

pandemic, an essential product that leading public health officials have recommended be used, and

used liberally, to stop the spread of COVID-19. Due to the shortage, many people have endeavored

to make their own hand sanitizer, and various tutorials have been published on the internet showing

how this can be done. Having encountered one of those tutorials, and unable to find hand sanitizer

anywhere for purchase, Mrs. King decided to buy the ingredients needed to mix her own.

16    50.    One ingredient used in homemade hand sanitizer is vegetable glycerin, a product that

Mrs. King had not recalled seeing at retail stores in her area, or online for that matter. On March 13,

2020, she looked on Amazon and found a 16-ounce bottle of NOW Solutions Vegetable Glycerin

selling for $11.54. This product was supplied by Amazon itself (not a third-party retailer). With her

supply of hand sanitizer dwindling, and concerned about the health and safety of her family, Mrs.

King purchased the vegetable glycerin from Amazon. Mrs. King saw no reasonable alternative in the

circumstances.

23    51.    The price Mrs. King paid for this particular vegetable glycerin product vastly

exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared

a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs.

26
27
28

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    King purchased sold on Amazon for **$5.79.** The **$11.54** price Mrs. King paid on March 20, 2020

2    represents an **99%** increase over the January 31, 2020 price.[43]



52.    Throughout the pandemic, Mrs. King also sought to protect herself and family by

using cleaning and disinfectant products on the surfaces of her home. This was consistent with

guidance from public health authorities. At various points during the pandemic, however, Mrs. King

observed shortages of disinfectants at physical and online stores.

53.    Throughout March 2020, Mrs. King was having particular difficulty locating

disinfectants, and, specifically, disinfecting wipes. Her parents were having the same difficulty and

they collectively agreed that, if anyone found a supply, they would purchase extra to share.

54.    Typically, Mrs. King tries to purchase cleaning products from eco-friendly

manufacturers, including Seventh Generation. Mrs. King was unable to find any Seventh Generation

disinfectants at this time, however. Thus, she broadened her search to look for disinfectants of any

type. She found none in physical stores, or at various online stores she recalls searching, including

OfficeMax, Staples, Vitacost, and Amazon.

55.    After several days of searching, Mrs. King found a supply of Clorox disinfecting

wipes that had become available on Amazon—specifically a 2-pack of Clorox Commercial Solutions

Disinfecting Wipes that Amazon was selling for $90. This product was supplied by Amazon itself

---

[43]    *See* https://keepa.com/#!product/1-B0019LWU2K (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

(not a third-party retailer). Although Clorox is not Mrs. King's brand of choice, and while she believed the price was substantially inflated, Ms. King also recognized that she had no meaningful choice given the scarcity of disinfectants and her inability to buy disinfecting wipes from any other retailer. In these circumstances, and mindful of how critical disinfectants are to combat COVID-19, Mrs. King purchased the Clorox wipes from Amazon.

56.    The price Mrs. King paid for these particular Clorox disinfecting wipes grossly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs. King purchased sold on Amazon for **$54.63.** The **$90.00** price Mrs. King paid on March 20, 2020, represents an **65%** increase over the January 31, 2020 price.[44]



57.    Mrs. King was also price gouged on water, an essential item that was particularly essential in her circumstances. Mrs. King's husband has sleep apnea, a condition in which breathing stops during sleep, leading to a host of health complications. One treatment for sleep apnea is use of a continuous positive airway pressure, or "CPAP," machine during sleep. CPAP machines, including the machine used by Mrs. King's husband, require distilled water during operation. Distilled water, however, was difficult to find during the pandemic.

---

[44]    *See* https://keepa.com/#!product/1-B077ZMMT9D (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 20
010923-11/2753066 V1



58.     In March 2020 in particular, Mrs. King was unable to locate any supply of distilled water. She looked both at physical stores, and online, and found none available. The only supply she could locate was a package of 24 bottles of Smartwater distilled water available on Amazon. This was substantially more distilled water than she required for her husband's CPAP machine. The price Amazon was charging—$56.76—also appeared exceedingly high to Mrs. King. But recognizing that distilled water was not available elsewhere, and having tried for some time to find it, Mrs. King concluded that she had no alternative but to purchase this product from Amazon. Without the water, her husband's CPAP machine could not operate.

59.     The price Mrs. King paid for Smartwater distilled water grossly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mrs. King purchased sold on Amazon for **$37.20.** The **$56.76** price Mrs. King paid on March 25, 2020 represents a **53%** increase over the January 31, 2020 price.[45]



### 5.    Ronnell Robertson

60.     Plaintiff Ronnell Robertson lives in Hickory, North Carolina. Hickory is in Catawba County.

---

[45]   *See* https://keepa.com/#!product/1-B073WWZ22T (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 21
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

61.    North Carolina reported its first case of COVID-19 on March 3, 2020.[46] The virus spread rapidly in North Carolina thereafter. On March 10, 2020, governor Roy Cooper declared a state of emergency, instructing, among other things, that employers and employees "use teleworking technologies to the greatest extent possible."[47] A week later, governor Cooper closed all restaurants and bars to sit-down service.[48]

62.    As the virus spread across North Carolina, Mr. Robertson had difficulty obtaining essential consumer goods, including goods needed to combat the virus and its transmission. Around March 17, 2020, Mr. Robertson sought out a supply of disinfectant wipes that he could use to sanitize surfaces in his home and office. Given the extreme risks posed by COVID-19, Mr. Robertson was particularly interested in obtaining a medical-grade disinfectant. The retail outlets in his area, however, were sold out of all types of disinfectant wipes.

63.    Mr. Robertson searched online and, on March 17, 2020, found a supply of CaviWipes on Amazon. This particular product is marketed as a powerful disinfectant for use in medical settings. Recognizing that disinfectants were in scarce supply, and not likely to appear at other retail outlets (online or brick-and-mortar) any time soon, Mr. Robertson purchased eight packages of CaviWipes on Amazon at $26.99 per package.

64.    Although Mr. Robertson recognized that $26.99 was an inflated price for this product, he did not believe he had any choice given the imminent health risks posed by the spreading coronavirus and his inability to procure a supply of disinfectants elsewhere. To keep himself and his family safe, Mr. Robertson made the purchase.

---

[46]   *See* North Carolina Department of Health and Human Services, Press Release (March 3, 2020) available at https://web.archive.org/web/20200407230739/https://www.ncdhhs.gov/news/press-releases/north-carolina-identifies-first-case-covid-19 (last visited Oct. 22, 2021).

[47]   *See* Office of Governor Roy Cooper, *Governor Cooper Declares State of Emergency to Respond to Coronavirus COVID-19* (March 10, 2020) available at: https://governor.nc.gov/news/governor-cooper-declares-state-emergency-respond-coronavirus-covid-19 (last visited Oct. 22, 2021).

[48]   *See* Office of Governor Roy Cooper, *Governor Cooper Issues Executive Order to Close Sit-Down Service at Restaurants and Bars and Make State Unemployment Benefits More Widely Available* (March 17, 2020) available at: https://governor.nc.gov/news/governor-cooper-issues-executive-order-close-sit-down-service-restaurants-and-bars-and-make (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

65.    The price Mr. Robertson paid for CaviWipes vastly exceeded the price on Amazon prior to the pandemic. On January 31, 2020, when the HHS declared a nationwide COVID-19 health emergency (effective January 27, 2020), the specific product Mr. Robertson purchased sold on Amazon for **$9.99**.[49] By March 17, 2020, when Mr. Robertson made his purchase, the price had jumped to **$26.99**, which represents a **170%** increase over the January 31, 2020 price.[50]



**B.    Defendant**

66.    Defendant Amazon.com Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Seattle, Washington. Amazon is the world's largest online retailer.

**C.    History of Fair Pricing**

67.    From ancient times, societies have imposed a duty on merchants to sell in good faith. The Hebrew culture was the first to prescribe fair dealing as an essential ethical tenant.[51] The Hebrew Talmud, for example, provides that "if thou sell [ought] unto your neighbour, or buyest ought of thy

---

[49]    *See* https://keepa.com/#!product/1-B0054OCHQW (last visited Oct. 22, 2021).

[50]    *Id.*

[51]    Hon. Sheldon Gardner & Robert Kuehl, *Acquiring on Historical Understanding of Duties to Disclose, Fraud, and Warranties*, 104 COM. L.J. 168, 170 (1999).

SECOND AMENDED CLASS ACTION COMPLAINT – 23
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    neighbour's, hand, ye shall not oppress one another."[52] Talmudic scholars interpreted this verse to

2    prohibit overcharges and undercharges,[53] and ruled that in any transaction in which the profit exceeded

3    one-sixth, the transaction would be null and void.[54] Jewish law was skeptical that self-regulating

4    markets could ensure fair prices, and accordingly intervened to adjust prices that, at least in legal terms,

5    it deemed "unfair."[55] Aspects of Jewish law, at least those touching on good faith dealing and full

6    disclosure, found their way into Roman law and consequently, into the Civil Code countries of France,

7    Germany, and others.[56]

8           68.    The major Western religious traditions also address the issue of "fair" prices. The

9    Catechism of the Catholic Church prohibits merchants from making pricing decisions that take unfair

10    advantage of those in need.[57] Essentially the same prohibition found its way into the secular norms of

11    early European markets, where merchants and their customers believed that there was indeed an

12    intrinsically fair price that could be objectively determined.[58] Market actors believed that, unfair

13

_____

14    [52]  *Leviticus* 25:14.

15    [53]  Hershey H. Friedman, *Biblical Foundations of Business Ethics*, 3 J. MARKETS & MORALITY 43, 48 (2000).

16    [54]  *Id.* at 49 (citing the Babylonian Talmud, *Bava Metzia*, 50b). Interestingly, Talmudic scholars
17    seemed to have a relatively sophisticated understanding of the workings of the law of supply and
18    demand, Professor Friedman relates the story of Shmuel, the Talmudic sage, who was concerned
      with sellers raising the prices of myrtle branches prior to Sukkot. *Id.* He warned the myrtle branch
19    merchants that unless they maintained stable prices, he would allow holiday observers to use myrtle
      branches with broken tips. *Id.* (citing Babylonian Talmud, *Sukkah*, 34b). Clearly Shmuel
20    understood the role of increased supply as a moderating influence on price.

21    [55]  MEIR TAMARI, "WITH ALL YOUR POSSESSIONS": Jewish Ethics and Economic Life 87, 87-88
      (1987).

22    [56]  Saul Litvinoff, *Good Faith*, 71 TUL. L. REV. 1645, 1651-55 (1997).

23    [57]  Catechism of the Catholic Church, pt. 3, § 2, ch. 2, art. 7, *available at*
      https://www.usccb.org/sites/default/files/flipbooks/catechism/580/ (last visited Sept. 19, 2024)
24    ("Even if it does not contradict the provisions of civil law, any form of unjustly taking and keeping
      the property of others is against the seventh commandment; thus, deliberate retention of goods lent
25    or of objects lost; business fraud; paying unjust wages; forcing up prices by taking advantage of
      the ignorance or hardship of another."); *see also Deuteronomy* 25:13-16.

26    [58]  EDWARD CAHILL, FRAMEWORK OF A CHRISTIAN STATE 43 (1930) ("According to medieval
27    teaching on the other hand, the price of a commodity was supposed to be determined by objective
      value alone; and could not be justly influenced by the special need or ignorance of buyer or
28    seller.").

SECOND AMENDED CLASS ACTION COMPLAINT – 24
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

pricing could best be avoided by trading in an open, transparent market.[59] Similarly, Islamic law prohibits both *Bay' al-mudtarr*, the exploitation of need by, for example, charging an exorbitantly high price,[60] and *Ihtikar*, which is hoarding, or withholding supplies of essential goods and services with a view to raising prices.[61]

69. Not surprisingly, given this deep-rooted history of prohibiting price gouging, price gouging is specifically called out in many state statutes. More than 35 states have dedicated price-gouging laws. Because there is no federal law protecting consumers from price gouging, states provide the only defense from unscrupulous sellers. While statutes and prohibitions vary across the states, they consistently include three facets. First, price increases are generally only prohibited when there is a declared emergency (hurricanes, earthquakes, flooding, or pandemics). Second, price increases are only generally prohibited on a specific set of products that are deemed necessary or essential. Third, the price increase must be due to the presumed increase in demand because of the emergency and not due to some other factor such a regular seasonal price increase or a new supplier.

70. The amount of increase in prices that violate price gouging statutes vary from state to state. Some state price-gouging laws designate a specific percentage increase over which a price increase would be considered gouging. The prohibited percentages range from 10% to 25%. Other state laws use less precise language to describe prohibited price increases such as: "excessive," "grossly exceeds," "unreasonable," "exorbitant," or "unconscionable."

71. Price gouging is regulated in Washington by the state's Consumer Protection Act, which proscribes "unfair" commercial practices. As the Washington Supreme Court recently observed in answering questions certified by this Court, price gouging is generally understood as "a situation

---

[59] JEAN FAVIER, GOLD & SPICES; OF COMMERCE IN TILE MIDDLE AGES 103 (Caroline Higgitt trans., 1998) "[T]o the medieval mind, price gouging … [was a] sin of greed, which was to be warded off by trading in an open market, observable by all.").

[60] Mohammad Nejatullah Siddiqi, Lecture to the UCLA Int'l Inst., Islamic Banking and Finance (Fall 2001), transcript available at http://www.isop.ucla.edu/article4.asp?parentid=15056 (last visited Oct. 22, 2021.

[61] MISHKAT, book xii, ch. viii. ("Those who bring grain to a city to sell at a cheap rate are blessed, and they who keep it back in order to sell at a high rate are cursed.").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    where a retailer or a supplier takes advantage of increases in demand by charging exorbitant prices for

2    necessities after a natural disaster or other state emergency."[62] The Washington Supreme Court

3    confirmed that Price gouging can be deemed "unfair" under the CPA and, where the facts are in dispute

4    or the plaintiff "advances a case-specific unfairness claim that is not regulated by statute or by some

5    other well-established public policy," this unfairness determination is to be made by a jury.[63]

6                              **IV.    FACTUAL ALLEGATIONS**

7    **A.    Outbreak of COVID-19**

8          72.    In late 2019, an outbreak of respiratory illness resulting from a novel coronavirus was

9    first identified in Wuhan City, Hubei Province, China. That illness, now known as COVID-19, has

10    spread across the world. COVID-19 was designated a pandemic by the World Health Organization,

11    the first pandemic resulting from a coronavirus. As of the date of this Second Amended Complaint,

12    more than 750 million confirmed cases of COVID-19 have been reported across the globe, and almost

13    7 million people have died from their illness.[64]

14          73.    The first diagnosed case of COVID-19 in the United States was a Washington state

15    resident who had traveled to Wuhan.[65] That diagnosis occurred on January 21, 2020. Within days,

16    there was a second diagnosis in Chicago and another in Orange County.[66] Alarm spread rapidly within

17    the public health community and the general population at large. On January 23, 2020, the World

18    Health Organization confirmed that the coronavirus was being transmitted human-to-human and

19    recommended that "all countries should be prepared for containment, including active surveillance,

---

[62]    *See Greenberg v. Amazon*, Case No. 101858-4 (Wa. Sup. Ct.), Op. at 6 (quotation marks omitted).

[63]    *Id.* at 57.

[64]    *See* World Health Organization, *Coronavirus (COVID-19) Dashboard,* available at
        https://covid19.who.int/ (last visited August 28, 2021).

[65]    *See* Alan J. Stein, *First confirmed case of COVID-19 in the United States is diagnosed in
        Snohomish County on January 20, 2020*, HistoryLink.org (Apr. 20, 2020),
        https://historylink.org/File/21018.

[66]    *See* Stacey Baca et al., *Coronavirus diagnosed in Chicago woman; 2nd case in US*, ABC 7
        Chicago (Jan. 24, 2020), https://abc7chicago.com/coronavirus-chicago-in-ohare/5875738/.

SECOND AMENDED CLASS ACTION COMPLAINT – 26
010923-11/2753066 V1



early detection, isolation and case management, contract tracing and prevention."[67] The following week, several cases of human-to-human transmission were confirmed in the United States.

74.    On January 31, 2020, the HHS declared a public health emergency (effective January 27, 2020).[68] At the same time, the United States imposed entry restrictions on foreign nationals and quarantined United States citizens who had been evacuated from Hubei province.[69] The virus, however, continued to spread rapidly, with new cases being reported across the country (and world). Washington state was an early epicenter, with an outbreak occurring at a long-term care center in Kirkland, Washington.[70]

75.    Things took a particularly dire turn on February 26, 2020, when health officials confirmed that a California patient had tested positive for COVID-19 despite having no known exposure to the virus through travel or contact with an affected individual. This was the first confirmation that COVID-19 was being transmitted in the United States through "community spread," suggesting that untold numbers of citizens were also affected but asymptomatic or otherwise not being tested for COVID-19.

76.    On February 29, a Washington man was the first reported COVID-19 death.[71] The virus continued to spread exponentially. The CDC has reported that during a three-week stretch between late February and early March 2020, COVID-19 cases in the United States "increased more than 1,000-

---

[67]    *See* Kyle Hicks, *3rd US case of new coronavirus confirmed in Orange County, California, officials say*, ABC 7 DENVER (updated Jan. 26, 2020), https://www.thedenverchannel.com/news/national/3rd-us-case-of-new-coronavirus-confirmed-in-orange-county-california-officials-say.

[68]    *See* Dep't Health & Human Servs., Press Release, *Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus* (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergency-us-2019-novel-coronavirus.html (last visited Oct. 22, 2021).

[69]    *See* Alex Leary & Brianna Abbott, *U.S. Imposes Entry Restrictions Over Coronavirus*, WALL STREET J. (updated Jan. 31, 2020), https://www.wsj.com/articles/u-k-reports-first-coronavirus-cases-as-china-allies-limit-ties-11580467046.

[70]    *See* Nicole Acevedo & Minyvonne Burke, *Washington state man becomes first U.S. death from coronavirus*, NBC NEWS (updated Feb. 29, 2020), https://www.nbcnews.com/news/us-news/1st-coronavirus-death-u-s-officials-say-n1145931.

[71]    *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – 27
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  fold."[72] By March 17, 2020, COVID-19 had been detected in all 50 states[73] and 91 people had died

2  from COVID-19 in the United States.[74] Today, more than 1 million people in the United States have

3  died from COVID-19, and no aspect of American life has gone unchanged.[75]

4  **B.      Emergency Declarations and Lockdowns**

5          77.     Following the HHS' January 31, 2020 declaration of a national public health emergency

6  related to COVID-19, state governments issued their own declarations of emergency. The first

7  statewide proclamation was issued by California Governor Gavin Newsom on March 19, 2020.[76]

8  Declarations in other states followed in rapid succession.

9          78.     Consistent with guidance from public health officials,[77] state governments typically

10 coupled (or followed) their declarations of emergency with "stay home," "shelter-in-place," or other

11 types of lockdown orders requiring residents to remain in their homes to the extent feasible. By April

12 20, 2020, 45 states had some form of "stay home" order in place, covering approximately 95% of the

---

[72] *See* Anne Schuchat, MD, CDC COVID-19 Response Team, *Public Health Response to the Initiation and Spread of Pandemic COVID-19 in the United States*, February 24–April 21, 2020, 69 MORBIDITY & MORTALITY WEEKLY REP. (May 8, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6918e2.htm.

[73] *See* Associated Press, *West Virginia, the last US state without coronavirus, confirms 1st case*, FOX 8 NEWS (updated Mar. 17, 2020), https://myfox8.com/news/coronavirus/west-virginia-the-last-us-state-without-coronavirus-confirms-1st-case/.

[74] *See* Will Feuer, *US coronavirus cases surpass 5,000, up fivefold from a week ago*, CNBC (updated Mar. 17, 2020), https://www.cnbc.com/2020/03/17/us-coronavirus-cases-surpass-5000-up-fivefold-from-a-week-ago.html.

[75] *See* CDC, *Covid Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#maps_deaths-total (last visited Sept. 19, 2024).

[76] *See* Cal. Exec. Order N-33-20, *supra* note 27.

[77] *See, e.g.*, Ros Krasny et al., *Fauci says it's time to 'hunker down'*, ARKANSAS DEMOCRAT GAZETTE (updated Mar. 16, 2020), https://www.arkansasonline.com/news/2020/mar/16/fauci-says-it-s-time-to-hunker-down-202/ (National Institute of Allergy and Infectious Diseases (NIAID) director Dr. Fauci instructing Americans to "stay home" during March interviews with major news outlets); Dean Cole & Alison Main, *Top infectious disease expert4 doesn't rule out supporting temporary national lockdown to combat coronavirus*, CNN (updated Mar. 15, 2020), https://www.cnn.com/2020/03/15/politics/anthony-fauci-national-lockdown-bars-restaurants-cnntv/index.html (Dr. Fauci informing the public in March 2020 that he would "like to see a dramatic diminution of the personal interaction that we see").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

United States population.[78] As the NEW YORK TIMES put it, "In a desperate race to stunt the spread of the coronavirus, millions of Americans have been asked to do what would have been unthinkable only a few months ago: Don't go to work, don't go to school, don't leave the house at all, unless you have to."[79]

79.    Although the wording differed, state governments across political stripes echoed this resounding theme:

- Gov. Eric J. Holcomb (Indiana): "Hoosiers, hunker down."[80]

- Gov. Ned Lamont (Connecticut): "At this critical time it is essential that everyone just stay home."[81]

- Gov. Brad Little (Idaho): "Our health care and public safety workers are putting themselves in harm's way to respond to the coronavirus emergency, and we owe it to them to do our part by following this statewide stay-home order."[82]

- Gov. Larry Hogan (Maryland): "This is a deadly public health crisis—we are no longer asking or suggesting that Marylanders stay home, we are directing them to do so."

- Gov. Tim Walz (Minnesota): "We are asking you—because it is going to take cooperation and collaboration—stay home."[83]

- Gov. Bill Lee (Tennessee): "[B]ecause with personal liberty comes great personal responsibility, all Tennesseans must do their part by staying at home whenever possible."[84]

---

[78] *See* Sara Mervosh et al., *See Which States and Cities Have Told Residents to Stay at Home*, N.Y. TIMES (updated Apr. 20, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[79] *Id.*

[80] *See* IndyStar, *Indiana coronavirus updates: Governor orders Hoosiers to stay at home starting Wednesday* (updated Mar. 24, 2020), https://www.indystar.com/story/news/health/2020/03/23/indiana-coronavirus-updates-indianapolis-covid-19-latest-news/2896967001/.

[81] *See* Gov. Ned Lamont, Press Release, *Governor Lamont Signs Executive Order Asking Connecticut Businesses and Residents: 'Stay Safe, Stay Home'* (Mar. 20, 2020), *see* https://www.housedems.ct.gov/wood/article/covid-19-update-320.

[82] *See* State of Idaho, *Statewide Stay-Home Order* (updated Mar. 27, 2020), *see* https://www.nytimes.com/interactive/2020/us/coronavirus-stay-at-home-order.html.

[83] *Stay at home: These states have issued orders for residents not to go out amid COVID-19 pandemic*, FOX 10 PHOENIX (updated Apr. 9, 2020), https://www.fox10phoenix.com/news/stay-at-home-these-states-have-issued-orders-for-residents-not-to-go-out-amid-covid-19-pandemic.

[84] *See* Tenn. Exec. Order No. 22 (Mar. 30, 2020), https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee22.pdf.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- Gov. Phil Scott (Vermont): "Vermonters are directed to stay at home or in their place of residence, leaving only for essential reasons."[85]

- Gov. Jay Inslee (Washington): "The more of us who stay home, the fewer of us who will be infected by COVID-19 and the more lives that will be saved."[86]

- Gov. Chris Sununu (New Hampshire): "We can't stress this enough – you should stay at your house unless absolutely necessary."[87]

- Gov. Michelle Lujan Grisham (New Mexico): "This is quite frankly an instruction to stay home."[88]

- Gov. Kate Brown (Oregon): "Stay Home, Save Lives."[89]

- Gov. Ralph Northam (Virginia): "Our message to Virginians is clear: stay home."[90]

80.     Although statewide "stay home" orders generally authorized residents to shop outside the home for essential items if necessary, prominent health officials encouraged consumers to shop online to protect themselves and arrest the spread of COVID-19. In this regard, during the pandemic the CDC advised all Americans to "[o]rder food and other items online for home delivery or curbside pickup (if possible)" and to "[o]nly visit the grocery store, or other stores selling household essentials, in person when you absolutely need to," as "[t]his will limit your potential exposure to others and the

---

[85] *See* VTDigger, *'Stay home,' Scott orders; relief measures pass,* Vt. Cmty. Newspaper Grp. (updated Apr. 2, 2020), https://www.vtcng.com/state_and_world/state_news/stay-home-scott-orders-relief-measures-pass/article_4a53daee-6f74-11ea-9b66-ef84b25aca39.html.

[86] *See* Austin Jenkins & Tom Banse, *Washington Gov. Inslee Announces Statewide Stay-At-Home Order*, OPB (Mar. 23, 2020), https://www.opb.org/news/article/washington-governor-inslee-coronavirus-stay-at-home-order/.

[87] *See* Gov. Chris Sununu (@GovChrisSununu), Twitter (Mar. 26, 2020, 12:04 PM), https://twitter.com/govchrissununu/status/1243252555599265792.

[88] *See* Dan McKay (@mckaydan), Twitter (Mar. 23, 2020, 2:30 PM), https://twitter.com/mckaydan/status/1242201996028870656.

[89] *See* Or. Exec. Order No. 20-12 (Mar. 23, 2020), https://govsite-assets.s3.amazonaws.com/jkAULYKcSh6DoDF8wBM0_EO%2020-12.pdf.

[90] *See* Gov. Ralph S. Northam, Press Release, *Governor Northam Issues Statewide Stay at Home Order* (Mar. 30, 2020), https://www.governor.virginia.gov/newsroom/all-releases/2020/march/headline-855702-en.html.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

virus that causes COVID-19."[91] As for individuals sick with COVID-19, or potentially exposed, the CDC instructed as follows: "Do not leave your home, except to get medical care. Do not visit public areas."[92]

**C.    Hoarding and Retail Scarcity**

81.    The ability to shop outside the home was further curtailed, particularly in the early stages of the pandemic (but also in subsequent waves), by hoarding and retail scarcity. As COVID-19 spread through the United States, and government efforts to combat the virus intensified, consumers began to stockpile essential items. By late January 2020, there were already reports that consumers were buying out retail stock of surgical masks and N95 respirators.[93] The research firm Nielsen found that the sale of medical supplies and rubbing alcohol surged nearly twenty percent after the first reported case of COVID-19 in the United States on January 30, 2020.[94]

82.    In February and March 2020, the reports of stockpiling, scarcity, and hoarding escalated. Nielsen found that sales of medical supplies and rubbing alcohol jumped 65 to 85 percent after there was a report of person-to-person transmission of COVID-19 on February 29. The firm also found that powdered milk sales jumped 85 percent, and rice and bean sales increased 25 to 37 percent.[95] For the week ending on March 7, 2020, compared to the same week a year earlier, sales of hand sanitizer, aerosol disinfectants, and multipurpose cleaners were 470, 385.3, and 148.2 percent higher,

---

[91] *See* Centers for Disease Control & Prevention, *Coronavirus Disease 2019 (COVID-19): Running Essential Errands* (updated July 30, 2020), https://stacks.cdc.gov/view/cdc/91347/ cdc_91347_DS1.pdf (last visited June 19, 2021).

[92] *See* Centers for Disease Control & Prevention, *What to Do If You Are Sick* (updated Mar. 17, 2021), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html (last visited Oct. 22, 2021).

[93] *See* Scottie Andrew, *There's been a run of surgical masks in the US because of the coronavirus scare. You don't need them, physicians say*, CNN (updated Jan. 28, 2020), https://www.cnn.com/2020/01/28/health/coronavirus-us-masks-prevention-trnd/index.html.

[94] *See* Michael Finney & Randall Yip, *Coronavirus impact: Why shoppers are hoarding toilet paper, supplies and groceries*, ABC 7 NEWS (Mar. 18, 2020), https://abc7news.com/hoarding-buying-frenzy-empty-grocery-shelves-toilet-paper-shortage/6025373/.

[95] *Id.*

SECOND AMENDED CLASS ACTION COMPLAINT – 31
010923-11/2753066 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

respectively.[96] In keeping, on March 18, a news station in the San Francisco Bay Area posted an article online, "Coronavirus impact: Why shoppers are hoarding toilet paper, supplies and groceries."[97] The article discussed "one of the most visible reaction[s] to the coronavirus – empty shelves at the grocery stores," and interviewed a local shopper who had gone to a large grocery store hoping to buy paper towels and toiletries, but came away with nothing.[98] The article's authors interviewed a marketing professor, Michal Strahilevitz, to explain the hoarding and scarcity: "when something becomes scarce, everybody wants more of it because they're afraid next time . . . [t]here won't be any toilet paper at all."[99]

83.     On March 13, 2020, the NEW YORK TIMES reported that shoppers were "flood[ing] stores across the nation and emptied shelves, looking to stockpile groceries and household items to prepare for uncharted territory."[100] "They grabbed milk and aspirin, paper towels and spaghetti. Cans of soup and bottles of laundry detergent. Olive oil and sanitizing wipes. With futures suddenly thrust into the unknown, they did what felt reassuring: panic shop."[101]

84.     A second wave of COVID-19 cases in November 2020 brought a second wave of hoarding and retail scarcity. On November 17, the NEW YORK POST reported that, "[w]ith COVID-19 cases surging across the US, panic buying is back in vogue — as evidenced by a sea of empty shelves in supermarkets across the nation in scenes reminiscent of earlier this year, according to reports."[102]

---

[96]  *See* Camila Domonoske & Avie Schneider, *Here's What's Been Flying Off Store Shelves*, NPR (Mar. 16, 2020), https://www.npr.org/2020/03/16/816404689/spiking-demand-for-sanitizer-canned-goods-leaves-stores-struggling-to-keep-up.

[97]  *See* Finney & Yip, *supra* note 94.

[98]  *Id.*

[99]  *Id.*

[100] *See* Corina Knoll, *Panicked Shoppers Empty Shelves as Coronavirus Anxiety Rises*, N.Y. TIMES (Mar. 13, 2020), https://www.nytimes.com/2020/03/13/nyregion/coronavirus-panic-buying.html.

[101] *Id.*

[102] *See* Yaron Steinbuch, *COVID-19 panic buying: Toilet paper, essentials fly off shelves again*, N.Y. POST (updated Nov. 17, 2020), https://nypost.com/2020/11/17/covid-19-panic-buying-toilet-paper-essentials-fly-off-shelves/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

1

**D.      Consumers Turn Increasingly to Online Purchasing, and Amazon in Particular**

2

85.      In response to retail shortages and to limit exposure to the coronavirus, more consumers

3

have been doing their shopping online, increasing consumer demand and reliance on online retailers.

4

According to a Nielsen survey, in mid-March 2020, when the concerns over COVID-19 transmission

5

rapidly escalated, approximately "one-quarter of shoppers said they expected to shop online more

6

frequently—or for the first time—to avoid germs in public places."[103] The data confirm that this has

7

occurred. The following graph shows a large increase in March 2020 sales of consumer packaged

8

goods ("CPG"), in store and online as compared to the same month a year prior, with an astonishing

9

91 percent increase for online sales. In the two weeks ending on March 21, 2020 upwards of 35 percent

10

more people had shopped online for CPG items as compared with a typical week.[104]



[103] *See* NielsenIQ, *Tracking the unprecedented impact of COVID-19 on U.S. CPG shopping behavior* (Mar.  30,  2020),  https://nielseniq.com/global/en/insights/analysis/2020/tracking-the-unprecedented-impact-of-covid-19-on-u-s-cpg-shopping-behavior/.

[104] *See id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

86.     Data released by the Commerce Department shows that, overall, United States online "sales hit $791.70 billion in 2020, up 32.4% from $598.02 billion in the prior year."[105] As observers have noted, "[e]commerce thrived in 2020 because of store closures and shoppers' fear of contracting the coronavirus in public. And figures from Q1 2021 show that the coronavirus was still making an impact on retail spending. Online sales increased 39% year over year in Q1 2021, nearly triple the 14% increase in Q1 2020, and faster than Q3 2020 and Q4 2020."[106]

87.     An unprecedented demand on internet retailers has also led to product scarcity online, with some retailers out of stock and experiencing shipping problems, including large delays.[107] Consumers thus have become only more reliant on Amazon—the world's largest online retailer—for essential consumer goods. Indeed, by July 2020, Amazon's sales accounted for **almost half of all United States retail e-commerce**.[108] By comparison, Amazon's nine largest competitors had only a 1.1 to 6.6 percent share.[109]

88.     Industry observers have universally recognized that Amazon saw "unprecedented demand amid widespread coronavirus-related shutdowns."[110] As one observer put it, with "millions of Americans ordered to remain home, Amazon is now, more than ever, a lifeline for essentials for millions of people rather than just a convenient option for online shopping."[111] By April 2020,

---

[105] *See* Digital Commerce 360, *Coronavirus adds $105 billion to US ecommerce in 2020* (June 16, 2021), https://www.digitalcommerce360.com/article/coronavirus-impact-online-retail/.

[106] *See id.*

[107] *See* Katie Evans, *A viral surge: How the coronavirus is impacting shipping and delivery of online orders*, DIGITAL COMMERCE 360 (Mar. 20, 2020), https://www.digitalcommerce360.com/2020/03/20/a-viral-surge-how-the-coronavirus-is-impacting-shipping-and-delivery-of-online-orders/.

[108] *See* eMarketer, *Amazon Now Has Nearly 50% of US Ecommerce Market* (July 16, 2018), https://www.emarketer.com/content/amazon-now-has-nearly-50-of-us-ecommerce-market.

[109] *Id.*

[110] *See* Sergei Klebnikov, *Jeff Bezos Gets $6.4 Billion Richer As Amazon Stock Hits A New Record High*, FORBES (updated Apr. 14, 2020), https://www.forbes.com/sites/sergeiklebnikov/2020/04/14/jeff-bezos-gets-63-billion-richer-as-amazon-stock-hits-a-new-record-high/.

[111] *See* Jason Del Rey, *Amazon was already powerful. The coronavirus pandemic cleared the way to dominance.*, VOX (Apr. 10, 2020), https://www.vox.com/recode/2020/4/10/21215953/amazon-fresh-walmart-grocery-delivery-coronavirus-retail-store-closures.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

consumer spending on Amazon had increased nearly 100 percent over 2019.[112] Fueled by the pandemic, Amazon's sales increased $318.41 billion over 2020 as a whole, a 44.1% increase that eclipsed already bullish forecasts for Amazon's growth.[113]

89.     One reason Amazon has seen its sales increase is that it can supply essential goods that are not always available on retail shelves in the COVID-19 era. And in terms of product diversity, Amazon sells twelve million products on the Amazon.com platform, with a particularly large range of consumer goods.[114] In 2018, it was estimated that Amazon had 1.5 billion items listed for sale and over 200 million users.[115]

90.     On March 4, 2020, Senator Edward J. Markey (D-Massachusetts) wrote a letter to Amazon CEO Jeff Bezos about reports of price gouging on Amazon.[116] He stated that "[i]nternet-based retailers such as Amazon.com have a particular responsibility to guard against price gouging in current circumstances as consumers—who are finding the shelves of local brick-and-mortar stores bare, and who may wish to avoid venturing into crowded stores and shopping malls—turn to the internet."[117] Consistent with Senator Markey's observation, and heeding the official guidance described above, consumers turned to Amazon—the world's dominant online retailer—throughout the pandemic to obtain the goods they required to survive and endure.

---

[112] *See* Facteus, *Facteus Insight Report on Consumer Spending and Transactions (FIRST)* (June 3, 2020), https://first.facteus.com/reports/first-report-6-3-2020 (last visited Oct. 22, 2021).

[113] *See* Blake Droesch, *Amazon dominates US ecommerce, though its market share varies by category*, EMARKETER (Apr. 27, 2021), https://www.emarketer.com/content/amazon-dominates-us-ecommerce-though-its-market-share-varies-by-category.

[114] *See* 60pi, *How Many Products Does Amazon® Carry?* (May 2016), https://0ca36445185fb449d582-f6ffa6baf5dd4144ff990b4132ba0c4d.ssl.cf1.rackcdn.com/IG_360piAmazon_9.13.16.pdf; Amazon store directory, https://www.amazon.com/gp/site-directory?ref_=nav_em_T1_0_2_2_36__fullstore (last visited July 2, 2020).

[115] *See* Neel Mehta et al., *Amazon changes prices on its products about every 10 minutes – here's how and why they do it*, BUSINESS INSIDER (Aug. 10, 2018), https://www.businessinsider.com/amazon-price-changes-2018-8.

[116] *See* Sen. Edward J. Markey, Letter to Jeffrey P. Bezos, Amazon.com, Inc. (Mar. 4, 2020), https://www.markey.senate.gov/imo/media/doc/letter%20to%20Bezos%20re%20coronavirus%20price-gouging.pdf (last visited July 2, 2020).

[117] *Id.*

HAGENS BERMAN

1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

E.    **Amazon Raised Prices Excessively During the COVID-19 Pandemic**

91.    As the world's largest online retailer, Amazon maintains its own inventory of products, which it sells directly to consumers across the country. These Amazon-supplied products account for approximately 32 percent of the revenue from of all products sold on Amazon.[118] In addition, Amazon sells products provided by third-party suppliers. These third-party product sales account for approximately 68 percent of the sales revenue on the Amazon.com platform.[119]

92.    As the COVID-19 pandemic spread, Amazon's prices for many essential goods spiked dramatically. In his March 4, 2020 letter to Amazon CEO Jeff Bezos, Senator Markey described "disturbing news reports of coronavirus-inspired price gouging on Amazon.com," including that bottles of Purell hand sanitizer, "typically sold for less than $10 per box," were "listed at $400," and similarly inflated prices existed for face masks.[120] Senator Markey explained that, as "first steps," Amazon had announced the prior week that it had removed listings for price gouging and reiterated that third-party suppliers must comply with Amazon's "fair pricing policies," but that there had been "continued reports of price gouging and a lack of transparency," which left consumers exposed to unfair trade practices.[121] He referenced a third-party Amazon supplier whose goods were sold on Amazon and described Amazon's enforcement policy as "haphazard."[122]

93.    On March 11, 2020, the United States Public Interest Research Group Education Fund ("PIRG") published a study showing that prices for half of certain public-health products sold on Amazon—particularly, products in high demand during the COVID-19 crisis—had increased by more than 50 percent in February above their 90-day average.[123] These price increases were not limited to products supplied by third parties. Of the essential products PIRG evaluated, nearly one in six supplied by Amazon itself increased in price by more than 50 percent above the 90-day average.

---

[118] *See* eMarketer, *supra* note 108.

[119] *Id.*

[120] *See* Markey, *supra* note 116.

[121] *Id.*

[122] *Id.*

[123] *See* U.S. Pub. Interest Research Grp. Ed. Fund, *supra* note 9.

SECOND AMENDED CLASS ACTION COMPLAINT – 36
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

94.     Referencing the PIRG study, attorneys general from 33 states sent Amazon a letter on March 25, 2020, calling on Amazon to eliminate price gouging on its platform. The attorneys general, including Washington's, noted that "[a]s COVID-19 spreads throughout the country, it is especially important unscrupulous sellers do not take advantage of Americans by selling products at unconscionable prices."[124] The letter implored Amazon to take action to abide by and enforce "the nation's consumer protection laws."[125]

95.     Other industry observers have analyzed Amazon's pricing data and concluded that Amazon "doubled its own prices on essential goods as the COVID-19 pandemic grew between early January and mid-March [2020]."[126] At one point in March 2020, observers noted, Amazon "listed a four-pack of its own brand of toilet paper for $72."[127] Consumers confirmed these unconscionable prices, reposting the listings online hoping to warn others that Amazon itself was "participating in price gouging":[128]

---

[124] *See* Letter from 33 state attorneys general to Jeff Bezos (Mar. 25, 2020), https://www.attorneygeneral.gov/wp-content/uploads/2020/03/03_25_2020_Multistate-letter.pdf.

[125] *Id.*

[126] *See* Adam Walser, *Data shows Amazon raised prices during pandemic alongside sellers accused of price gouging*, ABC 10 NEWS (updated Mar. 28, 2020), https://www.10news.com/news/coronavirus/data-shows-amazon-raised-prices-during-pandemic-alongside-sellers-accused-of-price-gouging.

[127] *Id.*

[128] *See* u/cpotter, *Amazon themselves participating in price gouging. $72 for toilet paper.*, REDDIT (Mar. 14, 2020), https://www.reddit.com/r/mildlyinfuriating/comments/fiuwuo/amazon_themselves_participating_in_price_gouging/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16



6  Amazon themselves participating in price gouging. $72 for toilet paper.
i.imgur.com/XnEcvJ... ⌐

17    96.    A September 2020 study by Public Citizen confirmed that, "[w]hile the initial media

18 and law enforcement focus of price gouging was on third-party sellers, . . . Amazon is directly selling

19 items at significantly above the regular market price despite publicly stating that the company is

20 fighting price gouging."[129] Public Citizen identified pandemic price increases by Amazon on its own

21 inventory that ranged from 48% to 1,010%.[130] The study concluded that "Amazon has misled the

22 public, law enforcement, and policymakers about price increases during the pandemic."[131] The study

23 identified examples of price gouging as follows:

24        Note: All products in this section were listed as "sold by Amazon," and not
          sold by third-party vendors.

25

26    _____

[129] Public Citizen, *supra* note 10 at 12.

27 [130] *Id.*

28 [131] *Id.* at 4.

SECOND AMENDED CLASS ACTION COMPLAINT – 38
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Figure 1: Examples of Price Gouging on Products Sold by Amazon

| Product | Amazon Price | Expected Price | Date Range | % Increase |
|---|---|---|---|---|
| Disposable Face Masks, package of 50 | $39.99 | ~$4.00 | April 1 – Aug. 16 | 1000% |
| Hand Sanitizer | $35.38 | ~$24.00 | May 10 – Aug. 16 | 48% |
| Disinfectant Spray | $13.04 | $6.99 | Aug. 1, 2019 – Aug. 16, 2020 | 87% |
| Antibacterial Soap | $7.00 | $1.49 | May 19 – Aug. 16, 2020 | 470% |
| Nitrile Disposable Gloves | $29.95 | $8.91 | Aug. 1, 2019 – Aug. 2020 | 336% |
| Toilet Paper | $36.39 | $6.89 | May 26 – Aug. 16, 2020 | 528% |
| Paper Towels | $46.94 | $15.49 | May 1 – Aug. 16, 2020 | 303% |
| Flour | $80.35 | $18.88 | May 1 – Aug. 16, 2020 | 425% |
| Sugar | $5.56 | $1.07 | May 1 – Aug. 16, 2020 | 520% |
| Corn Starch | $8.99 | $0.89 | Feb. 1 – Aug. 16, 2020 | 1010% |

SOURCE: AUTHOR OBSERVATIONS OF PRICES AT AMAZON.COM, KEEPA.COM
CAMELCAMELCAMEL.COM AND OTHER RETAIL SITES AS NECESSARY.

97.     Although certain offending listings have been removed, Plaintiffs' independent investigation has confirmed that Amazon sold products at unlawfully inflated amounts during the COVID-19 crisis, including before and after Amazon claimed to have cracked down on price gouging, and Amazon continues to do so. Moreover, these price increases occurred both on products supplied by third parties and on products supplied by Amazon.

98.     Notably, both Mrs. King and Ms. Hanson were gouged on products supplied by Amazon directly. The Clorox Disinfecting Wipes that Mrs. King purchased at a 65% markup were supplied by Amazon (not a third party), as was the vegetable glycerin she purchased to make hand sanitizer (99% price increase). The flea spray that Ms. Hanson purchased at a 58% price increase was likewise supplied by Amazon. Additional examples of unconscionable price increases on Amazon's own inventory abound, including the following:

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

3
- **Aleve Back & Muscle Pain Tablet, Pain Reliever**: Increased *233 percent*, from $18.75 to $62.40, immediately after the January 31, 2020 declaration of a national emergency by the HHS.[132]



Aleve Back and Muscle Pain Tablets, Fast Acting All Day Targeted Relief for Headache, Muscle, and B-ack Pain, Naproxen Sodium Capsules, 220 mg, 250 Count

---

[132] *See* https://camelcamelcamel.com/product/B07WDK2Z85 (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B07WDK2Z85 (last visited Oct. 22, 2021).



- **Curad Alcohol Prep Pads:** Increases of more than *157 percent*, from less than $7 to $17.99, following the January 31, 2020 declaration of a national emergency by the HHS.[133]



Curad Alcohol Prep Pads , Thick Alcohol Swabs (Pack of 400) - CUR45585RB

---

[133] *See* https://camelcamelcamel.com/product/B00KOSP454 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **North 760008A Silicone Full Facepiece Respirators – Face Piece Only:** Increases of *61 percent*, from $169.02 to $271.79, following the January 31, 2020 declaration of a national emergency by the HHS.[134]



---

[134] *See* https://camelcamelcamel.com/product/B00142BRF0 (last visited Oct. 22, 2021);
https://keepa.com/#!product/1-B00142BRF0 (last visited Oct. 22, 2021).

SECOND AMENDED CLASS ACTION COMPLAINT – 42
010923-11/2753066 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Faraon Black Beans, 4 lb:** Increases up to *223 percent*, from $4.98 to $16.07, following the January 31, 2020 declaration of a national emergency by the HHS.[135]



[135] *See* https://camelcamelcamel.com/product/B07BBW3N81 (last visited Oct. 22, 2021);
*see also* https://keepa.com/#!product/1-B07BBW3N81 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Cold-EEZE Cold Remedy Lozenges Honey Lemon:** Increases of ***111 percent***, from $4.68 to $9.86 following the January 31, 2020 declaration of a national emergency by the HHS.[136]



[136] *See* https://camelcamelcamel.com/product/B000KOPX4O (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B000KOPX4O (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Lysol Disinfecting Wipes:** Increases exceeding *86 percent*, from less than $12 to $22.36, following the January 31, 2020 declaration of a national emergency by the HHS.[137]



---

[137] *See* https://camelcamelcamel.com/product/B00Q70RCW6 (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B00Q70RCW6 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Germ Guardian Pluggable Air Purifier & Sanitizer:** Increases of *91 percent*, from $34.99 to $66.99, following the January 31, 2020 declaration of a national emergency by the HHS.[138]



99.    Additional excessive price increases on Amazon's own inventory of products following the HHS' declaration of a national emergency include, but are not limited to, the following:

| OTHER PRICE INCREASES ON AMAZON INVENTORY DURING THE COVID-19 PANDEMIC | |
|---|---|
| **PRODUCT** | **PRICE INCREASE** |
| Clorox Hydrogen Peroxide Disinfecting Wipes | 217%[139] |
| Curad Alcohol Prep Pads | 176%[140] |

---

[138]  *See* https://camelcamelcamel.com/product/B000G2BESO (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B000G2BESO (last visited Oct. 22, 2021).

[139]  *See* https://camelcamelcamel.com/product/B00K3U1B64 (last visited June 30, 2021); *see also* https://keepa.com/#!product/1-B00K3U1B64 (last visited Oct. 22, 2021).

[140]  *See* https://keepa.com/#!product/1-B00KOSP454 (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B00KOSP454 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| | |
|---|---|
| Cottonelle Flushable Wet Wipes | 156%[141] |
| Dynarex Alcohol Prep Pad | 122%[142] |
| GoYoga Yoga Mat | ~99%[143] |
| Hibiclens Antibacterial / Antiseptic Skin Cleanser | 97%[144] |
| Aleve Arthritis Cap Pain Relief | ~90%[145] |
| Meyenberg Whole Powdered Goat Milk | 82%[146] |
| Spectrum Essential Organic Ground Flaxseed | 66%[147] |
| StarKist Chunk Light Tuna in Water | 59%[148] |
| Ice Mountain 199% Natural Spring Water | 54%[149] |
| Medline Iodine Pads | ~52%[150] |
| KIND Bars, Dark Chocolate Nuts & Sea Salt | 36%[151] |
| Tide PODS Free and Gentle Laundry Detergent | 30%[152] |
| 3M Full Facepiece Reusable Respirator 6700 | 23%[153] |

---

[141] *See* https://camelcamelcamel.com/product/B07B46WWN2 (last visited July 4, 2020). Price increase estimated based on data available July 4, 2020. Pricing history for this product is no longer available on camelcamelcamel.com.

[142] *See* https://keepa.com/#!product/1-B005BFL0RQ (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B005BFL0RQ (last visited Oct. 22, 2021).

[143] *See* https://camelcamelcamel.com/product/B01IZDFWY2 (last visited Oct. 22, 2021).

[144] *See* https://keepa.com/#!product/1-B00EV1D79A (last visited Oct. 22, 2021); https://camelcamelcamel.com/product/B00EV1D79A (last visited Oct. 22, 2021).

[145] *See* https://camelcamelcamel.com/Aleve-Arthritis-Naproxen-Reliever-Headache/product/B07ZV5V19T (last visited Oct. 22, 2021).

[146] *See* https://keepa.com/#!product/1-B004K69OMU (last visited Oct. 22, 2021); https://camelcamelcamel.com/product/B004K69OMU (last visited Oct. 22, 2021).

[147] *See* https://keepa.com/#!product/1-B00DOKFLYI (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B00DOKFLYI (last visited Oct. 22, 2021).

[148] *See* https://keepa.com/#!product/1-B00FWUO2IE (last visited Oct. 22, 2021).

[149] *See* https://keepa.com/#!product/1-B01KCNJHYO (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/Ice-Mountain-Natural-8-ounce-plastic/product/B01KCNJHYO (last visited Oct. 22, 2021).

[150] *See* https://camelcamelcamel.com/product/B075KKP2BR (last visited Oct. 22, 2021).

[151] *See* https://keepa.com/#!product/1-B07PMTGM3C (last visited Oct. 22, 2021); https://camelcamelcamel.com/product/B07PMTGM3C (last visited Oct. 22, 2021).

[152] *See* https://keepa.com/#!product/1-B07JMK7STT (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B07JMK7STT (last visited Oct. 22, 2021).

[153] *See* https://keepa.com/#!product/1-B007JZ1K1C (last visited Oct. 22, 2021); *see also* https://camelcamelcamel.com/product/B007JZ1K1C (last visited Oct. 22, 2020).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

100.    In addition to increasing prices on its own inventory during the COVID-19 pandemic, Amazon sold third-party-supplied products at vastly inflated prices and, by taking a share of the transaction proceeds, profited from the excess. Just by way of example:

- **Disposable 3-Layer Face Masks:** Increase of ***1,800 percent***, from $4.21 to $79.99, following the January 31, 2020 declaration of a national emergency by the HHS.[154]



---

[154] *See* https://camelcamelcamel.com/product/B07W13JQW9 (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

- **Arm & Hammer Pure Baking Soda, 5 lb.**: Increase of *1,523 percent*, from $3.08 to $50.00 following the January 31, 2020 declaration of a national emergency by the HHS.[155]



- **Dynarex Corporation Surgical Procedure Masks**: Increase of *376 percent*, from $11.71 to $55.78, following the January 31, 2020 declaration of a national emergency by the HHS.[156]



---

[155] *See* https://keepa.com/#!product/1-B00HNSJSX2 (last visited Oct. 22, 2021).

[156] *See* https://camelcamelcamel.com/Dynarex-Corporation-2201-50-Surgical-Procedure/product/ B00QO4MKN6 (last visited Oct. 22, 2021). Base price of $11.71 identified on camelcamelcamel.com as of July 4, 2020.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Disposable Earloop Face Masks:** Increases exceeding ***500 percent***, from less than $20 to $120, following the January 31, 2020 declaration of a national emergency by the HHS.[157]



- **Cold-EEZE Cold Remedy Lozenges Honey Lemon:** Increases of ***1,599 percent***, from less than $4.65 to $79.00, following the January 31, 2020 declaration of a national emergency by the HHS.[158]



---

[157] *See* https://camelcamelcamel.com/product/B078718WVB (last visited Oct. 22, 2021). Base price of less than $20 identified on camelcamelcamel.com as of July 4, 2020.

[158] *See* https://keepa.com/#!product/1-B000KOPX4O (last visited Oct. 22, 2021); *vsee also* https://camelcamelcamel.com/product/B000KOPX4O (Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

3       • **Goya Black Beans Dry 14 oz.:** Increases up to ***521 percent***, from $3.54 to $21.99, following

4       the January 31, 2020 declaration of a national emergency by the HHS.[159]

5       

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27       [159] *See* https://keepa.com/#!product/1-B00IMLRH9G (last visited Oct. 22, 2021). Amazon also sold
         its own inventory of this product in 2020 at prices up to $14.47, roughly four times the price
28       prevailing prior to the pandemic. *See id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **King Arthur Flour:** Increases up to ***400 percent***, from $22.00 to $110.00, following the January 31, 2020 declaration of a national emergency by the HHS.[160]



---

[160] *See* https://camelcamelcamel.com/product/B078P9TBNW (last visited Oct. 22, 2021); *see also* https://keepa.com/#!product/1-B078P9TBNW (last visited Oct. 22, 2021). Amazon sold its own inventory of this product during 2020 at prices exceeding $70, roughly three times the pre-pandemic price. *See* https://camelcamelcamel.com/product/B078P9TBNW (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Logitech HD Pro Webcam C920:** Increase of at least ***423 percent***, from less than $65.99 to $345, following the January 31, 2020 declaration of a national emergency by the HHS.[161]



[161] *See* https://camelcamelcamel.com/product/B006JH8T3S (last visited Oct.22, 2021);
*see also* https://keepa.com/#!product/1-B006JH8T3S (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- **Ivermectin**: Although not approved by the FDA or WHO 9, the antiparasitic drug Ivermectin has been promoted in certain circles as a treatment for COVID-19 and an alternative to vaccines. Demand for the drug increased in 2021, and prices on Amazon skyrocketed. For example, an injectable solution of Ivermectin manufactured by Noromectin was available on Amazon for $93.54 when, on January 31, 2020, the HHS declared a national emergency. By September of 2021, the price had reached $200, a ***114 percent*** increase.[162]



101.    Additional excessive price increases on third-party supplied Amazon sales include, but are not limited to, the following:

| OTHER PRICE INCREASES ON THIRD-PARTY-SUPPLIED PRODUCTS DURING THE COVID-19 PANDEMIC | |
| --- | --- |
| **PRODUCT** | **PRICE INCREASE** |
| Quilted Northern Ultra Plush Toilet Paper 18 Rolls | 1,044%[163] |

---

[162] *See* https://camelcamelcamel.com/product/B078YFPF64?context=search (last visited Oct. 22, 2022); *see also* https://keepa.com/#!product/1-B078YFPF64 (last visited Oct. 22, 2022).

[163] *See* https://keepa.com/#!product/1-B07F1KLYVH (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B07F1KLYVH (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| | |
|---|---|
| Nishiki Medium Grain Rice | 880%[164] |
| Lysol Disinfecting Wipes | ~745%[165] |
| Advil Coated Tablets Pain Reliever and Fever Reducer | 656%[166] |
| Curad Alcohol Prep Pads | 542%[167] |
| StarKist Chunk Light Tuna in Water | 517%[168] |
| Kraft Easy Mac Microwavable Macaroni and Cheese | 485%[169] |
| Barilla Pasta, Spaghetti | 381%[170] |
| Planters Salted Peanuts (48 Pack) | 368%[171] |
| Almond Milk | 330%[172] |
| Kraft Macaroni & Cheese | 315%[173] |
| Bounty Select-A-Size Paper Towels | 319%[174] |
| Chef Boyardee, Spaghetti & Meatballs | 295%[175] |
| Asian Best Jasmine Rice | 255%[176] |

---

[164] *See* https://keepa.com/#!product/1-B00852ZN2U (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B00852ZN2U (last visited Oct. 22, 2021).

[165] *See* https://camelcamelcamel.com/product/B00Q70RCW6 (last visited Oct. 22, 2021);
*see also* https://keepa.com/#!product/1-B00Q70RCW6 (last visited Oct. 22, 2021).

[166] *See* https://keepa.com/#!product/1-B0000VLK4O (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B0000VLK4O (last visited Oct. 22, 2021).

[167] *See* https://keepa.com/#!product/1-B00KOSP454 (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B00KOSP454 (last visited Oct. 22, 2021).

[168] *See* https://keepa.com/#!product/1-B00FWUO2IE (last visited Oct.22, 2021).
https://camelcamelcamel.com/product/B00FWUO2IE (last visited Oct. 22, 2021).

[169] *See* https://keepa.com/#!product/1-B005ECO3H0 (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B005ECO3H0 (last visited Oct. 22, 2021).

[170] *See* https://keepa.com/#!product/1-B00WBGKJPW (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B00WBGKJPW (last visited Oct. 22, 2021).

[171] *See* https://keepa.com/#!product/1-B004TPU7LO (last visited Oct.22, 2021);
*see also* https://camelcamelcamel.com/product/B004TPU7LO (last visited Oct. 22, 2021).

[172] *See* https://keepa.com/#!product/1-B07HL1NRGQ (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B07HL1NRGQ (last visited Oct. 22, 2021).

[173] *See* https://keepa.com/#!product/1-B011W21U0I (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B011W21U0I (last visited Oct. 22, 2021).

[174] *See* https://keepa.com/#!product/1-B010OW4KMW (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B010OW4KMW (Oct. 22, 2021).

[175] *See* https://keepa.com/#!product/1-B004XVZG1U (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B004XVZG1U (last visited Oct. 22, 2021).

[176] *See* https://keepa.com/#!product/1-B019VPL9OK (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B019VPL9OK (last visited Oct. 22, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

| Raven Powder-Free Disposable Black Nitrile 6 Mi. Gloves | 230%[177] |
| Kirkland Signature Dried Cherries, 20 Ounce | 153%[178] |
| Better Than Bouillon Organic Chicken Base | 119%[179] |
| Elder Berry Whole, dried 1lb | 67%[180] |
| Kirkland Signature Ibuprofen Liquid Softgels | 66%[181] |

**F.      Amazon is Responsible for Unlawful Price Increases on All Products Sold on Its Platform**

102.    Amazon is accountable for unlawfully increasing the prices on its own inventory of products sold or offered to consumers during the COVID-19 crisis. Amazon is also legally responsible for price gouging on the third-party products it markets to consumers. Far from serving as a passive intermediary, Amazon controls the sale and marketing of all third-party products on its platform and receives a portion of the transaction proceeds, typically around 15 percent of the sales price (in addition to assessing recurring fees on third-party suppliers).[182]

103.    Amazon's control over third-party products extends to pricing. For certain third-party products, Amazon retains complete control of the prices at which they are offered. In particular, third-party suppliers who enroll in Amazon's "Sold by Amazon" ("SBA") program are guaranteed a "hands off the wheel selling experience," through which Amazon retains absolute discretion to price and reprice third-party inventory however Amazon sees fit. In the SBA program, the third-party supplier is guaranteed revenue from the sale of its product on Amazon.com based on the Minimum Gross Proceeds ("MGP") price, which Amazon sets unilaterally. Moreover, whatever the MGP price may be,

---

[177] *See* https://keepa.com/#!product/1-B002XXO5US (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B002XXO5US (last visited Oct. 22, 2021).

[178] *See* https://keepa.com/#!product/1-B004CSGRS0 (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B004CSGRS0 (last visited Oct. 22, 2021).

[179] *See* https://keepa.com/#!product/1-B00415IRQO (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B00415IRQO (last visited Oct. 22, 2021).

[180] *See* https://keepa.com/#!product/1-B076JMVSW5 (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B076JMVSW5 (last visited Oct. 22, 2021).

[181] *See* https://keepa.com/#!product/1-B000VK2QPQ (last visited Oct. 22, 2021);
*see also* https://camelcamelcamel.com/product/B000VK2QPQ (last visited Oct. 22, 2021).

[182] *See* Dave Hamrick, *Amazon FBA Fees: How They Work and How to Profit as a Seller*, JUNGLESCOUT (Mar. 24, 2021), https://www.junglescout.com/blog/amazon-fba-fees/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  *the price listed for and sold to the Amazon consumer* is set solely by Amazon, and may be more or less

2  than the MGP price—it is controlled by Amazon.[183]

3  104.  In other cases involving "large or strategic" third-party suppliers, Amazon also

4  negotiates all pricing terms,[184] or negotiates most-favored-nation protections assuring that third-party

5  suppliers do not undercut Amazon's prices when offering their products through other retail outlets.[185]

6  105.  Amazon also offers third-party suppliers "Automated Pricing" services, whereby

7  Amazon will automatically adjust the prices for third-party-supplied products based on preset "rules"

8  Amazon makes available to the suppliers.[186] With Automated Pricing, Amazon generally adjusts the

9  pricing of third-party products to match or stay in some relationship to competitor prices.[187] This

10  service coordinates pricing across Amazon's platform. If competitive benchmarks increase for any

11  reason—including price gouging—Amazon adjusts all automatically priced products accordingly

12  across its ecosystem. If Amazon were concerned that certain products supplied by third parties were

13  being inflated compared to pre-emergency prices, it could have turned off its automatic repricing

14  software that set prices for specific products and sales beyond lawful limits.

15  106.  Even in instances where third-party suppliers retain some authority to set prices,

16  Amazon establishes the price ceiling and retains the ultimate right to reject a price. Amazon has a "fair

17  pricing policy" pursuant to which it "regularly monitors the prices" set by third-party suppliers.[188] If

18  Amazon identifies a price it considers too high relative to other prices (on or off Amazon's platform),

19

20  [183]  *See* John Robb, *The Amazon SBA Program (aka Sold by Amazon.com)*, ECOMCREW (Jan. 2020), https://www.ecomcrew.com/the-amazon-sba-program-aka-sold-by-amazon/.

21  [184]  *See Online Platforms and Market Power, Part 2: Innovation and Entrepreneurship: Hearing of*
22  *the H. Subcomm. on Antitrust, Commercial, & Admin. Law, Comm. on the Judiciary*, 116th Cong.
23  23 (July 16, 2019) (responses of Amazon to Questions for the Record), https://docs.house.gov/ meetings/JU/JU05/20190716/109793/HHRG-116-JU05-20190716-SD038.pdf.

24  [185]  *See id.* at 1.

25  [186]  *See* Amazon, *Create a Pricing Rule*, https://sellercentral.amazon.com/gp/help/external/help-page.html?itemID=201995750 (last visited July 1, 2021).

26  [187]  *See id.*

27  [188]  *See* Amazon, Amazon Marketplace Fair Pricing Policy,
28  https://sellercentral.amazon.com/gp/help/external/G5TUVJKZHUVMN77V (last visited July 1, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Amazon may, among other things, remove the offer or suspend the seller.[189] Amazon may also remove the product from the "Buy Box" (discussed *infra*), the vehicle through which nearly all Amazon products are sold.[190] Amazon also polices the price ceiling by suggesting that third-party sellers lower their prices.[191] In other instances, Amazon will unilaterally reduce the price of third-party-supplied products by providing the consumer with a "discount, which appears as a credit" in the consumer's account.[192] These "discounts" are provided exclusively by Amazon, not the third-party supplier.

107.    Beyond pricing, Amazon controls all other aspects of transactions involving third-party-supplied products. Consumers who purchase third-party products generally have no direct interaction with the third-party suppliers. Amazon promotes the products on its website, the contents of which Amazon controls entirely. Pursuant to the Amazon Services Business Solutions Agreement, which third-party suppliers are required to sign to have their products sold on Amazon.com, "Amazon has the right to determine, the design, content, functionality, availability and appropriateness of its websites, selection, and any product or listing in the Amazon Stores, and all aspects of each Service, including [a third-party supplier's] use of the same. Amazon may assign any of these rights or delegate any of its responsibilities."[193] The Agreement also grants Amazon a royalty-free, non-exclusive, worldwide right and license to commercially or non-commercially exploit in any manner the information provided by third-party suppliers.[194]

108.    When a consumer purchases a third-party supplied product, Amazon collects the order, shipping, and payment information from the customer, and it processes all payments. Amazon maintains the right to use mechanisms to rate, or allow shoppers to rate, these products and suppliers

---

[189] *See id.*

[190] *See id.*; *see also* H. Subcomm. on Antitrust, Commercial, & Admin. Law, *supra* note 184, at 23.

[191] *See* H. Subcomm. on Antitrust, Commercial, & Admin. Law, *supra* note 184, at 1-2.

[192] *See id.* at 25.

[193] *See* Amazon, *Amazon Services Business Solutions Agreement* at S-6, https://sellercentral.amazon.com/gp/help/external/G1791 (last visited July 1, 2021).

[194] *See id.* at 4.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and to make the ratings publicly available, which it frequently does at the time the consumer is considering purchase.[195]

109.    Most third-party-supplied products sold by Amazon are "Fulfilled by Amazon" or "FBA." This means Amazon warehouses the products at its own storage facilities. Amazon maintains electronic records tracking this inventory, which it can commingle with its own.[196] When a customer orders an FBA product, Amazon packages and ships the product directly, while handling customer service aspects of the transaction.[197] Amazon handles returns and reserves the right to fulfill customer returns with *any* "returned Amazon Fulfillment Units."[198] Amazon unilaterally determines which products may participate in the FBA program.[199]

110.    Amazon also reserves "sole discretion" to "cancel[]" listings of third-party suppliers' products or "remov[e]" suppliers' listing privileges for violation of Amazon policies,[200] to permanently "withhold any payments" to suppliers for engaging in, *inter alia*, "illegal activity" or repeated violations of Amazon's "Program policies,"[201] and to "accept, calculate, and process cancellations, returns, refunds, and adjustments for the benefit of customers."[202] Amazon prohibits third-party suppliers from sending unsolicited communications to customers, mandates that all communications

---

[195] *See id.* at S.1.2.

[196] *See id.* at F-4.

[197] *See* JungleScout, *The State of the Amazon Seller 2021* at 14, available at https://www.junglescout.com/amazon-seller-report/ (last visited July 1, 2021); *see also generally* Amazon Services Business Solutions Agreement, Fulfillment By Amazon Service Terms, *supra* note 193.

[198] *See* Amazon Services Business Solutions Agreement, *supra* note 193, at F-6.2.

[199] *See id.* at F-1.

[200] *See* Amazon, *Listing Restrictions*, https://sellercentral.amazon.com/gp/help/external/200832300 (last visited July 1, 2021).

[201] *See* Amazon Services Business Solutions Agreement, *supra* note 193, at 2.

[202] *See id.* at S-2.2.



must be sent through a service provided on the Amazon platform, and Amazon keeps a record of all correspondence using this service.[203]

111.    Amazon also controls the entire "shopping experience" on its platform, using proprietary ranking mechanisms to direct consumers to third-party products of Amazon's choosing. When a consumer searches for a generic product on Amazon—for example, "bleach"—the search results are curated and ranked by Amazon.[204] As any seller might, Amazon gives particular products prominence or "shelf space." Amazon does this not only by ranking search results, but also by assigning products certain designations, such as "Sponsored," or "Amazon's Choice," or "Best Seller," or "Amazon Prime."[205] The criteria for these designations is established by Amazon and, through them, Amazon places the weight of its brand behind particular third-party-supplied products.

112.    Amazon also determines which supplier will "win" particular transactions, effectively allocating sales between itself and different third-party suppliers without any meaningful involvement (or even knowledge) of the consumer. Specifically, from Amazon's general search results page, consumers can click on a particular product of interest and then are directed to a separate page for that product. Many suppliers—including both Amazon and third-party suppliers—provide the same products on Amazon and all of these suppliers share the same individual product page. Amazon pushes consumers to particular suppliers through a "Buy Box" at the top right corner of the product page. The Buy Box includes "Add to Cart" and "Buy Now" buttons for the supplier Amazon has chosen.[206] Only one supplier controls the Buy Box at any given point in time, and when users click the "Add to Cart"

---

[203] *See* Amazon, *Selling Policies and Seller Code of Conduct*, https://sellercentral.amazon.com/gp/help/external/help.html?itemID=G1801 (last visited July 1, 2021); Amazon, *Buyer-Seller Messaging Service Overview*, https://sellercentral.amazon.com/gp/help/external/help.html?itemID=202125900 (last visited July 1, 2021). Amazon also requires that its third-party suppliers release it and agree to indemnify, defend, and hold it harmless against any claim, loss, damage, settlement, cost, expense, or other liability arising from, *inter alia*, sales of the suppliers' products. *See* Amazon Services Business Solutions Agreement, *supra* note 193, at 6.1.

[204] Janger & Twerski, *The Heavy Hand of Amazon: A Seller Not a Neutral Platform*, 14 BROOKLYN J. CORP., FIN & COMM. LAW 259 (Oct. 2019), https://brooklynworks.brooklaw.edu/bjcfcl/vol14/iss2/3/.

[205] *Id.* at 264-65.

[206] *Id*. at 268.

SECOND AMENDED CLASS ACTION COMPLAINT – 60
010923-11/2753066 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   or "Buy Now" button, they are buying from that Amazon-selected supplier.[207] Over 90 percent of sales

2   on Amazon occur using the Buy Box.[208]

3        113.    Amazon allocates shares of the Buy Box such that the chosen supplier can change

4   throughout the day. Thus, a consumer who clicks "Add to Cart" for a particular product at 6:00 a.m.

5   may be purchasing a product supplied by Supplier X, while a consumer who clicks the same button

6   for the same product at 6:30 a.m. may be purchasing a product from Supplier Y, or a product supplied

7   by Amazon itself.[209] Thus, not only does Amazon control which supplied products will win

8   transactions, and how many transactions Amazon itself will supply, Amazon allocates these shares

9   down to the minute.

10        114.    Text at the bottom of the "Buy Box" gives consumers some information as to who the

11   supplier may be. The text generally states either "(1) sold by [name of third party] and shipped by

12   [name of third party]; (2) sold by [name of third party] and fulfilled by Amazon; or (3) sold and shipped

13   by Amazon." But the reality is that Amazon substitutes freely between suppliers after the sale.[210] As

14   noted above, most third-party-supplied products are "Fulfilled by Amazon" or "FBA." By default,

15   Amazon warehouses FBA products by product type, not by supplier. Unless a supplier opts out of this

16   program, and Amazon makes it disadvantageous to do so, all products of the same type are

17   "commingled."[211] Accordingly, when a consumer purchases, for example, Clorox Disinfecting Wipes

18   from Amazon, Amazon will generally fulfill this order from its commingled stock of Clorox

19   Disinfecting Wipes regardless of what "supplier" was identified at the time of sale. The actual product

20   the consumer receives could thus be one supplied by *any* third-party supplier, *or* by Amazon itself.

21   And again, Amazon choses whose product the consumer will receive without any input from the

22   consumer or third-party suppliers involved.

---

[207] *See* Leanna Zeibak, *How to Win the Amazon Buy Box in 2021*, TINUITI (Mar. 25, 2020), https://tinuiti.com/blog/amazon/win-amazon-buy-box/.

[208] *Id.*

[209] Janger & Twerski, *supra* note 204, at 270.

[210] *Id.* at 269.

[211] *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

115.    For all of the foregoing reasons, Amazon functions as the "seller" of all third-party-supplied products on its platform. At an absolute minimum, Amazon facilitates these sales. Not only does Amazon control pricing—either by fixing the price point or price ceiling—Amazon interacts directly with customers to execute transactions, promotes particular third-party-supplied products, and often fulfills orders from a commingled stock. Amazon controls the entire shopping experience on its platform, regardless of who supplies the products sold. Amazon is responsible when it sells third-party-supplied products at prices that exceed legal prohibitions on price gouging. Nothing is sold on Amazon, at any price, without Amazon's active participation and facilitation.

116.    Amazon cannot deflect blame on third parties for a separate but related reason—Amazon knew third-party suppliers would increase prices by unconscionable amounts during the pandemic, and knowingly allowed it to happen.

117.    As Amazon is aware, third-party suppliers have previously inflated prices to unlawfully capitalize on emergencies, most prominently during Hurricane Irma in 2017.[212] Moreover, wherever COVID-19 spread, it led to scarcity of essential consumer items and substantial price inflation. Amazon was on notice that the same dynamic would play out in the United States once the virus reached its shores, or even sooner.

118.    Price inflation on third-party-supplied products was not only foreseeable; Amazon *knew* that it was occurring in real time and has claimed to have longstanding rules and systems to prevent and stop price gouging as a violation of its "fair pricing" policies (those claims, as shown in this Second Amended Complaint, have been proven false). Amazon assiduously tracks pricing on its platform to best position itself in the marketplace. Amazon thus knew that prices on third-party-priced products were exceeding legal thresholds, often by unconscionable amounts. Amazon had an obligation to prevent this from occurring, and to stop it once it occurred, which Amazon could readily

---

[212] *See* Jennifer Calfas, *Amazon Is Removing $100 Packs of Water After Being Accused of Hurricane Irma Price Gouging*, MONEY (Sept. 7, 2017), https://money.com/amazon-bottled-water-price-gouging-hurricane-irma-florida/.



do by capping prices or, where necessary, excising offending third-party suppliers. Amazon retains contractual authority to take these very steps.[213]

119.    Amazon did not act, however, until late February 2020, when it first began to suspend and take down some (but not close to all) products priced excessively by third parties.[214] Moreover, while Amazon's actions made for good publicity, they did not effectively address—much less eliminate—the problem. Amazon continued to sell third-party priced products at unconscionably inflated prices, as the examples cited in this Second Amended Complaint demonstrate. Notably in this regard, after Amazon took its limited initial steps to address price gouging by third-party suppliers, Senator Markey commented on Amazon's claim that it was addressing price gouging, writing on March 4, 2020, that despite Amazon's purported efforts, there had been "continued reports of price gouging" on the platform.[215]

120.    As public outcry swelled, Amazon was compelled on March 23, 2020, to suspend 3,900 United States accounts associated with products Amazon offered at excessive prices.[216] On that same date, Amazon issued a blog post stating that it has "zero tolerance for price gouging" and claimed to have had "longstanding policies and systems to prevent this harmful practice."[217] But those assertions already had been proven false with the gouging ramping up and ongoing for months. And Amazon's actions, even at that point, were again inadequate. Just two days later, 33 attorneys general, including

---

[213] *See* Amazon Marketplace Fair Pricing Policy, *supra* note 188.

[214] *See* Annie Palmer, *Amazon cracks down on coronavirus price gouging and products making false claims*, CNBC (Feb. 27, 2020), https://www.cnbc.com/2020/02/27/amazon-cracks-down-on-coronavirus-price-gouging-false-claims.html.

[215] *See* Markey, *supra* note 116.

[216] *See* Josh Rivera, *Amazon removes more than 3,900 seller accounts from US store due to 'coronavirus-based price gouging'*, USA TODAY (updated Mar. 24, 2020), https://www.usatoday.com/story/money/2020/03/23/coronavirus-amazon-price-gouging-removed-accounts/2904729001/. In a letter to shareholders published on April 16, 2020, Amazon CEO Jeff Bezos indicated that Amazon had suspended "more than 6,000 selling accounts globally." Amazon Annual Report, Ex. 99.1 (2020), available at https://www.sec.gov/Archives/edgar/data/1018724/000119312520108427/d902615dex991.htm. The letter did not specify how many of these accounts were operating in the United States, or whether that number is any greater than the 3,900 United States accounts suspended previously.

[217] *See* Amazon, "Price gouging has no place in our stores," *supra* note 1.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Washington Attorney General Bob Ferguson, advised Amazon the "new protections" implemented by Amazon had "failed to remove unconscionably priced critical supplies during the COVID-19 pandemic."[218]

121.    Amazon should have had adequate systems in place long before COVID-19 reached the United States to monitor and eliminate price gouging on its platform. As 33 attorneys general have advised, Amazon should not simply react to third-party price inflation—it should have policies to "prevent unconscionable price increases from occurring in the first place."[219] Amazon has the technology and sophistication to do this. In a May 13, 2020 blog post, Amazon acknowledged that it maintains "dynamic automated technology to proactively seek out and pull down unreasonably priced offers."[220] Amazon did not, however, deploy this system proactively to prevent unlawful price increases.

122.    Ultimately, the most troubling aspect of Amazon's "efforts" to address third-party price gouging is not that they came late, or were ineffectual, or that Amazon profited on these sales, all of which is true; **it is that while Amazon actively publicized these efforts, Amazon itself continued to inflate prices on its own inventory of products in amounts that satisfy any definition of "price gouging."**

123.    Amazon also cannot attribute the price increases on its platform—on either goods supplied by third parties or Amazon itself—to increased costs. Putting aside that third parties' costs are not borne by Amazon, the price increases at issue, often topping 1000 percent, exceed any plausible cost increase in supplying the price-gouged goods. With prices escalating on its platform, Amazon's overall profits—accounting for any cost increases—skyrocketed during the pandemic, jumping 220 percent in the first three month of 2021 over the year prior.[221] In fact, the "high volume of orders during

---

[218]  *See* Letter from 33 state attorneys general, *supra* note 124.

[219]  *See id.*

[220]  *See* Brian Huseman, Amazon Vice President of Public Policy, *It's time for Congress to establish a federal price gouging law* (May 13, 2020), https://blog.aboutamazon.com/policy/its-time-for-congress-to-establish-a-federal-price-gouging-law.

[221]  *See* Karen Weise, NYT, *Amazon's profit soars 2020 percent as pandemic drives shopping online* (April 29, 2021), https://www.nytimes.com/2021/04/29/technology/amazons-profits-triple.html.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  the pandemic [] let Amazon operate more efficiently."[222] As analysts have observed, Amazon was able

2  to run its warehouses "closer to full capacity" such that while the number of products sold by Amazon

3  increased 44 percent during the first year of the pandemic, its "cost to fulfill those orders was up only

4  31 percent."[223]

5  **G.    End of Emergency Lockdowns**

6      124.    In the fall of October 2022 Washington and other states began to end their COVID-19-

7  related State of Emergency Orders. In May 2023, the Federal Public Health Emergency Order related

8  to Covid-19 expired.

9  **H.    Amazon Price-Gouged Its Way to Unprecedented Revenues During the COVID-19**
   **Crisis**

10     125.    With rampant price gouging, Amazon has exploited unprecedented consumer demand

11 during the COVID-19 pandemic to reap extraordinary profits. Amazon's 2020 first-quarter net sales

12 reached $75.5 billion, up 26 percent from the first quarter of 2019.[224] This means that through the first

13 quarter Amazon had generated $10,000 every second of every day in 2020. Amazon continued to profit

14 throughout the pandemic. Its 2020 revenues were up 38%, an increase of more than $100 billion, and

15 its net profits spiked a remarkable 84%.[225]

16     126.    Despite the stock market's collapse in early 2020, there was never a better time to be

17 an Amazon shareholder. As one leading analyst stated in April 2020:

18         [Amazon] has achieved a feat that many investors on Wall Street would
           regard as impossible in a stock market that's fallen sharply off its highs
19         this year. Amazon's shares have soared more than 40% in the past
           month alone to a new record high as of early afternoon trading on
20
21
22

23 [222] *Id.*

24 [223] *Id.*

25 [224] *See* Amazon, Press Release, *Amazon.com Announces First Quarter Results* (Apr. 30, 2020),
   https://s2.q4cdn.com/299287126/files/doc_financials/2020/Q1/Amazon-Q1-2020-Earnings-
26 Release.pdf.

27 [225] *See* Shelley E. Kohan, *Amazon's Net Profit Soars 84% With Sales Hitting $386 Billion*, FORBES
   (Feb. 2, 2021), https://www.forbes.com/sites/shelleykohan/2021/02/02/amazons-net-profit-soars-
28 84-with-sales-hitting-386-billion/?sh=51d2e1b71334.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    Thursday, giving the company a market value of more than $1.2
2    trillion.[226]

3    127.    Jeff Bezos, Amazon's president and CEO, has seen his personal fortune swell during

4    the COVID-19 pandemic. Among other assets, Mr. Bezos owns approximately an 11.2 percent stake

5    in Amazon. On April 14, 2020 alone, when Amazon stock surged more than 5 percent, Mr. Bezos's

6    fortune grew by some $6.3 billion. Overall, Jeff Bezos's personal wealth increased by $75 billion (or

7    approximately $205 million per day) as the pandemic raged throughout 2020.[227]

8                        **V.    CHOICE OF LAW ALLEGATIONS**

9    128.    There is no actual conflict between Washington law and the laws of the states in

10   which Plaintiffs reside—namely, California, Arizona, and North Carolina—on the claims alleged

11   herein. Price gouging is unlawful under statutes, and/or the common law, in each of these states.

12   129.    Accordingly, Washington law can apply to Plaintiffs' claims by virtue of a Washington

13   choice-of-law provision that is set forth in "conditions of use" that appear on Amazon's website. These

14   conditions of use are available to consumers when they sign up for an Amazon account and make

15   subsequent purchases. In pertinent part, the choice-of-law clause contained in the conditions of use

16   provides:

17          By using any Amazon Service, you agree that applicable federal law,
             and the laws of the state of Washington, without regard to principles of
18           conflict of laws, will govern these Conditions of Use and any dispute of
             any sort that might arise between you and Amazon.

19                        **VI.    CLASS ACTON ALLEGATIONS**

20   130.    Plaintiffs bring this proposed action on behalf of themselves and, pursuant to Rules

21   23(a), 23(b)(2) & 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class

22   (collectively, the "Class"):

23          All persons who purchased any consumer good or food item, including
             any listed on Appendix A, on Amazon.com between January 31, 2020
24           and October 20, 2022 whose price was set at an unfair level. The

25

26   _____

27   [226] *See* Nathan Reiff, *Amazon Earnings: What Happened*, INVESTOPEDIA (updated July 30, 2020),
         https://www.investopedia.com/amazon-earnings-4692665.

28   [227] *See* Taylor, *supra* note 4.



precise identification of unfair prices and when they were in place will
be refined after discovery and expert analysis.

131.    This class definition is conservative because, by the time of the HHS' January 31, 2020 emergency declaration, prices were already on the rise. Amazon was also aware long before January 31, 2020, that consumers were turning to online retail to safely obtain the consumer goods they required.

132.    Plaintiffs reserve the right to revisit the Class definition as to the products in the Class based upon information learned through discovery.

133.    Excluded from this proposed Class are Defendant; Defendant's affiliates and subsidiaries; Defendant's current or former employees, officers, directors, agents, and representatives; and the district judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members.

134.    This action may appropriately proceed as a class action because Plaintiffs seek injunctive relief that will apply to the Class as a whole and, further, because Plaintiffs will prove the elements of their damages claims with predominantly common evidence.

135.    **Numerosity:** The proposed Class includes thousands (and potentially millions) of consumers who paid unlawfully inflated prices for products on Amazon.com. The members of this Class are so numerous that individual joinder of all class members is impracticable. The precise number of class members is not available to Plaintiffs at this time, but the number and identity of individual class members can be ascertained from Amazon's books and records.

136.    **Commonality and Predominance:** Numerous questions of law and fact are common to the claims of the Plaintiffs and members of the proposed Class, and these common questions predominate over any questions affecting only individual class members. These include, but are not limited to:

(a)    Whether Amazon inflated prices during the COVID-19 pandemic;

(b)    Whether those price increases were "unfair" under the WCPA;

(c)    Whether Amazon unlawfully increased prices on its own inventory of products;

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1  (d)  Whether Amazon is liable for price increases on products supplied by third-

2     parties;

3  (e)  Whether Amazon exercised reasonable care to monitor and prevent price

4     inflation by third-party Amazon suppliers;

5  (f)  Whether and the extent to which consumers were harmed by unlawful price

6     increases on Amazon, and the extent of their damages;

7  (g)  The extent to which Amazon was enriched unjustly;

8  (h)  Whether Amazon should be subjected to punitive damages, and the appropriate

9     amount; and

10  (i)  Whether Plaintiffs are entitled to injunctive relief and the appropriate scope of

11     any equitable decree.

12  137. **Typicality:** Plaintiffs' claims are typical of the claims of all class members because,

13 among other things, all class members were comparably and similarly injured by Amazon's wrongful

14 conduct alleged herein. Plaintiffs, like all class members, purchased products from Amazon at prices

15 that were unlawfully inflated during the COVID-19 pandemic.

16  138. **Adequacy:** Plaintiffs will represent and protect the interests of the proposed Class

17 adequately and fairly. Plaintiffs have retained counsel competent and experienced in complex

18 class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed Class,

19 and their interests do not conflict with the interests of the proposed class members they seek to represent.

20  139. **Injunctive and declaratory relief:** By way of the conduct described in this Second

21 Amended Class Action Complaint, Defendant has acted on grounds that apply generally to the

22 proposed Class. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate

23 respecting the Class as a whole.

24  140. **Superiority:** A class action is superior to all other available methods for the fair and

25 efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in its

26 management. Even if members of the proposed Class could sustain individual litigation, that course

27 would not be preferable to a class action because individual litigation would increase the delay and

28 expense to the parties due to the complex factual and legal controversies present in this matter. Here,

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1   the class-action device will present far fewer management difficulties, and it will provide the benefit

2   of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further,

3   uniformity of decisions will be ensured.

### VII.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### VIOLATION OF WASHINGTON CONSUMER PROTECTION ACT ("WCPA") (WASH. REV. CODE § 19.86)

141.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

142.    The WCPA renders unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020.

143.    Although the WCPA does not define what constitutes an "unfair" act or practice, the prohibition must "be liberally construed" to ensure "that its beneficial purposes may be served." *Id.*

144.    The conduct of Amazon described above is "in violation of the public interest," and as such violates the WCPA.

145.    The conduct of Amazon described above offended public policy or is immoral, unethical, oppressive or unscrupulous and therefore violates the WCPA.

146.    Interpretation of the WCPA is informed, but not confined "by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters." *Id.* Section 5(a) of the Federal Trade Commission Act (FTC Act) (15 U.S.C. § 45) likewise prohibits "[u]nfair or deceptive acts or practices in or affecting commerce." An act or practice may be deemed unfair under the FTC Act if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n). Amazon's conduct also violates this test as well.

147.    A nationwide emergency related to COVID-19 was first declared by the HHS on January 31, 2020, and a national emergency existed by executive through May 11, 2023.[228] This

---

[228] *See* HHS, *supra* note 5. On March 13, 2020, President Trump followed the Health and Human Services Division by declaring a national emergency (effective March 1, 2020) pursuant to the

SECOND AMENDED CLASS ACTION COMPLAINT – 69
010923-11/2753066 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Second Amended Complaint's January 31, 2020, cut-off date for price-gouging is conservative because public alarm and retail hoarding were occurring prior to the January 31, 2020 emergency declaration. Amazon knew no later than January 31, 2020 (and likely far earlier) that there was increased demand for online retail, and its services in particular. Amazon had a responsibility not to gouge consumers who turned to online retail increasingly as a means of obtaining essential goods safely during an escalating and alarming public health crisis.

148.    Increasing prices excessively during a pandemic offends basic public policy and also is unethical, oppressive, and unscrupulous, and thus "unfair" for purposes of the WCPA. Indeed, it is difficult to imagine an act more unscrupulous than profiteering off a pandemic. As the Washington Attorney General stated when imploring Amazon to address price-gouging on its platform, "[a]s COVID-19 spreads throughout the country, it is important unscrupulous sellers do not take advantage of Americans by selling products at unconscionable prices."[229]

149.    Under the FTC Act framework, the price increases on the items listed in Appendix A are unfair because they cause substantial consumer injury, particularly where, as here, the increases were widespread, affecting potentially millions of consumers across the country and greatly affecting the public interest. Consumers lacked reasonable means to avoid their injuries, as the exorbitant prices they paid attest. And as detailed above, Plaintiffs looked elsewhere for the products they purchased, or alternatives, and found none.

150.    There are no countervailing consumer or competition benefits to price gouging. The only party that benefitted here was Amazon, which has reaped blockbuster profits by charging excessive prices throughout the pandemic. These were illicit profits, earned only by exploiting

---

National Emergencies' Act. *See* 85 Fed. Reg. 15,337 (2020), https://www.federalregister.gov/documents/2020/03/18/2020-05794/declaring-a-national-emergency-concerning-the-novel-coronavirus-disease-covid-19-outbreak. On February 24, 2021, President Biden extended the national emergency declaration for another year. *See* Pres. Joseph R. Biden, Jr., Letter to U.S. Congress (Feb. 24, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/24/a-letter-on-the-continuation-of-the-national-emergency-concerning-the-coronavirus-disease-2019-covid-19-pandemic/.

[229] *See* https://oag.dc.gov/sites/default/files/2020-03/Price-Gouging-Multistate-Letter-Amazon.pdf (last visited Oct. 21, 2021).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    consumers who have been forced to rely on Amazon to obtain essential goods during this

2    unprecedented public health crisis. Consumers do not "benefit" when they are forced to overpay for

3    the goods they need to remain safe and healthy.

4        151.    On information and belief, Amazon's price increases were not directly attributable to

5    additional costs imposed on Amazon by suppliers, and Amazon increased prices on many products in

6    excessive and unfair amounts even when accounting for any additional costs and the markup Amazon

7    customarily applies to such products.

8        152.    Amazon sells, and facilitates the sale of, all products available on Amazon.com. Thus,

9    Amazon is liable under the WCPA for all unlawful prices on its platform. This includes sales involving

10   Amazon's own inventory of products. It also includes sales involving products supplied by third

11   parties. Consumers purchasing third-party-supplied products interact almost exclusively with Amazon,

12   which, functioning as the seller, controls virtually all aspects of the transaction, including by

13   establishing a price ceiling, in many cases setting the specific selling price below that ceiling, and

14   maintaining final authority to remove any product listing. Amazon promotes third-party-supplied

15   products on its platform, including by offering them for sale through its "Buy Box," and otherwise

16   choosing to rank, curate, and give prominence to the sale of specific products. Amazon asserts effective

17   control over which supplied products will win transactions and how many products Amazon itself will

18   supply, and allocates these shares down to the minute. Amazon accepts payment when third-party-

19   supplied products are purchased and handles all material aspects of the transaction. As with any seller,

20   Amazon profits when it sells third-party-supplied products, collecting per-transaction and other fees.

21   And because Amazon's fees are tied to the purchase price, Amazon profits directly when third-party

22   products are sold at higher prices.

23       153.    For all of these reasons, and as elaborated further herein, Amazon causes and is

24   responsible for all price-gouging on its platform, including sales (or sales offers) involving third-party-

25   supplied products.

26       154.    As a direct and proximate result of Amazon's unfair business acts and practices,

27   Plaintiffs are entitled to injunctive relief and actual damages, trebled to the extent permitted under

28

1    Wash. Rev. Code § 19.86.090. Plaintiffs are also entitled to the cost of suit, including reasonable

2    attorney's fees.

3                                    **SECOND CAUSE OF ACTION**

4                                         **NEGLIGENCE**

5        155.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

6        156.    Amazon has a non-delegable duty to apply a level of reasonable care commensurate

7    with the foreseeable harms arising from its control, maintenance, and management of the largest online

8    retail platform in the world. This encompasses a duty to ensure that, during a declared public

9    emergency, consumer goods or food items are not sold on the platform at excessive prices.

10       157.    As the COVID-19 crisis emerged in January 2020, and even prior, it was foreseeable

11   that third-party suppliers on Amazon would attempt to inflate prices excessively for many goods

12   essential to enduring and combatting the public health crisis. Such price inflation has occurred on

13   Amazon's platform in prior emergencies, and was occurring wherever COVID-19 spread. Amazon

14   knew it would occur in response to COVID-19.

15       158.    Amazon has the ability, technological capacity, and contractual right to prevent price

16   gouging during a declared emergency. Amazon maintains complete control over its platform. It has

17   oversight on the prices of all products sold on the platform and, by contract with its third-party

18   suppliers, may unilaterally remove or suspend any listing priced excessively.

19       159.    Amazon, its agents, servants, and/or employees, failed to exercise ordinary care and

20   failed to comply with existing standards of care in the following acts and/or omissions:

21           •   Failing to maintain and/or implement systems to detect and cap price increases

22               by third-party suppliers;

23           •   Listing products with excessive price increases during the COVID-19

24               pandemic;

25           •   Failing to adequately investigate reports of excessive price inflation on third-

26               party-supplied products; and

27           •   Facilitating the listing, sale, and delivery of products priced at excessive levels

28               on its platform.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

160.    Given the foreseeability of price gouging during the COVID-19 pandemic, a reasonable online retailer in Amazon's position would have had systems in place to prevent price gouging from ever occurring, and would have taken prompt, aggressive steps to stamp it out entirely. Amazon did not do so. Despite Amazon's vast resources and sophistication, it lacked or failed to implement systems to prevent unlawful price increases on third-party-supplied products, and the acts Amazon ultimately did take to address price gouging came far too late, and were ineffectual.

161.    Amazon knew that, because of its failure to exercise reasonable care, consumers such as Plaintiffs would be overcharged.

162.    Amazon's negligence was the proximate cause and substantial factor in causing Plaintiffs' economic loss. Had Amazon exercised reasonable care, Plaintiffs would not have paid excessive amounts for products they purchased from Amazon. Plaintiffs are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### UNJUST ENRICHMENT

163.    Plaintiffs repeat and re-make every allegation above as if set forth herein in full.

164.    Amazon has exploited vulnerable consumers by selling, and offering for sale, products at excessive prices during COVID-19 pandemic. Facing retail scarcity and official warnings as to the risks of public interaction, consumers have turned to Amazon as a lifeline to obtain goods vital to their safety, health, and well-being. Basic principles of equity, justice, and fair dealing, prohibit sellers from capitalizing on such exigencies to charge consumers excessive prices.

165.    By selling consumer goods and food items at excessive and inflated prices during the COVID-19 pandemic, Amazon was unjustly enriched. Amazon profited on both the sale of its own inventory as well as products supplied by third parties, for which Amazon retains a portion of the transaction proceeds. All of these inflated profits were conferred by Plaintiffs and the class they seek to represent, and retained unjustly by Amazon.

166.    In selling goods at excessive prices during a public health crisis, Amazon knew that it was overcharging consumers, that consumers would be harmed, and that by retaining the sale proceeds Amazon would be unjustly enriched.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    167.    Amazon has no contractual or other right to charge Plaintiffs' or the proposed class the

2  excessive prices identified in this Second Amended Complaint. Any contract purporting to authorize

3  Amazon's price gouging, as herein alleged, would be unenforceable and void.

4    168.    In the event Plaintiffs lack an adequate remedy at law, Amazon is required to make

5  restitution in equity pursuant to the common law of unjust enrichment.

6                                **PRAYER FOR RELIEF**

7        WHEREFORE, Plaintiffs respectfully request the following relief on their own behalf and on

8  behalf of all those similarly situated:

9        A.    That the Court certify the proposed Class and appoint Plaintiffs as Class representatives

10  and their counsel as Class counsel;

11        B.    That the Court award them and the proposed Class all appropriate relief, to include, but

12  not be limited to, treble damages, restitution, and injunctive relief prohibiting Amazon from forever

13  engaging in the wrongful conduct alleged herein, which has harmed Plaintiffs, the Class, and the public

14  at large;

15        C.    That the Court grant such additional orders or judgments as may be necessary to remedy

16  or prevent the unlawful practices complained of herein;

17        D.    That the Court award them and the proposed Class reasonable attorneys' fees, costs,

18  and pre- and post-judgment interest;

19        E.    That the Court impose punitive damages; and

20        F.    That the Court award them and the proposed Class such other, favorable relief as may

21  be available and appropriate under federal or state law, or at equity.

22                                **JURY TRIAL DEMANDED**

23        Plaintiffs demand a trial by jury on all issues so triable.

24

25

26

27

28



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    DATED: September 20, 2024            Respectfully submitted,

2                                        HAGENS BERMAN SOBOL SHAPIRO LLP

3                                        By /s/ Steve W. Berman
                                            Steve W. Berman (WSBA #12536)
4                                        1301 Second Avenue, Suite 2000
                                         Seattle, Washington 98101
5                                        Telephone: (206) 623-7292
                                         Facsimile: (206) 623-0594
6                                        Email: steve@hbsslaw.com

7
                                         Ben Harrington (*pro hac vice*)
8                                        Benjamin J. Siegel (*pro hac vice*)
                                         715 Hearst Avenue, Suite 202
9                                        Berkeley, California 94710
                                         Telephone: (510) 725-3000
10                                       Facsimile: (510) 725-3001
                                         Email: benh@hbsslaw.com
11                                       Email: bens@hbsslaw.com

12
                                         *Attorneys for Plaintiffs and the Proposed Class*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CLASS ACTION COMPLAINT – 75
010923-11/2753066 V1



1

## APPENDIX A

2

### PRODUCTS IN THE CLASS BEFORE
### FURTHER DISCOVERY AND EXPERT ANALYSIS

3

4

- 3M Full Facepiece Reusable Respirator 6700

5

- Almond Milk

6

- Baking Soda, including Arm & Hammer Pure Baking Soda

7

- Barilla Pasta, Spaghetti

8

- Better Than Bouillon Organic Chicken Base

9

- Black Beans, including Faraon Black Beans, Goya Black Beans Dry 14 oz.

10

- Bleach, including Clorox Concentrated Germicidal Bleach

11

- Bottled water, including Ice Mountain 199% Natural Spring Water and Smartwater distilled water

12

- Chef Boyardee, Spaghetti & Meatballs

13

- Cold Remedies, including Cold-EEZE Cold Remedy Lozenges Honey Lemon

14

- Cottonelle Flushable Wet Wipes

15

- Curad Alcohol Prep Pads

16

- Disinfectant Wipes, including CaviWipes, Clorox Commercial Solutions Disinfecting Wipes, Clorox Hydrogen Peroxide Disinfecting Wipes, and Lysol Disinfecting Wipes

17

18

- Disposable Gloves, including Raven Powder-Free Disposable Black Nitrile 6 Mi. Gloves

19

- Dynarex Alcohol Prep Pad

20

- Dynarex Corporation Surgical Procedure Masks

21

- Elder Berry Whole, dried 1lb

22

- Face Masks, including Disposable 3-Layer Masks, and Disposable Earloop Face Masks

23

- Flour, including King Arthur Flour

24

- Germ Guardian Pluggable Air Purifier & Sanitizer

25

- GoYoga Yoga Mat

26

- Hibiclens Antibacterial / Antiseptic Skin Cleanser

27

- Ivermectin

28

- KIND Bars, Dark Chocolate Nuts & Sea Salt

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1     •   Kirkland Signature Dried Cherries, 20 Ounce

2     •   Kraft Easy Mac Microwavable Macaroni and Cheese

3     •   Kraft Macaroni & Cheese

4     •   Logitech HD Pro Webcam C920

5     •   Marachan Beef Ramen Noodles

6     •   Medline Iodine Pads

7     •   Meyenberg Whole Powdered Goat Milk

8     •   North 760008A Silicone Full Facepiece Respirators – Face Piece Only

9
•   Pain Relievers, including Advil Coated Tablets Pain Reliever and Fever Reducer, Aleve Arthritis Cap Pain Relief, Aleve Back & Muscle Pain Tablets, and Kirkland Signature Ibuprofen Liquid Softgels
10

11     •   Paper Towels, including Bounty Select-A-Size Paper Towels

12     •   Planters Salted Peanuts (48 Pack)

13
•   Rice, including Asian Best Jasmine Rice, RiceSelect Jasmati Rice, and Nishiki Medium Grain Rice
14

15     •   Spectrum Essential Organic Ground Flaxseed

    •   StarKist Chunk Light Tuna in Water
16

17     •   Tide PODS Free and Gentle Laundry Detergent

    •   Toilet Paper, including Quilted Northern Ultra Plush Toilet Paper 18 Rolls
18

19     •   Vegetable Glycerin, including NOW Solutions Vegetable Glycerin

    •   Yeast, including Red Star Active Dry Yeast
20

21     •   Zodiac Flea & Tick Spray

22

23

24

25

26

27

28



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX